# Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


CASE NO. 4:22-cv-10685-SDK-CI

Hon. Shalina D. Kumar


JOHNNY SABBAG, individually and

on behalf of all others similarly

situated,

              Plaintiffs,

vs.

GANNETT CO.,

              Defendant.

_____


REMOTE 30(b)(6) VIDEO DEPOSITION OF

GANNETT CO., INC. THROUGH DEPONENT HELEN TRASK

June 4, 2024


REPORTED BY:

Laura H. Nichols

Certified Realtime Reporter,

Registered Professional

Reporter and Notary Public

JOB No. 6733693

Page 1

A P P E A R A N C E S

FOR THE PLAINTIFF AND THE PUTATIVE CLASS:

 Mr. Frank S. Hedin

 Attorney at Law

 Hedin LLP

 1395 Brickell Avenue, Suite 1140

 Miami, Florida 33131

 (305) 357-2107

 fhedin@hedinllp.com

-and-

 Mr. Philip L. Fraietta

 Attorney at Law

 Bursor & Fisher, P.A.

 1330 Avenue of the Americas, 32nd Floor

 New York, New York 10019

 (646) 837-7150

 pfraietta@bursor.com

Page 2

A P P E A R A N C E S   (Continuing)


FOR THE DEFENDANT:

Mr. Jad Sheikali

Attorney at Law

Honigman LLP

2290 First National Building

660 Woodward Avenue

Detroit, Michigan 48226-3506

(313) 465-7000

jsheikali@honigman.com


OTHERS PRESENT:

Mr. David Nordheimer, Videographer

Veritext Legal Solutions

Page 3

INDEX OF EXAMINATION

                                              Page:

GANNETT CO., INC.                                11
(THROUGH DEPONENT HELEN TRASK)
EXAMINATION BY MR. HEDIN                          11
EXAMINATION BY MR. SHEIKALI                      131
REEXAMINATION BY MR. HEDIN                       141
REEXAMINATION BY MR. SHEIKALI                    143
REEXAMINATION BY MR. HEDIN                       144

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

INDEX OF PLAINTIFFS' EXHIBITS

Number                                                        Page

Exhibit 17    Plaintiff's Notice of Rule           12
              30(b)(6) Deposition of
              Defendant Gannett Co.

Exhibit 18    Article:  Gannett Introduces         20
              USA Today Network, Uniting
              Local, National Properties

Exhibit 19    GICS, Johnny Sabbag                  22

Exhibit 20    Excel:  Database file,               49
              Bates Number 364

Exhibit 21    Michigan Customer List,              66
              beginning with Bates Number
              USAT_0276

Exhibit 22    GateHouse Media records              104
              Retention Policy, 1/1/2010,
              beginning with Bates
              Number USAT_0001

Page 5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

PLAINTIFFS' EXHIBITS (Continuing)

Number                                                      Page

Exhibit 23    Blog Article:  Gannett's          112
              Helen Trask on How Data
              Informs Content

Exhibit 24    Web page information:             120
              Promotions - USA TODAY NETWORK
              Ventures

Exhibit 25    Web page information:             124
              List Services Corporation
              Directbase Enhanced Data - List
              Services Corporation, 12/5/2020

Exhibit 26    PRINT PROFILE:  USA TODAY          125
              Reader

Exhibit 27    Article:  Gannett, Hearst,        127
              McClatchy & Tribune Launch
              Nucleus Marketing Solutions

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

INDEX OF PREVIOUSLY MARKED EXHIBITS,

REFERENCED IN THE

DEPOSITION OF GANNETT CO., INC.

(THROUGH DEPONENT HELEN TRASK)

| | | | Page |
|---|---|---|---|
| Exhibit 3 | Data Agreement, 2/9/2006, Acxiom-Gannet Co., Inc. | | 68 |
| Exhibit 4 | Data Agreement, 9/7/2005, Acxiom-USA Today | | 69 |
| Exhibit 6 | InfoBase Order Form, Order Form Number: 147376 | | 85 |
| Exhibit 8 | Data Agreement, 2/9/2006, Acxiom-Gannet Co., Inc. | | 78 |

Page 7

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and between the parties, through their respective counsel, that the 30(b)(6) deposition of GANNETT CO., INC. THROUGH DEPONENT HELEN TRASK may be taken before Laura H. Nichols, Commissioner, Certified Realtime Reporter, Registered Professional Reporter and Notary Public;

That the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions;

That it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

Page  8

I, Laura H. Nichols, a Certified Realtime Reporter and Registered Professional Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure of the United States District Court, and the foregoing stipulation of counsel, there came before me remotely via Zoom, on June 4, 2024, commencing at 10:17 a.m. EDT, GANNETT CO., INC. THROUGH DEPONENT HELEN TRASK, witness in the above cause, for oral examination, whereupon the following proceedings were had:

*     *     *

THE VIDEOGRAPHER:  Good morning.  We are going on the air -- going on the air.  We are going on the record at 10:17 a.m. on June 4th, 2024.  Please note that this deposition is being conducted virtually.

Quality of recording depends on the quality of camera and internet connection of participants.  What is seen from the witness and heard on screen is what will be recorded.  Audio and video recording will continue until all

Page 9

parties -- unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Helen Trask taken by counsel for the plaintiff in the matter of Johnny Sabbag, et al., versus Gannett Company, filed in the United States District Court for the Eastern District of Michigan, Case Number 4:22-CV-10685-SDK-CI -- I think that is a CI, yes.

The location -- this deposition is being conducted remotely using virtual technology. My name is David Nordheimer representing Veritext, and I am the videographer.  The court reporter is Laura Nichols also from Veritext.

I'm not authorized to administer an oath.  I'm not related to any party in this action, nor am I financially interested in the outcome.  If there are any objections to proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. HEDIN:  Good morning.  Frank Hedin, counsel for the plaintiff.

MR. FRAIETTA:  Good morning, Phil

Page 10

Fraietta, also counsel for the plaintiff.

MR. SHEIKALI:  Good morning, Jad Sheikali, counsel for defendant.

THE COURT:  Okay.  Will the court reporter please swear in the witness, and then counsel may proceed.


GANNETT CO., INC.

(THROUGH DEPONENT HELEN TRASK), having been first duly sworn, was examined and testified as follows:


EXAMINATION BY MR. HEDIN:

Q.     Good morning, Ms. Trask.

A.     Good morning.

Q.     My name is Frank Hedin.  As I said, I am one of the lawyers representing the plaintiff in this matter.  And I am going to be asking you some questions today.

Have you ever been deposed before?

A.     I have.

Q.     Okay.  So I will skip some of the ground rules.  But to begin with, could you just please state your full name for the record?

A.     Helen Trask.

Page 11

Q.     All right.  And you will be testifying today in your capacity as a corporate representative for the Gannett Corporation, correct?

A.     That's correct.

Q.     Okay.  I would just like to begin by having you take a look at a document, this exhibit that I am going to mark Number 17.  Actually, I just introduced it.  This is -- this should be appearing on your screen shortly.

(Plaintiffs' Exhibit 17 was marked for identification.)

Q.     (BY MR. HEDIN:)  Do you see this document that I have marked Exhibit 17?

MR. SHEIKALI:  It hasn't quite come through yet.

MR. HEDIN:  No, wait.  Sorry.  Hold on.

Q.     (BY MR. HEDIN:)  You don't see it?

MR. SHEIKALI:  Yeah, we just got it.  So we are pulling it up.  It is the 30(b)(6) notice?

MR. HEDIN:  All right.  Yes.

Q.     (BY MR. HEDIN:)  Ms. Trask, would you take a look at this document, review it and let me

Page 12

know when you are ready to discuss it?

THE VIDEOGRAPHER:  I have enabled share a screen if you want to do that in the meantime.  It is up to you.

MR. HEDIN:  I'm sorry.  I don't follow.

THE VIDEOGRAPHER:  That might not work.  Yeah.  I'm sorry.  That might not work since you are using -- if you have the document, you could share it on the screen if you wanted.  That's the button in the middle at the bottom there.

MR. HEDIN:  The witness is currently reviewing the document, right?

THE VIDEOGRAPHER:  Oh, okay.  Okay.  They got it, then.  I'm sorry.

(Pause.)

A.    Okay.

Q.    (BY MR. HEDIN:)  Okay.  What is this document that I have marked Exhibit 17?

A.    I'm sorry.  Restate that, please.

Q.    What document is it that you are looking at that has been marked Exhibit 17?

A.    It is the amended Acxiom subpoena.  Is that what you are asking me?

Q.    I'm looking at an Exhibit 17 that is

Page 13

titled "Plaintiffs Notice of Rule 30(b)(6) Deposition of Defendant Gannett Co." You are looking at -- you are looking at the Acxiom subpoena, Exhibit 17?

MR. SHEIKALI: All right. It looks like we might have clicked on the arrow to the right, which brought us back to the beginning. Now we have got the 30(b)(6) deposition notice on the screen. I will click this.

Q. (BY MR. HEDIN:) Okay. Please review this document with the yellow tab that says 17 on it, and let me know when you are ready to discuss it.

A. Okay. Where do I start?

(Pause.)

(Off-the-record discussion.)

A. Thank you.

Q. (BY MR. HEDIN:) Okay. So what document are you currently looking at?

A. It says "Gannett Rule 30(b)(6) Deposition Notice."

Q. Okay. Have you ever seen this document before today?

A. I believe it is this document, yes.

Q. Okay. I would like to direct your

Page 14

attention to the fifth page of this document where -- under the heading "Topics."  Let me know when you are on Page 5, please.

A.    I am on the page.

Q.    Okay.  So there's twenty-three topics listed under the heading "Topics" on Pages 5 through 9, correct?

A.    Twenty-three topics?

Q.    Yes.

A.    Yes.

Q.    I'm sorry.  Just for the record, that is a yes?

A.    Yes.

Q.    Okay.  And you will be testifying today on behalf of the Gannett Corporation as to each of these twenty-three topics, correct?

A.    Correct.

Q.    And you are prepared to provide testimony about each of these twenty-three topics?

A.    Correct.

Q.    Okay.  And you are presently employed by the Gannett Corporation?

A.    Yes.

Q.    How long have you been employed by Gannett?

Page 15

A.    1993 with a five-year break and back in 2021.  No, I'm sorry.  2001.  Sorry.

Q.    Okay.  You were employed from 1993 until 2001 and then you took a five-year break?

A.    No.  I was employed until I think it was '97 or '98 and then came back in 2001.

Q.    Okay.  And what is your current job title at Gannett?

A.    I am senior VP of consumer marketing.

Q.    And how long have you held the position of senior VP of consumer marketing?

A.    Approximately one year.

Q.    And prior to being senior VP of consumer marketing, what was your job title at Gannett?

A.    VP, consumer marketing.

Q.    Okay.  And when did you become VP of consumer marketing at Gannett?

A.    Approximately a year prior.

Q.    Okay.  So at 2022 to 2023, approximately, you were --

A.    Approximately, yes.

Q.    Okay.  And prior to being VP of consumer marketing at Gannett, what was your job title at Gannett?

Page 16

A.      Senior director, consumer marketing. It is -- the business title is consumer marketing for all of it.

Q.      So for your entire tenure at Gannett from 1993 through the present, you have been working under the consumer marketing title?

A.      It is in the consumer marketing department.  The titles have changed, but the business title is consumer marketing.

Q.      So if I could direct you to the seventh paragraph on document that has been marked Exhibit 17, it is actually on Page 5 just above where it says "Topics" at the very top.  Do you see that paragraph?

A.      Yes.

Q.      Okay.  So this -- the date -- the time frame listed of December 21st, 2015, through July 30th, 2016, is the period of time relevant to this lawsuit.  And I will be referring to that time period as the "relevant time period" throughout this deposition.

Does that sound fair to you?

A.      Yes.

Q.      Okay.  So during that relevant time period, what was your job title at Gannett?

Page 17

A.      I believe it was senior director.

Q.      Senior director of consumer marketing?

A.      Correct.

Q.      And what were your job duties as senior director of consumer marketing for Gannett?

A.      I oversaw the processes for gaining subscriptions, retaining subscribers, just the general practices.

Q.      Just one second.  Did you do anything in advance of today's deposition to prepare for today's deposition?

A.      Yes.

Q.      Okay.  What did you do to prepare for today's deposition?

A.      I spoke with the legal team primarily.

Q.      And who on the legal team did you speak to?

A.      Jad and our internal counsel, Ed Larkin.

Q.      Okay.  And you said you spoke primarily with the legal team in preparing for today's deposition.  Is there anybody else that you spoke to in preparing for today's deposition?

Page 18

A.    No.

Q.    Did you review any documents in preparing for today's deposition?

A.    Yes.

Q.    Do you see the list of the seventeen exhibits that have now been marked in share folder, the Veritext share folder system on your screen?

A.    I see it on Jad's screen.

Q.    Do you see the list of the seventeen exhibits?

A.    Are there seventeen?  Yes.

Q.    Okay.  Are there any documents besides those seventeen exhibits that you reviewed in preparing for today's deposition?

MR. SHEIKALI:  Objection, form.  You can answer if you are able to.

A.    I reviewed these documents.

Q.    (BY MR. HEDIN:)  Okay.  So what type of documents did you review in preparing for today's deposition?

A.    The PDFs as well as one Excel file.

Q.    Okay.  Okay.  So are you familiar with the USA TODAY Network?

A.    Yes.

Q.    And what is the USA TODAY Network?

Page 19

A.     It is the Gannett-owned publications, including USA TODAY.

Q.     I'm sorry.  Say that again.  I didn't mean to interrupt.

A.     It is the Gannett-owned daily publications, including USA TODAY.

Q.     Okay.  So the USA TODAY Network comprises USA TODAY newspaper as well as all of the other newspapers and publications published by Gannett nationwide?

A.     The daily newspapers, yes.

Q.     The daily.  Okay.  And when did it -- when did Gannett form this new group called the USA TODAY Network?

A.     I don't recall.

Q.     I am going to introduce a document as Exhibit 18.  Just one minute.

                (Pause.)

                (Plaintiffs' Exhibit 18 was marked
                for identification.)

Q.     (BY MR. HEDIN:)  Did this document appear on your screen?

A.     Yes.

Q.     Okay.  Please take a look at this, let me know when you are ready for some additional

Page 20

questions.

A. Okay.

Q. Okay. Does this document refresh your recollection as to when the USA TODAY Network was formed?

A. Yes.

Q. Okay. And it was formed at the beginning of December of 2015, correct?

A. Correct.

Q. So the USA TODAY Network was formed very shortly before the relevant time period for purposes of this litigation, correct?

A. Correct.

Q. And when the USA TODAY Network was formed, did your job duties, the way in which you performed your job change in any way?

A. No.

Q. Okay. But the Gannett properties, inclusive of USA TODAY and the various daily newspapers, were united with the formation of USA TODAY Network, correct?

MR. SHEIKALI: Objection, form. You can answer if you understand.

A. They are no different than when they were under the title "Gannett."

Page 21

Q.     (BY MR. HEDIN:)  I am going to mark -- I am going to introduce another exhibit here as Exhibit 19.  This is Composite Exhibit 19.

(Plaintiffs' Exhibit 19 was marked for identification.)

Q.     (BY MR. HEDIN:)  Let me know when you have the document in front of you.

A.     It is in front.

Q.     Please review this document and let me know when you are ready.

(Pause.)

A.     Okay.

Q.     (BY MR. HEDIN:)  You see there's five screenshots of computer screens in this exhibit, correct?

A.     Correct.

Q.     And each of those screens contains information that pertains to an individual named Johnny Sabbag, correct?

A.     Correct.

Q.     And Mr. Sabbag you understand to be the named plaintiff in this lawsuit, correct?

A.     Correct.

Q.     With respect to the first two pages of this Composite Exhibit 19, where -- sorry.

Page 22

Strike that.

With respect to the first two pages, what computer system are these screenshots depicting?

A.    What computer system?

Q.    Yeah.  Where were these screenshots generated from?

A.    Well, that is a GUI system that lays over Genesys.

Q.    Okay.  And it is called the GICS system?

A.    Yes.  It is internally known as GICS.

Q.    Okay.

A.    It is a GUI.  It is not a system.  It is not where the data is.  It is just a GUI.

Q.    Okay.  And who -- sorry.  Gannett produced these screenshots to the plaintiff in connection with this lawsuit, right?

A.    Yes.

Q.    Who generated -- who took these screenshots at Gannett prior to their production to the plaintiff?

A.    My understanding is it would have come from our customer service department team.

Q.    Do you see that there's various tabs

Page 23

on these first two screens, beginning with the tab of "Home" and ending with the tab "End Call"?

A. Yes.

Q. Under the "Home" tab that is shown in the -- the "Home" tab is selected in the first two screenshots on this exhibit, correct?

A. Yes. It is on Number 1, and I can't tell on Number 2. Yes, it is.

Q. The GICS system has a separate record for each account number?

A. It should, yes.

Q. Okay. The first two screenshots on this exhibit both refer to Johnny Sabbag, correct?

A. Correct.

Q. But these are different account records that are shown in these two first screenshots, right?

MR. SHEIKALI: The account number is cut off for us on the first screenshot. We can see it on the second screenshot, though.

Q. (BY MR. HEDIN:) If you look at the telephone numbers listed at the top left of each of the -- at both of the first two screenshots, the telephone numbers that are listed are different, correct?

Page 24

A.     Yes.

Q.     One of them ends with a 9.  That is on the first page.  And the second one ends with a 6, correct?

A.     Correct.

Q.     And the second one indicates that Mr. Sabbag was a subscriber since 5/4/2016, correct?

A.     Yes.

Q.     All right.  And the first one indicates that he has been a subscriber since December 6th, 2013, correct?

A.     Yes.

Q.     So can you kind of walk me through why these would be -- why these records would reflect different information about the same individual?

A.     The only response I can give to that is they -- there was a start and a stop on the account and it restarted at a different time.

Q.     Is it possible that he had multiple separate accounts in the Gannett system, one pertaining to a subscription that commenced at a different time than the other?

A.     I believe that is what I was saying,

Page 25

one started at one time and another started at another time.

Q.      Okay.

MR. SHEIKALI:  Are you asking if he had simultaneous subscriptions, Frank?

MR. HEDIN:  No.  No, I am not.

Q.      (BY MR. HEDIN:)  What information would be reflected in this system under the "Service" tab?

A.      Under the "Service" tab would typically be whether or not they are on vacation, whether they missed their delivery, that sort of thing.  I am not an expert on those screens, though, so I don't know without looking what it would be.  That is typical, though, what happens on a "Service" screen.

Q.      What information would be reflected under the "Customer" tab?

A.      I don't know.

Q.      What about the "Wiki" tab?

A.      The Wiki takes you to just that, a Wiki that gives updates on what is happening that day with that publication or different things about the publication that can be revealed to the consumer during a call.

Page 26

Q.    Okay.  And we know that these first two screens are both referring to USA TODAY because the top tab on the first screen and the top bar on the second screen says "USA TODAY," right?

A.    Correct.

Q.    What would be reflected -- what information would be reflected under the "History" tab?

A.    Start, stop, vacation, anything pertaining to the delivery of the account.

Q.    And that would include the purchase of the subscription, the expiration of a subscription?

A.    I believe so.

Q.    Would that include any sort of promotional or marketing activity pertaining to the account holder?

A.    It would at some point.  I'm not sure if it is on the History screen, show where -- how they started a subscription.

Q.    Okay.  What system would contain information about the materials that -- the advertising or the marketing materials that would be sent to a customer?

A.    There's no screen that will say what

Page 27

Case 4:22-cv-10685-SDK-CI ECF No. 52-3, PageID.1564 Filed 09/12/24 Page 29 of 188

was sent to a subscriber.

Q.   Okay.  So there's no screen on the GICS system that shows that?

A.   In our Genesys or GICS system, no.

Q.   So on the first screen here, if you look down under the address section, do you see where it says "Gift Payor Address"?

A.   Yes.

Q.   It says "No gift payor information," correct?

A.   Correct.

Q.   If Mr. Sabbag had received this subscription as a gift, would the information pertaining to the person who gave him that gift appear in that field?

A.   I can't answer that.  I do not know.

Q.   Who at the Gannett Corporation would know the answer to that question?

A.   Our customer service vice president.

Q.   And what is his or her name?

A.   Jay, first name; Guthrie -- I'm not sure I know how to spell it.  J -- G-U-T-H-I-E-R maybe?

Q.   Just one minute.  Do you see the "promotion" field under the Subscription

Page 28

Information section?

A. Yes.

Q. What does the data in that field on this first screen represent?

A. It -- the DS means it is a daily Sunday, which is just a code for USA TODAY, it means Monday through Friday. The start date -- honestly, I don't know what the rest of the codes stand for.

Q. Do you see the "retention" field below the "promotion" field?

A. Yes.

Q. Do you know what the data in that field represents?

A. I do not.

Q. Okay. Is there a data dictionary that gives meaning to the values that appear in the various fields in the GICS system?

A. I don't know about that. I do know that all the codes do have a definition.

Q. There is a document that exists that describes the meaning of those various fields or those various values, right?

A. If they haven't been changed. I don't know. Some codes are used over.

Page 29

THE REPORTER:  Some what are used over?

A.    Some of the codes can be used over for different purposes and mean something different.

Q.    (BY MR. HEDIN:)  When was this first screen here generated, when was the screenshot taken?

A.    Huh?

MR. SHEIKALI:  Stay on this screen.

A.    I don't know how to answer that.  I don't know when it was taken.

Q.    (BY MR. HEDIN:)  Just to be clear, on your computer screen currently, you are looking only at the exhibits that are being shown to you, correct?

A.    Correct, yeah.

Q.    There's no other information that you are referring to?

A.    Nope.

Q.    Good.  Do you see the "agency payor" field under the payment information?

A.    Yes.

Q.    And there's no information in that field on this first screen, correct?

Page 30

A.    Correct.

Q.    What type of information could appear there for particular customers?

A.    To the best of my knowledge, that is not a field that is populated.

Q.    What is an agency payor?

A.    I do not know.  The systems are built thinking of the future, and I don't recall that being a field that is populated.

Q.    Okay.  Let's go to the second screenshot of this exhibit marked 19.  Do you see at the top right of this one, it says "account number"?

A.    Yes.

Q.    And it begins with the letter UT and then it contains seven numbers, right?

A.    Correct.

Q.    This represents this customer's USA TODAY account number?

A.    Yes.

MR. HEDIN:  Jad, we request that the first screen be reproduced in a form that shows the information that is cut off to the right.  Will you agree to produce that to us in the form that has been produced in the second screenshot?

Page 31

MR. SHEIKALI: Yeah, I will discuss your request with Gannett and get back to you.

Q. (BY MR. HEDIN:) Okay. So let's now go to the third screenshot. Let me know when you are there, please.

A. I am there.

Q. Okay. What system was this screenshot taken from?

A. Genesys.

Q. So is this the same system as the prior two screenshots?

A. It is the same system. The first two shots were the GUI screens.

Q. Okay.

A. It is an overlay of the system.

Q. Okay. So this is a system without the user interface?

A. Correct.

Q. And you see the account number shown on this one is UT7357634, correct?

A. Yes.

Q. And does this screenshot contain information that pertains to Mr. Sabbag's subscription?

A. It does.

Page 32

Q.    What information is shown in this screen?

A.    Delivery information, his cancel request, and it looks like an update TMC.

Q.    What is TMC?

A.    Total market coverage.

Q.    And what does that mean, total market coverage?

A.    Total market coverage is typically a publication that goes to all households that aren't subscribing.

Q.    So total market coverage, is it a publication?

A.    It is.  I just don't know -- that is what that term means.  I don't know that it was applicable to that area.

Q.    And what does the letter T represent that is next to that text that says "updated TMC to:"?

A.    I do not know.

Q.    And then there's a Type column for each of these three records on this screen; do you see that?

A.    Yes.

Q.    What does the -- what do the values

Page 33

under that column header mean?

A.    I'm sorry.  I do not know the codes.

Q.    Okay.  And then there's a last column that says "by."  And there's two -- two digit and two letter values in each of those three columns under that header.  What does that data mean?

A.    I do not know.

MR. HEDIN:  Jad, we request that the data dictionaries be produced that give meaning to each of these values and fields in this -- in the Genesys database as well as the GUI form of the Genesys database.

MR. SHEIKALI:  Okay.  I will confer with Gannett about that request, but it sounds like you want to know what these codes mean in Exhibit 19?

MR. HEDIN:  Yeah, we want to ask the witness questions about the values in these fields after having the benefit of the database dictionary which we asked for in discovery because we are not able to ask the witness now about what particular values reflect because we don't know what the data means.

MR. SHEIKALI:  Well, we are not going to agree right now to reopen a deposition, but I

Page 34

will confer with Gannett.

Q. (BY MR. HEDIN:) All right. Let's go to the next screen, the fourth screen on this exhibit. This is another screenshot from the Genesys system.

A. Yes.

Q. And this one has Account Number UT8037468, correct?

A. Correct.

Q. And this is a different account number than is listed on Screens 2 and 3, right?

A. Yes.

Q. And the second -- sorry, the third screen has a different account number than on the first -- sorry, the second screen, correct?

A. I'm sorry. Repeat that, please.

Q. Sure. So the third screen has an account number listed on it that is different than the account number on the second screen?

A. Yes.

Q. So there's three -- strike that.

There's three unique account numbers shown on Screens 2 through 4 -- or 5, correct? Strike that.

There's three unique account numbers

Page 35

shown on Screens 2 through 4, right?

A.      Yes.

Q.      And the first screen appears to be different than the second screen, right?

A.      Yes.

Q.      Are you able to determine whether the first screen reflects account information that pertains to the same account as any of the accounts shown on the other three screens?

A.      No.  There's no --

Q.      You are not able to determine that?

A.      I am unable to.

Q.      So going back to that fourth screen that we were looking at, what does the message text "credit card change by CAUS process" mean?

A.      I am assuming it means the credit card was changed, the consumer called in and the credit card was changed.  I believe the by is the code of the representative who made that change.

Q.      What is the -- what does the data in the "carrier" field represent?

A.      I believe it identifies the carrier and the route.

Q.      All right.  Then let's go to the fifth screen, please, on Exhibit 19.  This has

Page 36

Account Number 8145319, correct?

A. Yes.

Q. And so this screen contains information about the same account that Screen 2 contains information about, correct?

A. It should, yes.

Q. And so at least for this account, Mr. Sabbag's subscription to USA TODAY started on May 4th, 2016, right?

A. Yes.

Q. And you know that it pertains -- that is the start date of a USA TODAY subscription because the letters UT appear under the "Pub," P-U-B, field on the left; is that right?

A. Correct.

Q. What does the "source" field reflect? What does the data in that field reflect?

A. That he voluntarily called in to create the subscription. V stands for voluntary.

Q. What other values could be put in a source field?

A. Other sources -- other ways of starting a subscription.

Q. And what other ways of starting a subscription would there be?

Page 37

A.      There's multiple.  Could be that they started on direct mail, responded to direct mail. They may have seen an ad elsewhere.  There's multiple ways of starting a subscription.

Q.      But the V means that they would have called in?

A.      They called us.

Q.      Okay.  Do you see there's a "sold by" field on this screen?

A.      Yes.

Q.      And there's no value in that field, right?

A.      That's correct.

Q.      If Mr. Sabbag had been sold a subscription by a third party besides Gannett, would there appear information in that field?

MR. SHEIKALI:  Objection, form.

MR. HEDIN:  I will rephrase the question.

Q.      (BY MR. HEDIN:)  Would information -- would there be a data value corresponding to a third party in that field had Mr. Sabbag bought his subscription through a third party?

A.      I believe so if it was sold by a third party.  But I'm not even sure -- third party,

Page 38

I'm not sure I know what your reference to all the data and stuff -- it could be a lot of different things.

Q.    Has Gannett ever sold subscriptions to USA TODAY magazine -- strike that.

Is Gannett the only company that sold USA TODAY newspapers subscriptions during the relevant time period?

A.    No.

Q.    Okay.  What other entities sold USA TODAY newspaper subscriptions to customers during the relevant time period?

A.    There's multiple.  I mean we were on Amazon, could be sold through Amazon; could be sold through other companies that sell and then send us the subscription.

Q.    What other companies?

A.    I don't know the names of any other companies.

Q.    But if a subscription was purchased from a customer from one of those other parties, Gannett would have information in its databases indicating that the subscription was purchased from that third party, correct?

A.    I can't confirm that a hundred

Page 39

percent.  I believe so, but I do not know.

Q.    Okay.  What -- who would know for sure if that information exists in Gannett's databases?

A.    Customer service.

Q.    Who at customer service would know that information?

A.    Jay.

Q.    Jay Guthrie?

A.    Yes.

Q.    Did you speak with Mr. Guthrie in preparation for today's deposition?

A.    No.

Q.    Just one minute.  Do you see under the field "DM:", there's no information there, right?

A.    Oh, yes.

Q.    What does DM stand for?

A.    I believe it stands for district manager.

Q.    And above where -- on that same row, to the right, you see where it says "USA TODAY"?

A.    Yes.

Q.    And then it appears that there's a phone number to the left of USA TODAY, right?

Page 40

A.    Correct.

Q.    Whose phone number is that?

A.    I do not know.

Q.    Above where it says USA TODAY, it says "Detroit Publishing M," right?

A.    Correct.

Q.    What does that refer to?

A.    I believe that is the distribution method.

Q.    So Detroit Publishing is the name of a distribution company?

A.    USA TODAY does not have its own distribution network.  It is distributed by other publishers.

Q.    Okay.  And in the state of Michigan, how many different publishers did USA TODAY use during the relevant time period in USA TODAY?

A.    In the state of Michigan?  I can't answer that.  It would be the -- it is not just Gannett publications.  It is whatever partner they contract with.

Q.    Is Gannett -- strike that.

During the relevant time period, was Gannett Corporation affiliated in any way with Detroit Publishing Company?

Page 41

A.	Detroit Publishing Company is a JOA that is partially Gannett and partially -- I don't recall the name of the company, but it is another company out of Denver.  But it is -- so there's the Detroit News and the Detroit Free Press.  They are a joint operation, and they are formed under the Detroit Publishing media company.

Q.	When you said JOA, can you tell me what that means?

A.	Joint Operating Agreement.

Q.	And you said two publications, the Detroit Free Press and what was the other one?

A.	The Detroit News.

Q.	The Detroit News?  And both of those publications are published -- sorry, were published during the relevant time period by, you said, both Gannett and Detroit Publishing Company?

A.	They are under the Detroit Publishing Company, which is owned by Gannett in part.  It is a shared agreement, and I would have to look up the name of the other company.  I don't recall which Detroit News falls under.

Q.	Was it Digital First Media?

A.	I was going to say, I think it is Media First, so that is likely it, yes.

Page 42

Q.      And it is the Digital Media Partnership that is the name of the JOA between Gannett and Detroit Publishing?

A.      I believe so.

Q.      Is it possible that this reference to Detroit Publishing means that Mr. Sabbag would have been receiving a subscription to the Detroit Free Press or the Detroit News at the same time as he was receiving his USA TODAY subscription?

A.      I don't believe that is what this references.

Q.      So USA TODAY during the relevant time period did not distribute any USA TODAY newspaper subscriptions on its own?

MR. SHEIKALI:  Objection, form.

MR. HEDIN:  I will rephrase the question.

Q.      (BY MR. HEDIN:)  Would Gannett ever distribute copies of its newspaper to its customers without the assistance of another publisher?

A.      I am not sure I am following the question.  Sorry.

Q.      So you are saying -- you are saying that Gannett used Detroit Publishing Company as a distributor of USA TODAY newspaper to Mr. Sabbag,

Page 43

as reflected on this screenshot, correct?

A.     Correct.

Q.     Would Gannett -- are there any circumstances in which Gannett would not use a third-party publishing company or any other publishing company; it would just personally deliver the newspapers to the customer itself?

A.     I do not believe so.  I don't recall that instance.

Q.     If Mr. Sabbag was a subscriber to Detroit Free Press or Detroit News, where in Gannett's databases would that information be reflected?

A.     I -- if he were a subscriber, it would be at a different Genesys system.  It is a separate system.

Q.     All right.  At any point in connection with this litigation, has Gannett searched any of those other systems to determine whether Mr. Sabbag was a subscriber to any other publication besides USA TODAY?

A.     I am really here to speak about USA TODAY at this point.

Q.     Okay.  Well, if you take a look at the deposition notice that you received, which is

Page 44

Exhibit 18 -- I'm sorry, Exhibit 17, if you will look at the first topic, this concerns Mr. Sabbag's purchases of written materials, including books or magazine or journal subscriptions from Gannett without limitation to USA TODAY, correct?

MR. SHEIKALI:  I am just going to object.  You know, regardless of what the topic says, we made our position prior to the deposition clear that we were just going to speak about Gannett's practices with respect to USA TODAY.  And I can represent that in searches for responsive documents, we didn't limit our searches for Johnny Sabbag just to USA TODAY.  We searched Sabbag generally through all Gannett systems.

MR. HEDIN:  So that is the question I was asking the witness, Jad.  I was not asking that question to you.  I will note that it is not appropriate for you to limit the scope of this deposition to only USA TODAY newspaper.

The Complaint in this case at Paragraph 14 indicates that Gannett is the publisher of various newspapers, including the Detroit Free Press, as well as its flagship publication, USA TODAY, and at Paragraph 53 it says that:  We seek to represent a class that defines

Page 45

all Michigan residents who, at any point during the relevant time period, had their information disclosed to third parties by Gannett without their consent.

And it is not limited to information about USA TODAY newspaper subscriptions. And so we object to any sort of limitation on the scope of this deposition. And we have received no written objections to the deposition notice.

MR. SHEIKALI: We did object to the scope of the deposition to the extent that it went beyond USA TODAY. We offered to confer about it, and plaintiffs' counsel didn't take us up on that offer to confer.

MR. HEDIN: You sent us an email saying what you intended to do. It wasn't an objection. But I will also note we have already been over that. The USA TODAY Network was formed basically at a time that coincided with the start of the relevant time period here, and there's no meaningful distinction under the statute between USA TODAY newspaper information and Detroit Free Press information, for example.

So we will file a motion if you are unwilling to allow the witness to testify about

Page 46

other Gannett publications besides USA TODAY, if that is what you want to do.

MR. SHEIKALI: Well, because Mr. Sabbag is only a subscriber to USA TODAY and we have made our position numerous times, including in writing prior to this deposition, we are here today to testify about Gannett's practices as they relate to these topics, with the limitation that they correspond with Gannett's practices for USA TODAY only.

MR. HEDIN: Okay. But, Jad, here is the thing, okay. I asked the witness whether Mr. Sabbag subscribed to any other publication as, you know, revealed by the searches of the relevant databases, and you wouldn't let the witness answer that question.

MR. SHEIKALI: She can answer that question.

MR. HEDIN: Okay.

Q. (BY MR. HEDIN:) So Ms. Trask, did Gannett search any other databases for information pertaining to Mr. Sabbag besides the databases that contain USA TODAY customer information?

A. Yes.

Q. Okay. Which databases did it search

Page 47

besides the USA TODAY databases?

A.    The Genesys system.

Q.    Does the Genesys system contain subscriber and customer information across all of Gannett's publications?

A.    The publications at that time.

Q.    It contained information about all of the subscribers of all of those publications at the time?

A.    Yes.

Q.    And did Gannett's searches reveal any information to suggest that Mr. Sabbag subscribed to any other publication besides USA TODAY?

A.    No.

Q.    What does -- okay. Going back to the fifth screenshot on Exhibit 19, what does that field "write-off" in red and the corresponding data next to it represent?

A.    It means a payment was not received for the subscription.

Q.    Okay. And when was that payment not received?

A.    Well, it would have been for the last subscription time period.

Q.    And what was the last subscription

Page 48

time period?

A.     It looks -- again, I'm not an expert on these screens, but it looks like it was the time period leading up -- so it started in May, and there's a ninety-day write-off period.  And I see a date of 5/22, but I don't know if that is the stop date or not.  I don't see a stop date on here.

Q.     And that date 5/22 is in the top right corner, is that what you are referencing?

A.     That is what I am referencing.

Q.     Okay.  Let's go to another exhibit that may give you the information you need to answer that question.  So I'm going to mark this as Exhibit 20.  This is an Excel file that Gannett produced in this case.  Just one second.

(Plaintiffs' Exhibit 20 was marked for identification.)

Q.     (BY MR. HEDIN:)  All right.  Let me know if you are able to view this Excel file on the share system.  You may have to open this file separately on the computer to view it properly, but just let me know if you are able to.

(Pause.)

Q.     (BY MR. HEDIN:)  Do you have Exhibit Number 20 in front of you, Ms. Trask?

Page 49

A.     Yes.

Q.     Okay.  And this is an Excel file that contains a number of columns and rows of data, right?

A.     That's correct.

Q.     And this document was produced by Gannett to the plaintiff in this case, correct?

A.     Correct.

Q.     And the data on this spreadsheet reflects information about Mr. Sabbag's subscriptions to USA TODAY, correct?

A.     Correct.

Q.     Who generated this file prior to its production to the plaintiff in this case?

A.     I believe it was our IT department.

Q.     And who would have asked the IT department to do that?

A.     I did.

Q.     What specifically did you ask them to generate pertaining to Mr. Sabbag?

A.     I believe it was a search for his name on the dates requested, the six-month period.

Q.     Okay.  So any USA TODAY subscription or account that Mr. Sabbag had active on the system during the relevant time period would be reflected

Page 50

on this spreadsheet?

A.     I'm sorry.  Can you repeat that?

Q.     Sure.  So any account or subscription to USA TODAY that Mr. Sabbag had that was active during the relevant time period would be reflected on this spreadsheet?

A.     It should be, yes.

Q.     Okay.  And do you see under Column Header D the account number column?

A.     Yes.

Q.     It looks like there's information pertaining to two separate account numbers on this spreadsheet; is that right?

A.     Yes.

Q.     And what system was this data on Exhibit 20 pulled from?

A.     The Genesys system.

Q.     And this is the same system that we were looking at screenshots of in Exhibit 19?

A.     Correct.

Q.     Okay.  So going back to the fifth screen on Exhibit 19, are you able to determine when the write-off occurred as shown on Screen 5 by referring to the data on Exhibit 20?

A.     19 -- let me go back to the other

Page 51

screen.  I don't see that account number on this screen.

Q.      Why is that account number not on the screen?  I'm sorry.  Strike that.

Why is the account number shown on Screen 5 of Exhibit 19 not reflected in the data in Exhibit 20?

A.      I can't answer that.

Q.      The data pertaining to the account number shown in Screen 5 of Exhibit 19 should appear in Exhibit 20, correct?

MR. SHEIKALI:  Objection, form.

MR. HEDIN:  I will rephrase that question.

Q.      (BY MR. HEDIN:)  So you said that Exhibit 20 contained information about all active accounts and subscriptions that Mr. Sabbag had during the relevant time period, right?

A.      I believe so.

Q.      And it looks like the account or subscription shown in Screen 5 of Exhibit 19 started on May 4th, 2016, which is within the relevant time period, right?

A.      Yes.

Q.      So the account shown on Screen 5 of

Page 52

Exhibit 19 should appear in the data shown in Exhibit 20, correct?

A. I would expect it to. I do not see it.

Q. Okay. Is it possible that the -- that the individual that you asked to pull this data inadvertently did not pull all of the account information pertaining to all of the accounts for Mr. Sabbag?

MR. SHEIKALI: Objection to form. You can answer.

A. Not intentionally.

Q. (BY MR. HEDIN:) No, I understand. But I am just saying -- does -- so for these other accounts that are listed, that are shown on Exhibit 20, would this same type of information exist in the Genesys system about the account shown on Screen 5 of Exhibit 19?

A. It should. I don't know how history is stored and for how long history is stored in these cases.

Q. If you look at the data for Account Number 8037468 in Exhibit 20, that is -- do you see that information shown in Rows -- sorry, yeah, Rows 2 through 37?

Page 53

A.     Yes.

Q.     Okay.  It looks like this -- this account dates back to at least 2013, correct?

A.     Correct.

Q.     Okay.  So if the account shown in Screen 5 started in 2016, the data pertaining to that account should exist in the Genesys system in the same form that this other data in Exhibit 20 appears in, right?

A.     I -- I see data here in Row -- Column Q, 4/2016.

MR. HEDIN:  So Jad, we are going to request that the same type of data that is shown in Exhibit 20 for these two accounts that are listed in Exhibit 20 is also produced for the other account numbers that correspond to Mr. Sabbag as shown in Exhibit 19.

MR. SHEIKALI:  Okay.  I will confer with Gannett on those requests.

MR. HEDIN:  Okay.  I mean can you just agree to produce that information to us?  We are going to have to continue the deposition so that we can ask about that data after it is produced.

MR. SHEIKALI:  Well, I am not going

Page 54

to agree to continue the deposition, but we can produce that information if it exists.  I mean I think the Excel sheet is records of payments that are in Gannett's possession, not necessarily all records of accounts.  But I can confer with Gannett.

MR. HEDIN:  If the information exists for these other accounts and you produce it, will you agree to reopen the deposition?

MR. SHEIKALI:  I'm not going to agree to reopen the deposition, no.

MR. HEDIN:  Okay.  That is ridiculous, but we will file a motion.  The same information that's shown here for the other account should be produced for all of the accounts.

Q.    (BY MR. HEDIN:)  Okay.  Going back to Exhibit 20, this data all pertains to Mr. Sabbag, correct?

A.    I believe so.

Q.    What would you need to do to confirm that this data in Exhibit 20 pertains to Mr. Sabbag?

A.    I would need to go back to the original document to see the name.  I don't see a name on here.

Page 55

Q. Well, you see account number, right?

A. I do see the account number, yes.

Q. Account numbers are linked to names in the Gannett system, right?

A. Yes. Yes.

Q. Okay. So if you look at the account number that appears for Rows 2 through 37 under Column D, the one ending in 468, do you see that?

A. Yes.

Q. And then if you go to the fourth screen on Exhibit 20 -- sorry, if you go to the fourth screen on Exhibit 19 --

A. This one?

Q. -- do you see that same account number ending in 468?

MR. SHEIKALI: Go up one.

A. Yes.

Q. (BY MR. HEDIN:) And next to it you see the name Johnny Sabbag, correct?

A. Yes.

Q. Okay. So the data on Rows 2 through 37 on Exhibit 20 all pertains to Mr. Sabbag's account, right?

A. Correct.

Q. And the same is true for Rows 41

Page 56

through 104 on Exhibit 20, correct?

A. Yes.

Q. And how do you know that that data in Rows 41 through 104 pertains to Mr. Sabbag?

A. Based on the account number.

Q. And where is that account number linked to Mr. Sabbag's name in the documents?

A. Are we talking about Screen -- what screen is this?

MR. SHEIKALI: It is Screen 2.

A. Screen 2, Exhibit 19?

Q. (BY MR. HEDIN:) No. I don't believe we are because the account number on Screen 2 in Exhibit 19 is not the same account number that is shown in Rows 41 through 104 on Exhibit 20, is it?

A. No.

Q. And so --

A. Can you repeat the question that you are asking, please?

Q. Yeah. How is it that you know that the data in Rows 41 through 104 in Exhibit 20 pertains to Mr. Sabbag?

A. I'm not finding an account number that matches.

Q. Is it possible that the account

Page 57

number -- the account number matches the account number on Screen 1 in Exhibit 19?

A.    It is possible.

Q.    But we don't know for sure because that document was cut off and it was not produced in its complete form; is that right?

A.    I don't see the account number on that screen.

Q.    The account number would appear on the system of the person who took the screenshot, though, right?

A.    It should.

Q.    But it does not appear in the exhibit because the exhibit is cut off?

A.    That's correct.

Q.    And Mr. Guthrie would have taken the screenshot?

A.    His -- he or his team.

MR. HEDIN:  Can you please ask Mr. Guthrie to take the screenshot in its complete form and to produce it to us?

MR. SHEIKALI:  Yes, we will confer with Gannett and see if we can get a reproduced copy.

Q.    (BY MR. HEDIN:)  Is there any

Page 58

information on Screen 1 of Exhibit 19 that leads you to believe that that is the same account that the data in Rows 41 through 104 in Exhibit 20 reflects?

A.      Yes.  Oh, I'm sorry.  That is 2016. I don't see matching data at a quick glance.

Q.      Okay.  In any event, going back to Rows 2 through 37 on Exhibit 20 --

A.      Uh-huh, yes.

Q.      -- when did -- when did the data reflect the subscription to USA TODAY newspaper starting for this account?

A.      It appears to be 2013.

Q.      What date in 2013?

A.      December 6th.

Q.      Okay.  And where do you see that in the data?

A.      Column Q.

Q.      Column Q, Row 2?

A.      Yes.

Q.      Okay.  And where in Exhibit 20 does the data reflect the method of payment for that subscription?

A.      So the payment methods are starting in AE, Column AE.

Page 59

Q.   Okay.  So it is that AE on Row 3 where it says twenty-five, indicates that he paid twenty-five United States dollars for the subscription?

A.   I believe so.

Q.   And then if you look at Columns Y and Z under Row 3, does that reflect that that money was paid with a credit card?

A.   Y and Z?  Yes.

Q.   Okay.  Because Column Z is the last payment method column, correct?

A.   Yes.

Q.   And the value of CC reflects credit card?

A.   Correct.

Q.   And the numerical figure under Column Y, which is last payment amount, is the amount of money paid through that payment method, correct?

A.   I believe so.

Q.   Okay.  Where in this data does it show when the subscription purchased in 2013 for account ending in 468 ended or expired?

A.   When did it expire?

Q.   Yeah, when did the subscription expire that we are talking about here in the data

Page 60

shown in Rows 2 through 37?

A.     There's a pending expiration column, AL; is this what you are referring to?

Q.     I'm not sure.  I am just asking you what the data shows is the expiration date of this subscription.

A.     It is showing pending expiration AL, Column AL.

Q.     Okay.  And which row under AL shows the expiration date of the subscription?

A.     So I also see the column, there's another column that shows expiration, and I don't know what the differences are, PIA expiration in Column R.  So ask the question again.  I'm sorry.

Q.     For the account shown in Column -- sorry, in Rows 2 through 37 --

A.     Yeah.

Q.     -- where in this data does it show when a subscription expires?

A.     So in Column R it shows a PIA expiration date.

Q.     Okay.  So under -- okay.  So in Row 3, Column R reflects the date that that subscription purchased on December 6, 2013, would have expired?

Page 61

A.      Again, this is not an area where I am an expert.  I am not sure what that date indicates completely, but it does say PIA expire date.  What that means, the definition of what that means is what I cannot answer.

Our subscription -- that is a database term because we don't have -- the subscription continues until the person stops the subscription.

Q.      And you are not able to answer questions about the database terms?

A.      I'm not sure what this database term means.

Q.      Okay.

MR. HEDIN:  So Jad, Topic 10 in the notice of deposition is the databases in which, including the formats by which Gannett currently maintains and maintained during the relevant time period Gannett customer and/or subscriber data.  And so this witness is not able to answer questions about that topic.

MR. SHEIKALI:  I mean I think she has been answering questions about the topic.  She doesn't know every granular detail of this database.  You are also asking her open-ended

Page 62

questions.  You know, you are not really directing her on what to answer.

MR. HEDIN:  That is absolutely incorrect.  I am asking her what particular values mean in this data that was produced by Gannett.  You failed to either adequately prepare this witness or you failed to produce a witness capable of answering questions on this topic.  You have also failed to produce a data dictionary that describes the meaning of the values and the column headers in this database.

MR. SHEIKALI:  Well, that is based on the assumption there is a data dictionary.  And she has been testifying to various values on both Exhibit 19 and on Exhibit 20.

Q.    (BY MR. HEDIN:)  So which value shows the expiration date of the subscription that you testified was purchased on December 6th of 2013?

A.    So PI expiration means the date the payment has been made through.  And that once that payment is -- there's no more money on account, that -- the next payment is needed for it to continue.  That is what I believe that expiration date means.

Q.    What does the data under the next

Page 63

column, S, sub L-E-N -- what does that mean?

A.     Subscription link.

Q.     So the data -- the value of 13, that would reflect thirteen weeks?

A.     Correct.

Q.     Okay.  So ending in -- so Rows 2 through 9 appear to pertain to the same subscription which ended on March 11th, 2014; is that right?

A.     Whoops.  Sorry.  That is the PIA expire date.  It is a paid through date.

Q.     Okay.

A.     What -- the expire in the system and the stop are two different things.

THE REPORTER:  I think we might need to go off the record.  Somebody dropped off.

THE VIDEOGRAPHER:  Yeah.  So would anyone mind if we took a little break?

MR. SHEIKALI:  Yeah.  That would be great.

THE VIDEOGRAPHER:  Okay.  This is the end of Media 1.  It is 11:54, and we are going off the record.  And we are clear.

(Whereupon, a lunch break was had from 11:54 a.m. until 12:36 p.m. EDT)

Page 64

THE VIDEOGRAPHER:  This is the beginning of Media 2.  It is 12:36, and we are back on the record.

MR. HEDIN:  Okay.  Thank you, Ms. Trask, for bearing with me while I had a technical issue with my internet connection.  And while we were on the break, Mr. Sheikali and I spoke, and we were able to reach a stipulation that should resolve the need to ask more questions about the Excel file and the customer data pertaining to Mr. Sabbag that we were discussing before our break.

And so, Jad, specifically just to memorialize our stipulation, we are going to stipulate that again it is data that shows that Mr. Sabbag purchased subscriptions to USA TODAY newspaper directly from Gannett for money and that -- and the dates that the subscription started and ended and that Gannett has the same information in its database for its other customers sufficient to show everyone else who purchased subscriptions from Gannett directly for money during the relevant time period and prior to the relevant time period.

MR. SHEIKALI:  That is correct.  Stipulated.

Page 65

MR. HEDIN:  Okay.  Great.  So that will resolve that issue.

So the next thing I want to do is introduce Exhibit 21.  It should be popping up on your screen here momentarily.

(Plaintiffs' Exhibit 21 was marked for identification.)

MR. HEDIN:  This one is taking a little while to load.  I think it is because it is a larger file.  I don't know why it is still loading.  It just says "loading file."  Let me try it again.

(Pause.)

MR. HEDIN:  Okay.  Let me know when this is on your screen.  I think it is working now.

(Pause.)

Q.     (BY MR. HEDIN:)  Okay.  Do you see this document that has been marked Exhibit 21, Ms. Trask?

A.     Yes.

Q.     Okay.  And what is this document?

A.     This is a list of subscribers, subscriber accounts.

Q.     So this list was produced by Gannett to the plaintiffs in the litigation, correct?

Page 66

A.     Yes.

Q.     And this document reflects all of the persons who had purchased subscriptions directly from Gannett during the relevant time period and who resided in Michigan.

A.     Correct.

Q.     Is that correct?

A.     Yes.

Q.     Okay.  And this document is redacted for certain fields.  But I believe Mr. Sabbag's information appears on this document in an unredacted form.

MR. HEDIN:  Jad, do you know if that is correct?  I believe so but --

MR. SHEIKALI:  I don't think so.  I think we just sort of did a block redaction for those entire columns, and IT wouldn't have excluded -- I don't think we left Sabbag out of the redaction.

MR. HEDIN:  Okay.  All right.  So again it will stipulate that Mr. Sabbag's information is one of these records?

MR. SHEIKALI:  Yes.

MR. HEDIN:  Okay.  Okay.  One second.

Q.     (BY MR. HEDIN:)  Okay.  So now I want

Page 67

to refer to a document that has been previously marked as Plaintiffs' Exhibit 3.

(Plaintiffs' Exhibit 3, having been previously marked for identification, was referenced in this deposition.)

Q. (BY MR. HEDIN:) If you could please turn to that one and let me know when you are there, please.

A. We are here.

Q. Okay. So this is a data agreement between Gannett Co., Incorporated and an entity called Acxiom dated February 9th, 2006, correct?

A. Yes.

Q. Okay. And you are familiar with Acxiom?

A. I am.

Q. And Gannett's relationship with Acxiom?

A. Yes.

Q. And the relationship between Gannett and Acxiom existed during the relevant time period; is that right?

A. Correct.

Q. And so this data -- I'm sorry. This data agreement that has been marked Plaintiffs'

Page 68

Exhibit 3, this agreement was renewed several times over the years and, in fact, continued to be in place subject to certain amendments during the relevant time period, right?

A.    Correct.

Q.    Okay.  Now I would like to take you to Plaintiffs' Exhibit 4.

(Plaintiffs' Exhibit 4, having been previously marked for identification, was referenced in this deposition.)

Q.    (BY MR. HEDIN:)  If you could please turn to that document.  Are you there?

A.    Yes.

Q.    This is also a data agreement with several schedules to it as well between Acxiom and it says USA TODAY, a division of Gannett Satellite Information Network, Incorporated, dated September 7th, 2005, right?

A.    Yes.

Q.    Okay.  And was this agreement also in effect, subject to any amendments that were made during the relevant time period?

A.    I cannot answer that.  I do not know.

Q.    Do you know why there were two separate agreements with Acxiom, one with -- one

Page 69

between USA TODAY and Acxiom and one between Gannett [inaudible} and Acxiom?

A.     That was not uncommon to have a separate contract for USA TODAY and a separate contract for what we called the community public newspapers.

Q.     Okay.  Could you describe, generally speaking, what the services were that Acxiom was providing to Gannett during the relevant time period?

A.     Acxiom would basically enhance our files --

Q.     Okay.  When you say --

A.     -- with demographic information.

Q.     Okay.  And so when you say "enhance the files," you are referring to the practice of appending additional data to those files such as demographic data?

A.     Correct.

Q.     And so during the relevant time period, could you just kind of walk me through how that process worked?

A.     So we would send Acxiom our files, and they would add data to those files and send them back.

Page 70

Q. Okay. And so what type of files was Gannett sending to Acxiom during the relevant time period?

A. It would be files of subscribers and nonsubscribers.

Q. And that would be subscribers to USA TODAY newspapers?

A. I don't know if it did or not.

THE REPORTER: You're garbling a little bit, Mr. Hedin. I don't know if you are for other people, but it sounded like your question said: And that would be subscribers to USA TODAY newspapers?

Was that your question?

MR. HEDIN: Yes, that was my question. Let me follow up with that, though.

Q. (BY MR. HEDIN:) Are you aware of instances during the relevant time period where Gannett would just transfer its existing customer database to Acxiom or to append data on a wholesale basis to all of the records?

A. I can't speak specifically to that.

Q. Okay. Who would be able to do that?

A. Howell Sizemore.

Q. I'm sorry. Paul Sizemore?

Page 71

A.    Howell.

MR. SHEIKALI:  Do you mind if we take a short break, Frank?

MR. HEDIN:  Not quite yet.  We are just kind of getting started on this topic.

Q.    (BY MR. HEDIN:)  Did you say Howell, H-O-W-E-L-L?

A.    Correct.

Q.    And if you turn back to Exhibit 3 -- I'm sorry.  Yeah.  Exhibit 3, correct.  Turn back to Exhibit 3.  Would you please turn down to Exhibit A, which is on the seventh page of this PDF?

A.    Page what?  7?

Q.    Yes.  Exhibit A.  So this is a list of all the client affiliates of Gannett -- sorry, all of the affiliates of Gannett that were able to benefit from the services that Acxiom provided under this agreement.  Is that correct?

A.    It appears so, yes.

Q.    Okay.  And USA TODAY is listed on this list, correct?

(Pause.)

A.    Yes.

Q.    (BY MR. HEDIN:)  What page are you

Page 72

referring to?

A.    I am looking at, I believe, Page 3. Was that Page 3?  It says 3 of 21.

MR. SHEIKALI:  13.

A.    13.

Q.    (BY MR. HEDIN:)  13?

A.    And I misspoke earlier.  We sent them nonsubscriber files.  I just wanted to clear that up.

Q.    I'm sorry.  Say that again.

A.    We sent Acxiom nonsubscriber data.

Q.    Okay.  What information did you just learn that caused you to provide that clarification?

A.    I -- as I was thinking about what I answered, that is all.

Q.    Okay.  So what kind of nonsubscriber information was Gannett sending to Acxiom?

A.    It would be names, address.  That would be --

Q.    Of what persons, though?  Where would Gannett have obtained these names and addresses that it was sending to Acxiom, names and addresses of noncustomers?

A.    Well, they could be former

Page 73

subscribers.

Q.    Okay.  And what type of information of these former subscribers was Gannett sending to Acxiom?

A.    I'm sorry?

Q.    What categories of information about former subscribers of Gannett publications was Gannett sending to Acxiom?

A.    It could be addresses, names.  I mean --

Q.    Okay.  And for what purpose was Gannett sending that information to Acxiom during the relevant time period?

A.    Just for enhancement.

Q.    Okay.  And so Acxiom would add additional information to those records of former subscribers and then send those files -- and send the files back to Gannett?

A.    Yes.

Q.    Gannett was engaged in those practices with Acxiom during the relevant time period?

A.    Yes.

Q.    Okay.  And can you show me where in this contract marked Plaintiffs' Exhibit 3 those

Page 74

data-appending practices that you just described
with respect to former subscribers or customers are
addressed?

A.      So what is the question?

Q.      With respect to the practices of
Gannett sending to Gannett -- sorry.

With respect to the practice of
Gannett sending to Acxiom customer information of
prior subscribers for data appending, where in the
contract marked as Plaintiffs' Exhibit 3 are those
practices addressed?

A.      I don't know that they are listed
anywhere.

Q.      Could you go to Page 19 of this
document, which has the heading "Schedule to Data
Agreement"?

A.      Okay.

Q.      And then on Page 19 and 20, do you
see anything on these pages that describe those
services?

A.      I do not.

Q.      This -- these pages do reference the
InfoBase Enhancement product.  Do you see that?

A.      Yes.

Q.      Could you tell me what that product

Page 75

is?

A.   I -- I don't know the name -- I know -- I have heard of the product.  I know the product.  I don't know what it is.

Q.   Okay.  What about the Personicx product, do you know anything about that?

A.   I do not.

Q.   And what about InfoBase analytics or InfoBase telesource?

A.   I do not.

Q.   Just one second.  Who would be the person at Gannett that would be most qualified to answer questions about those products and the services that Gannett received from Acxiom on those products?

A.   Howell Sizemore.

Q.   Howell Sizemore?  Okay.

A.   In fact --

Q.   Go to --

A.   Go ahead.

Q.   No.  No.  You go ahead.  I didn't mean to interrupt.

A.   He would be the source for all these questions you are asking me.

Q.   Okay.  And he still is with Gannett?

Page 76

A.    He is.

Q.    So if you go down to Page 21, which is another schedule, this one dated February 9th, 2006, this concerns the InfoBase list.  Is he also the person who would be able to answer questions about that product?

A.    Yes.

Q.    Is it fair to say that all of the products and services addressed in this contract would be products and services that Howell Sizemore is the most knowledgeable about at Gannett?

A.    Yes.

MR. SHEIKALI:  Frank, can we go off the record?  I think there's some confusion here.

MR. HEDIN:  Okay.  What is the confusion?  I mean why do we have to go off the record?

MR. SHEIKALI:  Well, because the witness is able to testify about the services that Gannett consumed from Acxiom, but I think she just understands them by a different name or notation.

MR. HEDIN:  Okay.

MR. SHEIKALI:  I think there's some confusion here about whether she is able to testify to certain products because I think she knows them

Page 77

as different names.

MR. HEDIN:  Okay.  Let me pull up another -- one more exhibit, and maybe this will refresh her recollection on that and, if not, we can go off the record.

Q.    (BY MR. HEDIN:)  Why don't we take a look at what has been marked Plaintiffs' Exhibit Number 8.

(Plaintiffs' Exhibit 8, having been previously marked for identification, was referenced in this deposition.)

Q.    (BY MR. HEDIN:)  Please let me know when you are at that one.

A.    It is -- I have it.

Q.    Okay.  So are you familiar with this document?  Have you seen this document before?

A.    Yeah, I believe so.

Q.    So this is the Amendment Number 3 to the data agreement with Gannett and Acxiom that we were just looking at, correct?

A.    I believe so.

Q.    Okay.  And this is an amendment that became effective on November 10th, 2011, right?

A.    Yes.

Q.    And this amendment was in effect

Page 78

during the relevant time period for this case, correct?

A.     I believe so.

Q.     Okay.  So are you able to describe the services that were provided by Acxiom to Gannett pursuant to this amendment and the schedule thereto?

A.     I can describe what is in Section 2, if that is what you are asking.

Q.     So Section 2 lists the products that were provided by Acxiom to Gannett under this Schedule to Amendment 3 to the data agreement, correct?

A.     Yes.

Q.     Okay.  Could you kind of describe, just generally describe the services that were -- sorry, the products that were provided by Acxiom to Gannett as listed in Paragraph 2?

A.     So we would send the file, and they would append an email, if the email was missing.

Q.     Okay.

A.     We would -- that is really the first two pieces.  And the second piece was, we would send an email, and they would append other relevant data.

Page 79

Q. Okay. So during the relevant time period, if there was a record with no email, Gannett would send that record along with others like it to Acxiom to add an email to?

A. Correct.

Q. And then on the flip side of that, if there was an email that Gannett had but did not -- it was not accompanied by other data like name and address, Gannett would send the email to Acxiom, and it would add the name and address and send it back to Gannett?

A. Correct.

Q. And these were both current and prior customers of Gannett that were subject to these transmissions to Acxiom?

A. It could be. I don't know if it was prior, our current subscribers or nonsubscribers. I don't know how that was broken out.

Q. Do you see under Section 4 on this page and then going on to the second page where it says B, Section 4B, Order Forms?

A. Yes.

Q. Just one moment. So it's Wendy Hurwitz at Gannett that would approve orders that were placed pursuant to this agreement?

Page 80

A.    At that time.

Q.    Okay.  And so when was Wendy Hurwitz employed by Gannett and in that capacity?

A.    She was employed during that time period.

Q.    During the relevant time period for this litigation?

A.    I believe so, yes.

Q.    Okay.  And is Wendy Hurwitz still at Gannett?

A.    She is not.  And I do not know what date she left.

Q.    Just one minute.

A.    I don't know.  I am going to take back what I just said.  I don't know if she was employed during the time period.

Q.    Okay.  Why did you just take that back?

A.    Because I am trying to think, 2016. And I don't know that she was still employed at that time.  This contract was signed much earlier than that.

Q.    Okay.  So who else at Gannett could it have been during that period of time?

A.    I believe Howell Sizemore -- he would

Page 81

not have signed -- are you asking about who would have signed the contract at that time?

Q.  No.  I am asking -- who would have the duty of approving orders pursuant to Section 4 of this agreement during the relevant time period?

A.  Can you give me a definition of what orders are, approving orders?  Do you mean what we are requesting?

Q.  So I am referring to just -- so if you -- if you look at Affiliate Orders, Section 4A.

A.  Howell Sizemore was definitely with the company at that time.

Q.  Okay.  What about Gary Beck?

A.  I don't know if he was at the company during that time.  I don't think he was.

Q.  Did you work with Mr. Beck at Gannett when he was there?

A.  Not directly.

Q.  Okay.  So under -- going back up to Section 2 of this Schedule to Amendment 3, it looks like the service that you are referring to where email is appended only is called the Email Append Connect Only subset of the InfoBase Email Enhancement; is that right?

A.  I believe so.

Page 82

Q.    Okay.  And then Email Append, Reactivation/Alternate email, is that a service where one email is provided to Acxiom, and then Acxiom provides alternate emails for the same person?

A.    Can you tell me which one you are referring to, please.

Q.    Sure.  I am on the second bullet point subset for the Email Append service for the InfoBase Email Enhancement product.

A.    I believe that is what it means.

Q.    Okay.  And then Reverse Email Append is where an email is provided, and then the other identifying information about a consumer is provided in return?

A.    Correct.

Q.    And it says under Term/Termination that:  This schedule and agreement to the amendment would -- sorry, amendment to the agreement would continue for a period of one year in perpetuity unless terminated first.

Do you see that?

A.    Can you tell me what page you are on?

Q.    The same page, Section 1.

A.    Yes, I see it.

Page 83

Q.      So in order for this agreement or this amendment and the schedule under it to terminate, there would have to be some sort of -- or to end, there would have to be a termination of it; otherwise it would continue --

A.      Correct.

Q.      -- in perpetuity?  Okay.  Are you aware of any termination of this amendment and the schedule to it that occurred prior to or during the relevant time period?

A.      Excuse me.  I am not aware.

Q.      Okay.  So as far as you know, this was in effect during the relevant time period?

A.      I believe it was.

Q.      Okay.  So then if you go down to Page 3 of this Schedule, do you see Section 7?

A.      Yes.

Q.      Under Part A, Section I, Source File Requirements.  So this provision required Gannett to provide Acxiom with a file of all its existing customer records on a periodic basis, correct?

A.      Yes.

Q.      How periodic were those -- were those provisions of the existing customer records by Gannett to Acxiom?

Page 84

A. I believe it was quarterly.

Q. Okay. So like every three months?

A. I believe so. But I also know at times it changed.

Q. Okay. Okay. Now I would like to go to another exhibit. It has been premarked. This one is Plaintiffs' Exhibit 6.

(Plaintiffs' Exhibit 6, having been previously marked for identification, was referenced in this deposition.)

Q. (BY MR. HEDIN:) Please take a look at that and let me know when you are there.

A. I am there.

Q. All right. So this is Amendment -- wait. I'm sorry. This is an InfoBase order form, right?

A. It is an addendum.

Q. You are looking at Exhibit 6?

MR. SHEIKALI: We are at -- sorry. We are at Doc 6. Yeah, we are at Plaintiffs' Exhibit 6.

A. Okay. I have it now.

Q. (BY MR. HEDIN:) Okay. So this is InfoBase Order Number 147376 production order?

A. Yep.

Page 85

Q.      Okay.  So this is an order placed by Gannett from Acxiom, and it is identified under the fourth section down under the order type section as a standing order; is that correct?

A.      Yes.

Q.      And the effective dates of the standing order were June 2nd, 2016, through June 30th, 2017, correct?

A.      Correct.

Q.      And it says it is in an express batch standing order.  What does express batch mean?

A.      I do not know.

Q.      And what would a standing order mean?

A.      I would assume a standing order would be that it was outlined when a file would come and go.

Q.      Okay.  Does a standing order potentially mean that an order can be placed pursuant to these terms at any time between that timeframe identified?

A.      I can't answer that.

Q.      Who would be the person most knowledgeable about this document and best able to answer those questions?

A.      Well, the person who is the contact

Page 86

name is no longer with the company.  So.

Q.    And that is Gary Beck?

A.    No, that is Tom Argiriou -- I can't say his name.

Q.    Okay.  So he is the billing contact, right?

A.    He was the vice president at the time over this area.

Q.    Gary Beck is listed as the customer contact name, right?

A.    Right.  And he is no longer with the company.

Q.    So is there anybody at Gannett more knowledgeable than you about this order form and the information reflected on it?

A.    If there is, it would be Howell Sizemore, but I don't know that he would be.

Q.    Okay.  In any event, are you familiar with an order that was placed on or about June 28th of 2016 pursuant to this order form?

A.    I'm sorry.  Can you repeat that?

Q.    Yes.  Are you familiar with an order that was placed on or about June 28th, 2016, pursuant to this order form?

A.    I am not.

Page 87

MR. SHEIKALI:  Frank, do you mind if Helen --

MR. HEDIN:  Let's take a break, yeah.

THE VIDEOGRAPHER:  Okay.  This is the end of Media 2, and it is 1:15 and we are going off the record.

(Whereupon, a break was had from 1:15 p.m. until 1:31 p.m. EDT)

THE VIDEOGRAPHER:  This is the beginning of Media 3.  It is 1:31, and we are back on the record.

Q.     (BY MR. HEDIN:)  Okay.  Ms. Trask, before we took a break, we were looking at Exhibit Number 6, and this is the InfoBase Order Form Number 147376.  This order form was placed -- was entered into pursuant to Amendment 3 to the agreement between Acxiom and Gannett, correct?

A.     Yes.

Q.     And that is because this is a Gannett reverse email append order, correct?

A.     Correct.

Q.     And are you aware of an order that was placed on June 28th, 2016, pursuant to this order form?

A.     I don't have anything in front of me

Page 88

that shows that.

Q. Okay. So I can tell you that Acxiom has testified that an order was placed on June 28th, 2016, and that a file would have been -- an input file would have been transmitted by Gannett to Acxiom containing email addresses for Acxiom to perform its reverse email append service to, and to then return that enhanced file to Gannett.

You are not aware of that happening one way or the other?

A. I am not.

Q. Okay. Where would Gannett store the file that it transmitted and the file that it received back from Acxiom?

A. When you say "store," you mean maintain?

Q. Where would it have maintained the file that it transmitted and received back?

A. So the information we received back, where would we maintain that?

Q. Let's start with the information you sent. Would you maintain the information that you sent to Acxiom?

A. I don't believe we maintained that.

Q. Okay. But you don't know for

Page 89

certain?

A.    I don't believe any of those files are kept.

Q.    Who would know for sure whether those files are kept or not?

A.    That would be Howell Sizemore, and in my conversation -- I have spoken with him, and unless I am misunderstanding, we don't hold onto any information.

Q.    When did you last speak to Mr. Sizemore about this matter?

A.    In March.

Q.    And what type of information did you seek from him at that time?

MR. SHEIKALI:  I am just going to object to the extent that if any of those discussions with Mr. Sizemore were with Gannett's counsel.

A.    They were.

MR. SHEIKALI:  So we are going to object on privilege.

Q.    (BY MR. HEDIN:)  What about the files that you would have received back from Acxiom with the enhanced data, with the appended data added alongside the email addresses that you had sent?

Page 90

A.     So the enhanced data -- let -- so the enhanced data that I was referring to are files they send us and we append them on our end.

Q.     Okay.  Yeah, that is not what you testified to previously.  But I am referring to this reverse email append service.

You are testifying that that service would involve Acxiom sending Gannett data?

A.     I think I am getting confused.

Q.     I'm referring to Order 14736 which concerns reverse email appending.

A.     Yes.

Q.     Okay.  With respect to this order, Gannett would send Acxiom a list of email addresses, and Gannett would send something back that contained information concerning each of those email addresses, right?

A.     And reverse append, my understanding is we send a file and Acxiom sends the email to -- to the file, adds the email to the file.

Q.     Okay.  Well, that is not what -- Acxiom testified as to the opposite.

A.     I may have it backwards.

Q.     Emails -- Paul [sic] Sizemore would know the most about this?

Page 91

A.     Yes.

Q.     Okay.  Okay.  And so when a file was returned, though, to Gannett from Acxiom pursuant to this reverse email append product or service, would Gannett retain that?

A.     My understanding is we do not hold onto the information.

Q.     Okay.  But what was the information that was obtained from Acxiom used for?

A.     So the information whether -- again, we used the information.  It would be appended to the file, I believe, but those -- those files weren't maintained -- I mean the sends themselves were not maintained.

Is that what you are asking me?

Q.     Yes.  Although the actual files from Acxiom to Gannett were not maintained, the data in those files, is it the case that that data was then added to Gannett's database?

A.     I believe so.  But again, that is a Howell Sizemore question.

Q.     Okay.  But do you know whether the database would reflect the additional data obtained from Acxiom in response to this email append service?

Page 92

A.     I do not.

Q.     Paul [sic] Sizemore would know that?

A.     Yes.

Q.     So Paul [sic] Sizemore is the person we are looking at and the services provided under Exhibit 6?

A.     I don't know about this order form, and it is Howell.

Q.     Howell Sizemore?  Sorry.

But he is the person that you believe would know the most about this document at Gannett?

A.     I believe so.  But we are talking Gannett; we are not talking USA TODAY.  I don't know about USA TODAY, if he is the one.  But he knows our systems, and he knows the contracts.

Q.     Well, okay.  But we discussed at the outset of this deposition that in December of 2015, Gannett formed the USA TODAY Network, correct?

A.     Correct.  Each application was still managed separately in many cases.  The publications are still the publications.

Q.     Right.  No, I understand.  But this order form does not appear to be specific as to any individual publication, correct?

A.     Correct.

Page 93

Q.      It appears to just be a generic Gannett reverse email append of its customers, right?

A.      Right.

Q.      So that would likely have included the USA TODAY customers at that time?

A.      I can't answer that.  That is --

Q.      Do you have any --

A.      -- assumption.

Q.      You don't have any reason to believe that during the relevant time period the transmissions and the receipts of data from Acxiom would not have included USA TODAY customer information, right?

A.      I don't have any reason to believe it would or would not.

Q.      Just to be clear, you don't think that the description of this reverse email append is a Gannett email append, reverse email append; you don't have any reason to believe that that would, at this period of time, the relevant time period for this litigation in 2015 and 2016, you don't have any reason to believe that it would have included USA TODAY customer information?

A.      Do I have reason to believe it would

Page 94

include or would not include?

Q.    Would.

A.    So internally we had -- we separated the two.  We separated the community of newspapers from USA TODAY.  There's no reason to believe that it would contain USA TODAY.  And the Acxiom wouldn't know either.

Q.    Okay.  Who would know?

A.    I don't know if anybody internally would have that information.

Q.    How many individuals, approximately, subscribe to USA TODAY during the relevant time period?

A.    It is going to be between one -- probably one hundred fifty thousand, approximately.

Q.    Okay.  And how many people subscribe collectively to the other daily publications published by Gannett at that time?

A.    I can't answer that.

Q.    Yeah.  But if you go to the second page of Exhibit 6, do you see under the data charges section where it says:  Five dollars per thousand matched on the commitment Gannett will send a minimum of three hundred thousand records through this process annually.

Page 95

Do you see that?

A.    Yes.

Q.    So based on the assumption that Gannett was sending at least three hundred thousand records per year to Acxiom, does that -- does that change your opinion about whether or not USA TODAY customer information was likely sent to Acxiom on this order?

A.    No, it does not.

Q.    Okay.  And why not?

A.    Well, because collectively, the other publications would far exceed the three hundred thousand and USA TODAY does not reach the three hundred thousand.

Q.    Okay.  I thought you testified that you didn't know how many people subscribe collectively to the other publications.

A.    An exact number, I do not.

Q.    Okay.  What is your best estimate of the number of people who subscribe collectively to the other publications during the relevant time period?

MR. SHEIKALI:  Objection, foundation. You can answer if you are able to.

A.    It currently is about a million.

Page 96

Well, no, that is not true.  That -- it is a different publication set, so it is hard -- I mean we had a merger, and it is a bit different publication set.  It's over a million -- it would have been over a million at that time.

Q.    (BY MR. HEDIN:)  How many would it be today?

A.    It is a different situation when we have double the publications.

Q.    Okay.  So at first I thought you said it would be over a million today, and then you said it would be a million then.  Which would it be then during the relevant time period?

A.    It would have been over a million then, and it would be over a million now.

Q.    Okay.

A.    But it is a different publication set.  We only had ninety-some publications then; we have over two hundred now.

Q.    Give me just one second.

A.    But what we sent and how many publications we sent for, that is what I can't answer.

Q.    Who would have sent the files to Acxiom pursuant to this order?

Page 97

A.      I don't know.

Q.      Who would know?

A.      To this order, I don't know who would know.

Q.      Is Tom Argiriou still at the Gannett --

A.      He is not.

Q.      Okay.  So looks like the output files, that is, the files that were sent back to Gannett from Acxiom, would have been posted to an FTP folder and then the email report would have been emailed to this email address MaaxSupport@gannett.com.  Do you see that at the bottom of the first page of Exhibit 6?

A.      Yes.

Q.      What efforts did Gannett make to search the inbox identified there for this report referenced in the order form?

A.      What efforts to find the file?

Q.      Yes.  In preparation for this litigation.

A.      I would expect that somebody knew the file was coming and would pick up the file.

Q.      Right.  No, I am saying, though, after this lawsuit was filed, was any effort made

Page 98

to locate the file at that email address or locate that report that was -- that this order form indicates would have been sent to that email address to produce it to the plaintiff in this case?

A.    I can't answer that.

MR. SHEIKALI:  I will also just object on the grounds that first time we are seeing -- we saw this document was this past Friday during Acxiom's deposition when it was also produced to Gannett's counsel as well as plaintiffs' counsel for the first time by Acxiom.

MR. HEDIN:  Well, Gannett has been aware of this document, this order form since it placed the order form six years -- eight years ago. So that is not the first time Gannett has learned of the existence of this order.  It placed the order.

I am just asking if a reasonable effort has been made to locate the documents concerning this order, including the report that it says here would have been emailed to that specific email address.

MR. SHEIKALI:  Yes.  And I will represent that it would have fallen within the same

Page 99

document and email searches Gannett conducted for any materials or communications regarding Acxiom or other third parties.

MR. HEDIN:  But I want the witness to testify, Jad, about the search, and that is one of our topics.

Q.    (BY MR. HEDIN:)  So are you able to testify about Gannett's search for responsive documents in response to our document request?

A.    I cannot answer whether or not this was searched for.

Q.    All right.  Who are the document custodians whose repositories were searched in response to plaintiffs' document requests?

A.    A request was put in through our IT team, our customer service team.  We requested from our contract team.  Where they requested beyond that, I'm not sure.

Q.    Who made the requests, what person?

A.    I made requests along with Ed Larkin.

Q.    Who is Mr. Larkin at the Gannett company?

A.    He is our in-house counsel.

Q.    What team would have been in charge of placing this order reflected in Exhibit 6?

A.    That would have come out of the consumer -- out of the consumer area.

Q.    Did anybody put in a request for the consumer team to search for documents?

A.    So customer service falls under the consumer team.

Q.    Are there any other teams that fall under the consumer team?

A.    Directly to this, no.  As far as a search, no.

Q.    Well, what other teams could have performed searches that fall under the consumer team?

A.    Searches -- there's not going to be anybody who can do searches that fall under the consumer team other than customer service.

Q.    Where would this order form have existed in Gannett's systems?  Where would this document currently be located in Gannett's systems today?

A.    Only if there's something paid through Finance.  But this is an order form, not a payment form.

Q.    So Gannett would not currently maintain this document?

Page 101

A.    If -- so that is the problem with people leaving.  If they maintained it on their system, I would not have a copy of it.

Q.    And there's no way to search prior employees' systems on a global basis at Gannett?

MR. SHEIKALI:  I'm going to object to foundation.

A.    I can't answer that.

MR. SHEIKALI:  We can search for the specific document, Frank, and we can see if this email address still exists and if it is still searchable.

MR. HEDIN:  Okay.  We request that that would happen and a thorough search be performed for the actual files that were transmitted or received.  And if they exist in archive or backup, we will pay to have it restored from backup.  But, you know, we want to know what is available and what is not.  We would appreciate if you could do that, Jad.

MR. SHEIKALI:  We will take a look. Like I mentioned, we weren't even aware of this order form until Friday.  And so although I am confident that we ran a comprehensive enough search that this would have been pulled in as a responsive

Page 102

document if it existed in Gannett's system, I don't see an issue with us taking another look now, having the benefit of this document.

MR. HEDIN: Okay.

Q. (BY MR. HEDIN:) All right. Just one second.

Okay. So if you could go back, please, to Exhibit 8, this is the Amendment Number 3, and just take a look at the third page of it, and let me know when you are there.

MR. SHEIKALI: All right. Is that Exhibit 8?

MR. HEDIN: Exhibit 8, yes.

MR. SHEIKALI: We are on Page 3.

Q. (BY MR. HEDIN:) Under Section 5, Permitted Uses/Restrictions under Subpart A, do you see where it says: The product may be used for clients' marketing programs to consumers and businesses. And that if used to market to a consumer, "existing customer" shall mean only those customers with whom Client can reasonably demonstrate an existing business relationship. Consumers who have merely contacted the client are not existing customers.

Do you see that?

Page 103

A.     I do.

Q.     And then just one second.  So if you can go down to Page 5 under Additional Warranty Terms.

A.     Okay.

Q.     Do you see where it says under Section (b) "Client warrants that" and then under Section (ii), "As in accordance with the terms of Section 4 above, all consumer records submitted for processing are existing customers"?

A.     Yes.

Q.     Okay.  So the order that we were previously looking at that was placed pursuant to Amendment 3 and that was Plaintiffs' Exhibit Number 6, all orders placed pursuant to this order at Exhibit 6 would have been existing customers of Gannett whose emails were transmitted to Acxiom?

A.     Yes.

Q.     So I would -- we have as an exhibit here next the document retention materials.

MR. HEDIN:  I am going to mark this as Exhibit Number 22.

(Plaintiffs' Exhibit 22 was marked for identification.)

Q.     (BY MR. HEDIN:)  Just one second.

Page 104

This is a Composite Exhibit of a few different retention policies that were produced.  Just take a look at this and let me know when you are ready.

MR. SHEIKALI:  It is not quite here for us yet.

MR. HEDIN:  It still says "distributing file" on the system.  Let me try it again.  Did that go through?

MR. SHEIKALI:  Yes.

Q.    (BY MR. HEDIN:)  So this is a Composite Exhibit with multiple policies over a period of time.  If you could just take a look at this and let me know when you are ready.

A.    I am ready.

Q.    All right.  So this document, the first page of this document is a GateHouse Media Records Retention Policy, dated January 1, 2010, right?

A.    Correct.

Q.    Have you seen this document before?

A.    I have not.

Q.    Okay.  Have you seen any of the documents before that are -- that comprise this exhibit?

A.    Are you talking about on this

Page 105

particular file?

Q.    Yeah.  On Composite Exhibit 22, there's multiple retention policies and schedules. I just want to know if you are familiar with any of them and if you are able to answer questions about the policies and whether they were in effect during the relevant period.

A.    Well, I can tell you that GateHouse policies had nothing to do with this time period with Gannett or USA TODAY, if that is what you are asking me, because we did not -- we weren't doing business as GateHouse.

Q.    When did Gannett cease doing business as GateHouse?

A.    We didn't do -- Gannett and GateHouse merged in 2019.

Q.    Okay.  And GateHouse did not publish USA TODAY?

A.    No.

Q.    GateHouse published other daily publications around the country?

A.    GateHouse was its own company. Gannett was its own company.  GateHouse technically bought Gannett in 2019.

Q.    Okay.  So these would have no

Page 106

relevance to the relevant time period?

A.    That's correct.

Q.    What about this policy at Exhibit -- starting at Page 41 that is Exhibit -- do you recognize this document?

A.    No.  New Media -- my understanding is New Media was the holding company for GateHouse, but I'm not a hundred percent positive on that.

Q.    Okay.  Who would be the person most knowledgeable about the retention policies that are shown in this Composite Exhibit 22?

A.    For GateHouse?

Q.    For -- well, no.  For Gannett as it exists today.  I mean with respect to the policies in effect during the relevant time period, who at Gannett today would know the most about records retention?

A.    It would probably be our IT department.  I think it depends on what you are asking for.  Different departments likely have different policies, but IT would be the group that would adhere to the policy.

Q.    If you can go to the last page of this document, Records Retention - Technology --

A.    Yes.

Page 107

Q.      -- who would be the person most knowledgeable about technology-related record retention policies and the actual retention or destruction of those types of materials identified on that page?

A.      Again, it would be the IT department.

Q.      Okay.  So who at the IT department do you think is the person most knowledgeable?

A.      The head of the IT -- this group is Rick Baker.

Q.      What are master files as one of the record types or one of the document types identified in this page?

A.      On this page?

Q.      Yeah.

A.      Again, you are referring to Gannett -- a GateHouse contract.

Q.      No.  This appears to be a Gannett retention policy.  If you look at the bottom, it provides a Gannett email address, somebody named Steve Ertel.

A.      I don't know the name.  I don't -- I can't speak to the definition of a master file.

Q.      What about transaction files?

A.      Transaction files are -- again, those

Page 108

are going to be warehoused in Genesys, and those are -- transaction files are anything -- anything that goes onto the customer's account like interruption of service, payments.

Q.   What about appended data provided by Acxiom, would that be considered transaction files?

A.   I don't know if that is considered transaction files or not.

Q.   Do you know which of these types of files shown on this page that would fall under?

A.   I do not.

Q.   Okay.  Just one second.  Did Gannett during the relevant time period use a third party auditor to audit USA TODAY subscription data?

A.   We used AAM.  Is that what you are asking, specifically for subscription accounts?

Q.   Yes.  Did AAM serve as the auditor for USA TODAY magazine subscription accounts during the relevant time period?

A.   Correct.  Yes.

Q.   At that time was AAM affiliated with BPA?

A.   That does not sound familiar.

Q.   Did AAM provide any other services to Gannett besides auditing subscription accounts

Page 109

during the relevant time period?

A.    Not to my knowledge.

Q.    Did AAM receive any type of data other than subscription accounts from Gannett?

A.    Can you be more --

Q.    Let me rephrase the question.  In order to provide its services to audit the subscription accounts for USA TODAY magazine, what type of information would Gannett provide to AAM during the relevant time period?

A.    I don't know specifics on that file, but I do know that the report does state number of accounts by, I believe, zip code.

Q.    Would the underlying customer records of USA TODAY subscribers be provided to AAM in order for AAM to provide its services?

MR. SHEIKALI:  Objection to foundation.  You can answer if you know.

A.    I don't know what in a customer file is transmitted to them.

Q.    (BY MR. HEDIN:)  But the customer files were transmitted to AAM during the relevant time period?

A.    There's information transferred.  I don't know specifics as to what information was

Page 110

transferred.

Q.    Who would know?

A.    IT.

Q.    The IT department would know what information is included in the customer records provided to AAM during the relevant time period for --

A.    They were the ones that set up the file.  It's in that housing, within that department.

Q.    Who would be the ones that would instruct the IT department to assemble the file sent to AAM?

A.    It is automatic.  It has been going on forever.  I don't -- it would be what AAM required, so I don't know the answer to that.  This would take a long time --

Q.    So the same type of information that is provided to AAM today would have been provided to AAM during the relevant time period in order to perform its auditing services?

MR. SHEIKALI:  Objection, foundation.  You can answer if you can.

A.    I can't answer.  I don't -- I am not close enough to how those files are transmitted and

Page 111

what kind of data goes onto those files.

Q. (BY MR. HEDIN:) Has Gannett ever instructed AAM to transmit the data that it maintains pertaining to Gannett customers to any third party?

A. Do you mean AAM provides the files we send to a third party? Is that what you are asking?

Q. I am asking whether Gannett has ever instructed AAM to transmit the Gannett data that AAM has that it received from Gannett to any third party.

A. Not to my knowledge.

MR. HEDIN: I'm going to introduce -- just one minute. I am going to introduce as Exhibit 23 a document -- just one second.

(Plaintiffs' Exhibit 23 was marked for identification.)

Q. (BY MR. HEDIN:) All right. Please take a look at the document I have marked as Plaintiffs' Exhibit 23 and let me know when you are ready.

A. It looked better there.

MR. SHEIKALI: Looked the same.

Q. (BY MR. HEDIN:) Okay. So what is

Page 112

this document, Ms. Trask?

A.     This is a write-up on me.

Q.     Okay.  And this was from what time period?  Do you know when this was published?

A.     In the last year.

Q.     Okay.  Can you go down to the third page, please, under the heading "How has AAM supported your company?"

A.     Yes.

Q.     Okay.  You see it says:  AAM has regularly supported our need to pull data being requested by advertisers that is outside the normal requests.  The efficiency and quick responses have satisfied the requests time and time again.

Is that an answer that you provided to the question of "How has AAM supported your company"?

A.     Yes.

Q.     So what you mean -- what did you mean here about AAM has supported -- has regularly supported Gannett's need to pull data being requested by advertisers that is outside the normal requests?

A.     They are able to go into our files very quickly and tell advertisers -- or provide us

Page 113

with information for our advertisers on how many subscribers are in X, Y, Z zip code, etcetera.

Q.    So AAM, like if an advertiser asks that, AAM would be able to go into Gannett's system and --

A.    Advertiser asks us.  I didn't mean to interrupt.

Q.    Okay.  An advertiser asks you, but then AAM is able to go into your system and see the number of subscribers?

A.    They do not go into our system.

Q.    So walk me through this again because I don't understand.  What does it mean for AAM to support Gannett's need to pull data being requested by advertisers?

A.    We send the audit files to AAM.  So they have those files.  And then AAM uses those files for a request that we may have to satisfy an advertiser.

Q.    Okay.  So can you tell me an example of how this might play out?

A.    An example would be that a customer wants to know how many subscribers subscribe to a certain day of the week and in zip codes X, Y and Z.

Page 114

Q.      And a customer that -- an advertiser, potentially, wants to know that?

A.      Correct.

Q.      So where would they go for that information?

A.      They would look at the files that are sent for auditing purposes.

Q.      Okay.  And then what would happen?

A.      Then AAM would pull the information and send it back to us.

Q.      Pull what information and send it back to you?

A.      The answer to the question.

Q.      Okay.

A.      The question that was being presented.

Q.      So AAM had access to Gannett data?

A.      AAM audits our subscription files.

Q.      Right.  So Gannett sends AAM its subscription files about its customers?

A.      I don't know what specific information are in the files.  I don't know if there's names.  I know there's a zip code.  I know it tells them how many days of the week they subscribe to.  I know it tells them if -- well,

Page 115

that they have to be active and it has to be an active account.  But I don't know what data is transmitted.

Q.     How often are those transmissions to AAM made?

A.     There is an annual published report. And beyond that it has changed, so I don't know what it is today.  And I don't know what it was back in 2016.  There were quarterly updates at one point.  It depends on the size of the publication, every six months, every year, every two years.

Q.     Okay.  For USA TODAY newspaper, how often is it?

A.     It -- this is, I think, every -- I think it is every six months, but it could even be every quarter.

Q.     Okay.  And it is either every six months or every quarter.  Customer data is provided.  USA TODAY subscriber customer data for active subscribers is provided to AAM for auditing.

A.     Correct.

Q.     And you are not sure if that information includes names and addresses.

A.     I do not know.  I do know it has to have zip code because that is one of the things

Page 116

that comes on the published report.

Q.    Okay.  So who would know if that information during the relevant time period included names and addresses?

A.    The IT department.

Q.    Okay.  And -- sorry.  Remind me who is the person at the IT department who would be best able to address that issue.

A.    Rick Baker.

Q.    Rick Baker.  And do you know whether those files that were transmitted during the relevant time period to AAM for auditing are still maintained by Gannett?

A.    I do not know.

Q.    And Rick -- is Rick Baker the person most knowledgeable about whether those files would still exist?

A.    He would know who was the most knowledgeable if it is not him.

Q.    Okay.  And besides providing auditing services, did AAM do anything else for Gannett with respect to USA TODAY newspaper subscribers?

A.    Not to my knowledge.  Our work with AAM was for auditing purposes.

Q.    Exclusively for auditing purposes?

Page 117

A.    I believe so, yes.

Q.    Are you aware of any contract or agreement that has ever been entered into between AAM and Gannett or USA TODAY?

A.    I'm not following.  We have a contract for them to do our -- it is not even a contract.  No, there is no contract that -- it is basically a, I think, quarterly payment that is made.

Q.    Is there a written document that describes the rights and obligations of the parties in that relationship between Gannett and AAM?

A.    Funny.  I asked that not too long ago.  And I don't know that there's a contract.  There's just a payment process, and I don't know of an existing contract.

Q.    So I am asking about just any written document that describes the relationship between Gannett and AAM during the relevant time period or prior that was in effect during the relevant time period.  Do you know of anything?

A.    I do not know of any contract or outline that you are talking about.

Q.    And no --

A.    All I am aware of is a payment

Page 118

schedule.

Q.     And that is a written payment schedule?

A.     Yes.

Q.     Okay.

MR. HEDIN:  Jad, we request that that be produced.

MR. SHEIKALI:  Okay.  I will confer with Gannett and see if it exists.

MR. HEDIN:  Anything else, any other written materials between Gannett and AAM that would have covered the relevant time period.

MR. SHEIKALI:  Okay.

Q.     (BY MR. HEDIN:)  So if names and addresses were included in the material sent to AAM on a six-month basis or a yearly basis -- I'm sorry, on a quarterly basis or a six-month basis during the relevant time period, do you have any knowledge of Gannett suppressing or not including active Michigan subscribers in those transmissions?

MR. SHEIKALI:  Object to foundation.

A.     Yeah.

MR. SHEIKALI:  You can answer.

A.     I can't answer that.

Q.     (BY MR. HEDIN:)  Okay.  Is that a

Page 119

Howell Sizemore question?

A.     No.   That would be an IT -- IT is -- IT is in charge of the files.

MR. HEDIN:   I am going to introduce Exhibit Number 24.

(Plaintiffs' Exhibit 24 was marked for identification.)

Q.     (BY MR. HEDIN:)   Take a look at this and let me know when you are ready to discuss it. Are you familiar with this document?

MR. SHEIKALI:   Hold on.   We just got it.   Here it is.

A.     I am not.

Q.     (BY MR. HEDIN:)   Have you ever heard of USA TODAY NETWORK Ventures?

A.     Yes.

Q.     Okay.   What is USA TODAY NETWORK Ventures?

A.     Ventures is a group that does events. It is an entity within Gannett.   They are mostly involved with events, event marketing.

Q.     Okay.   Are you aware of any practices of the USA TODAY NETWORK Ventures group transmitting customer data to any third parties?

A.     I am not aware of any of that.

Page 120

Q.      Do you see the second sentence on this document under the Promotions heading at the top that says:  Through USA TODAY and over two hundred and fifty local media brands, the database of more than five million email addresses and a wide social media presence --

THE REPORTER:  I'm sorry.  I can't understand you.

MR. HEDIN:  Sorry.  I will start over with that question.

Q.      (BY MR. HEDIN:)  Do you see the second sentence on this document, it starts with the words:  Through USA TODAY and over two hundred fifty local media brands?

A.      Yes.

Q.      Does that sentence accurately describe the work done by USA TODAY NETWORK Ventures?

A.      Yes.

Q.      And USA TODAY NETWORK Ventures was formed in 2015, correct?

A.      I don't know the year.

Q.      Just one minute.  We will come back to that issue.  But do you see under the Top Benefits For Advertisers heading where it says that

Page 121

one of the benefits for advertisers under the --
this program is to increase email and mobile
databases?

A.      Yes.

Q.      Do you see where one of the other
benefits is to gain first party consumer data?

A.      Yes.

Q.      So is it fair to say that this
program involves transmitting email addresses
and/or other customer data to third parties?

A.      No.

Q.      Okay.  Walk me through why the answer
to that is no.

A.      I will tell you what I know and leave
it at that.  They do promotions in conjunction with
partners and work on their behalf together.  And
when you purchase a ticket or whatever you are
doing, you are getting -- I believe -- I'm not an
expert here either -- that they get an email
address and it is shared.  That helps the other
company build their database.

Q.      So Gannett customer data is not being
used to facilitate these promotions that are being
run?

A.      Gannett does not give its data to

Page 122

another company, no.

Q.   Okay.  If you look down to the Testimonials section, one that's here on the right is from someone named Lauren Hardy, very top right. It says:  We got five appointments from the first six phone calls off the database list we acquired through our promotion.  That list is gold.

A.   Can you tell me what page you are on?

Q.   Yes.  I am on --

A.   I see it now.  I'm sorry.

Q.   No problem.  Yes, this is the third page, very top right.  It is the database list that Lauren Hardy acquired.  You are certain that's --

A.   -- acquired it from.

THE REPORTER:  I'm sorry.  Y'all were talking at once.

A.   Sorry.

MR. HEDIN:  I'm sorry.

Q.   (BY MR. HEDIN:)  You don't know where she acquired it from?

A.   I would have no idea what she is referencing there.

Q.   But you are certain it is not a list provided by Gannett?

A.   We do not give our data to other

Page 123

companies.

Q.     Do you know who at the USA TODAY NETWORK Ventures program would know the most about the type of database list that Lauren Hardy is referencing in that testimonial?

A.     You know, I'm sorry.  I'm just not that familiar with this group.  I know that -- I don't know the name off the top of my head, no.  I think it is Rebecca somebody.

Q.     Just one second.  Has Gannett ever had a relationship with a company called List Services Corporation?

A.     It doesn't sound familiar to me.

MR. HEDIN:  I am going to introduce this as Exhibit Number 25.

Q.     (BY MR. HEDIN:)  Just take a look at this, let me know when you are ready.

(Plaintiffs' Exhibit 25 was marked for identification.)

A.     We have it.

Q.     (BY MR. HEDIN:)  Okay.  So have you ever heard of -- this is a document pertaining to the DirectBase enhanced database provided by List Services Corporation.  Are you familiar with this?

A.     I am not.

Page 124

Q.   Okay.  Do you see under the -- on the second page, the second paragraph, this is under the heading that starts on the first page "DirectBase Mailing Lists Work For Everyone."  Do you see the paragraph there that says:  The same data that drives the success of LSC's DirectBase lists are also the building blocks for LSC's enhanced lists; files from USA TODAY to Publishers Clearing House.

Are you familiar with the files from USA TODAY that is being referenced in that paragraph?

A.   I am not.

Q.   So you are not aware of any transmissions of any files to LSC that contain USA TODAY customer data?

A.   I am not aware.

Q.   All right.  I have got one more exhibit here I am going to show you.

MR. HEDIN:  I am going to mark this Exhibit Number 27.

THE REPORTER:  27 or 26?

MR. HEDIN:  I'm sorry.  Yeah, it is 26.

(Plaintiffs' Exhibit 26 was marked

Page 125

for identification.)

Q.   (BY MR. HEDIN:)   Okay.   Do you have this document?

A.   Not yet.   Yes.

Q.   Okay.   This is a print profile for USA TODAY that was located on Gannett's website. And I can represent that this was found -- I believe this pertains to the relevant time period, at least 2016.

I am just wondering what these numbers next to these various categories mean in terms of the USA TODAY subscribership pertaining to those various interests.

A.   I can't answer.   This is on the advertising side of the business.

Q.   Okay.   Are you familiar with the relationship between comScore and Gannett?

A.   I know there was a relationship, but that is it.

Q.   Okay.   Who on the advertising side would be the person who could answer questions about that relationship?

A.   Probably Kathy Jack -- no, she wouldn't.   I don't know on the USA TODAY side. Kathy Jack.   She is not the person, but she could

Page 126

Case 4:22-cv-10685-SDK-CI   ECF No. 52-3, PageID.1663   Filed 09/12/24   Page 128 of 188

get us to the person.

Q.    Okay.  Are you familiar with a company called Nucleus Marketing Solutions?

A.    No.

MR. HEDIN:  I am going to mark this as Exhibit Number 27.

(Plaintiffs' Exhibit 27 was marked for identification.)

Q.    (BY MR. HEDIN:)  Take a look at this and let me know when you are ready.

(Pause.)

A.    Did you want me to read through the whole thing?

Q.    (BY MR. HEDIN:)  Have you ever heard of this company, this Nucleus Marketing Solutions partnership?

A.    I have not.

Q.    Okay.  You are not aware of any exchange or transfer of customer data from Gannett to Hearst or McClatchy or Tribune or any advertisers of the foregoing?

A.    No, I am not aware.

Q.    Okay.  All right.  If you can just give me like five minutes, I just want to see if I have any additional follow-ups, look at my notes,

Page 127

and then I will be right back.

A.   Okay.

Q.   Thank you.

THE VIDEOGRAPHER:   This is the end of Media 3.  It is 2:33, and we are going off the record.

(Whereupon, a break was had from 2:33 p.m. until 2:37 p.m. EDT)

Q.   (BY MR. HEDIN:)  Thank you, Ms. Trask.  This is a follow-up question.  If Gannett did acquire any appended data from Acxiom pertaining to Mr. Sabbag, what database would that data be stored in if it still is stored today?

A.   So there's a lot of ifs there.  If something was added, it would be -- everything is in the Genesys system.

Q.   So demographic?

A.   No, there's no demographic information in the Genesys system so -- that is why I am like -- I don't think there would be any. There's no demographic information kept in our systems, in our Genesys systems.  And that is where all the subscriber information resides.

Q.    If information, any type of information about a customer is appended to a

Page 128

record by Acxiom and sent back to Gannett, that information would all go into the Genesys system?

A.    If there -- I believe an email would be added to the Genesys system, but I don't believe the Genesys system can house anything else.

Q.    Well, for the reverse email appending, let's say an email, a list of email addresses provided to Acxiom and it sent back names and addresses corresponding to those email addresses.  That information would be added to the Genesys system too?

A.    If it is -- so the Genesys system houses the name, address, activity on an account, email, address, and that is it.

Q.    Right.  But let's say that they -- for the reverse email appending services that we were talking about earlier, if a list of email addresses was provided for Acxiom to provide, you know, to reverse append, to append -- let's say names, addresses, maybe other emails to each record and then sent back to Gannett, Gannett would add that information to the file on that email address in the Genesys system?

A.    I can't answer that.  I don't know if it was added to the Genesys files.

Page 129

Q.    Okay.  You said Howell Sizemore would be the person that would know the answer to that type of thing?

A.    Yes.

Q.    Okay.  All right.  My last question is about -- or couple of questions is about the LocaliQ company.  Are you familiar with LocaliQ?

A.    It is -- yes.  Not very, but yes, that is our advertising side.

Q.    Is that -- is that a -- is LocaliQ a separate company from Gannett, or is it a division of Gannett?

A.    It is a division of Gannett.

Q.    And when did LocaliQ begin performing services for Gannett?

A.    It was created by Gannett, and I can't tell you the year.

Q.    Have you ever heard of a company called ReachLocal?

A.    Yes.

Q.    ReachLocal was acquired by Gannett in 2016, right?

A.    I don't know what year it was acquired.

Q.    Was ReachLocal rebranded as LocaliQ?

Page 130

A.    I don't know if there was any connection between the two.

Q.    What type of work did ReachLocal perform for Gannett?

A.    I don't know.  This is all on the advertising side.

Q.    Okay.  And who is the person most knowledgeable about these issues on the advertising side?

A.    Kathy Jack, Kathy Jack-Romero.

MR. HEDIN:  Okay.  I have nothing further at this time.  But Jad, you know, we did request additional information, and we reserve the right to reopen this deposition to elicit testimony from some of the other individuals that Ms. Trask identified in response to certain of our questions.

Mr. Sheikali may have some additional questions for you.  Thank you very much for your time.  I really appreciate it.

MR. SHEIKALI:  Yeah, I just have a few questions to get through here.

EXAMINATION BY MR. SHEIKALI:

Q.    Ms. Trask, do you recall submitting an affidavit in this litigation, earlier on in this

Page 131

litigation?

A.    Yes.

Q.    And do you recall submitting that affidavit in support of Gannett's motion to dismiss in this case?

A.    Yes.

Q.    And do you recall making the representation in your affidavit that Gannett did not share the subscriber information for USA TODAY subscribers during the 2015 through 2016 relevant time period?

A.    That's correct.

THE VIDEOGRAPHER:  Excuse me.  Could you move the camera so that just she is on the screen there?  Thank you.

Q.    (BY MR. SHEIKALI:)  And do you recall making the representation in your affidavit that Gannett did not share the personal information of Johnny Sabbag during the 2015 through 2016 relevant time period to any third parties?

A.    That's correct.

Q.    Is it your understanding that -- actually, strike that.

Was Gannett's practice during the 2015 through 2016 time period not to share the

Page 132

personal information of USA TODAY subscribers to third parties?

A.    That is correct.

Q.    And is it accurate that with respect to personal information of USA TODAY subscribers, Gannett handled that information separately from other publications during the 2015 through 2016 time period?

A.    That's correct.

Q.    There was some discussion earlier in your deposition about the USA TODAY Network.  Is it accurate that the USA TODAY Network is simply a branding vehicle?

A.    That is correct.

Q.    And with respect to the various publications that fall within the USA TODAY Network, is it accurate that for any publications -- that the practices of the various publications that existed prior to the creation of the USA TODAY Network continued after the creation of the USA TODAY Network?

A.    Yes.

Q.    In other words, the practices -- Gannett's practices with respect to USA TODAY data did not change as a result of the creation of the

Page 133

USA TODAY Network?

A. That is correct.

Q. There was also some discussion about certain services that Gannett consumed from Acxiom Corporation. Do you recall providing testimony on that?

A. Yep.

Q. And is it accurate to say that pursuant to various contracts and amendments, that during the relevant time period Gannett had the license to use certain products and services provided by Acxiom?

A. Yes.

Q. Is it accurate to say that during the 2015 through 2016 time period, Gannett did not use all of the services to which it had a license from Acxiom?

A. That is correct.

MR. HEDIN: We object across the board to all of these questions as leading.

MR. SHEIKALI: Is that a valid objection in a deposition?

MR. HEDIN: Yes.

Q. (BY MR. SHEIKALI:) And is it your understanding that during the 2015 through 2016

Page 134

time period, Gannett only used three products from Acxiom?

A.    Correct.

Q.    And the three products used by Gannett, the three Acxiom services used by Gannett were a file install service, an email append service and a reverse email append service; is that accurate?

A.    Yes.

MR. HEDIN:  Same objection.

Q.    (BY MR. SHEIKALI:)  And earlier you testified regarding certain data enhancement services provided by Acxiom.  Is it accurate that the file install service provided by Acxiom was a process by which Acxiom would provide Gannett with certain consumer lists housed in Acxiom's database which were transferred to Gannett so Gannett could use that information for internal marketing purposes?

A.    That is correct.

MR. HEDIN:  Same objection.

Q.    (BY MR. SHEIKALI:)  And for the file install service, is it accurate that Gannett would receive certain consumer lists from Acxiom which Gannett would then use internally to append its own

Page 135

customer lists?

A. Yes. It was done on the Gannett side.

Q. And so is it accurate that in order for Gannett to use the file install service from Acxiom, Gannett did not provide any subscriber information to Acxiom to make use of that product?

A. For the -- no, it did not.

Q. Is it accurate that at no point during the 2015 through 2016 time period did Gannett provide USA TODAY subscriber information to Acxiom?

A. It did not.

MR. HEDIN: Objection, leading.

Q. (BY MR. SHEIKALI:) Is it accurate that during the 2015 to 2016 time period Gannett did not provide the personal information of Johnny Sabbag to Acxiom?

A. That is correct.

Q. And is it accurate that in order for -- strike that.

With respect to the email append service that Gannett used from Acxiom during the 2015 through 2016 time period, is it accurate that the way that process worked was Gannett would

Page 136

provide a name and mailing address to Acxiom and in exchange would receive a corresponding email address from Acxiom?

A.    That is correct.

MR. HEDIN:  Object to form, leading.

Q.    (BY MR. SHEIKALI:)  And the information provided to Acxiom from Gannett in order to use the email append service was only limited to name and mailing address; is that correct?

A.    Yes.

Q.    And given Gannett's practice of not sharing the personal information of USA TODAY subscribers to third parties, is it accurate that the information provided from Gannett to Acxiom for the email append product would not have included USA TODAY subscriber information?

MR. HEDIN:  Objection, leading, foundation.

MR. SHEIKALI:  Sure.  I will repeat that.

Q.    (BY MR. SHEIKALI:)  So you testified that in order for Gannett to use the email append service from Acxiom, Gannett would need to provide a name and a mailing address; is that right?

Page 137

A.     Yes.

Q.     And with respect to Gannett's use of the email append service and given Gannett's practice and policy of not providing USA TODAY subscriber information to third parties during the relevant time period, is it accurate that Gannett would not have provided the names or mailing addresses of USA TODAY subscribers to Acxiom in order to use the email append product?

MR. HEDIN:  Objection, foundation, calls for speculation, leading.

A.     You are going to have to repeat it. I'm sorry.  I am not wrapping my head around that one.

Q.     (BY MR. SHEIKALI:)  Okay.  I will rephrase it.  So you testified that during the relevant time period, Gannett would have not -- Gannett did not provide USA TODAY subscriber information to Acxiom.

A.     Correct.

Q.     And so with respect to Gannett's use of Acxiom's email append product, is it accurate to say that Gannett would not have provided the names or mailing addresses of USA TODAY subscribers to Acxiom?

Page 138

A.     Correct.

MR. HEDIN:  Objection.

Q.     (BY MR. SHEIKALI:)  And with respect to the reverse email append product, is it your understanding that product works by Gannett providing Acxiom with a list of email addresses and then Acxiom would provide the corresponding name and mailing address?

A.     That is correct.

Q.     Is it accurate that the information provided by Gannett to Acxiom for the reverse email append product would only have included email addresses?

A.     That's correct.

Q.     And with respect to both the -- with respect to all three of the products used by Gannett during the relevant time period, so the file install, the email append and the reverse email append, once Gannett received the output file from Acxiom and completed its own internal -- and Gannett completed its own internal enhancement of its customer data, would Gannett have any purpose to retain the output files provided by Acxiom?

A.     No.

MR. HEDIN:  Objection, leading.

Page 139

Calls for speculation.

Q.    (BY MR. SHEIKALI:)   There was also discussion earlier in your deposition regarding Gannett customer source files.  With respect to the use of the file install product from Acxiom, would -- is it accurate that Gannett would not have needed to provide its source file to Acxiom to use that product?

A.    You mean did we send them our files?

Q.    Correct.

A.    No.  They sent us the enhanced data.

Q.    And so just to clarify, with respect to the use of the file install, earlier was that -- is file install the product you were referring to when you were testifying as to Acxiom's enhancement --

A.    Yes.

Q.    -- in getting that list?

A.    Yes.  That is how I refer to it. Sorry.

Q.    And so when you are referring to scenarios where Acxiom was enhancing Gannett's lists, were you referring to scenarios where Acxiom was providing Gannett with consumer lists which Gannett would then use internally to enhance its

Page 140

own list?

A.    Yeah.  They provide --

MR. HEDIN:  Objection, leading.

A.    We would take their data and add it to our use -- we did the work on our end.

MR. SHEIKALI:  That is all the questions I have.

MR. HEDIN:  I just have a couple more on redirect.

REEXAMINATION BY MR. HEDIN:

Q.    So isn't it true, Ms. Trask, that the email addresses that Gannett sent to Acxiom for the reverse email append were sufficient for Acxiom to put a name and an address to the person who that email address belonged to?

A.    Assuming they had the data -- I don't know what the match rate was.

Q.    I mean but that is the service that Acxiom was providing?

A.    Yes.

Q.    Okay.  And I believe you just stated that you -- I believe you just testified that Gannett did not transfer Mr. Sabbag's -- any of Mr. Sabbag's information to Acxiom or to any other

Page 141

third party.  Isn't it true that you don't know here today whether or not Gannett sent Mr. Sabbag's email address to Acxiom?

MR. SHEIKALI:  Objection.  Misstates prior testimony.

Q.    (BY MR. HEDIN:)  Is it true that, sitting here today, you don't know whether Gannett sent Mr. Sabbag's email address to Acxiom?

A.    We did not send USA TODAY -- we didn't have USA TODAY emails.

Q.    I'm sorry?

A.    I -- I don't believe we sent his email to Acxiom.

Q.    But you don't know for certain?

A.    No.

Q.    Okay.  And you also don't know for certain that Mr. Sabbag's name and address was not sent to AAM during the relevant time period, right?

A.    We can clear that up quickly.  I don't know what is in the files.

Q.    You don't know what is in the files at AAM?

A.    That's correct.  I don't know what data is in the files sent to AAM.

Q.    Okay.  So you can't definitively say

Page 142

that Mr. Sabbag's information, name and address was not sent to AAM?

A.      That is correct.

MR. HEDIN:  I have nothing further. Thanks again for your time.

MR. SHEIKALI:  I have just a couple more.

REEXAMINATION BY MR. SHEIKALI:

Q.      With respect to the reverse email lookup, earlier you testified that the way that process worked was Gannett would provide a list of email addresses to Acxiom in exchange for name and address information; is that correct?

A.      Yes.

Q.      And with respect to individuals for whom Gannett already had a name and email address, do you agree that the reverse email append service would provide no value in that scenario?

A.      That's correct.

Q.      And is -- earlier you also testified that Gannett's practice during the 2015 through 2016 time period that is relevant to this litigation was that it was not providing the personal information of USA TODAY subscribers to

Page 143

third parties; is that accurate?

A. Yes.

Q. And is it accurate that the only Gannett subscription that -- the only subscription that Gannett has a record of Mr. Sabbag subscribing to is USA TODAY; is that accurate?

A. That is accurate.

MR. SHEIKALI: Okay. No further questions.

MR. HEDIN: I just have one more question, and that is it.

REEXAMINATION BY MR. HEDIN:

Q. Can you think of any scenario in which Gannett during the relevant time period would only possess an email address of an existing customer?

A. Only an email address?

Q. Yes.

A. I cannot think of a situation where for USA TODAY Gannett would have just an email address for a subscriber. We wouldn't be able to deliver the newspaper.

Q. What about its other publications, any of the other Gannett publications where only an

Page 144

email address would be possessed by Gannett for an existing customer?

A. For an existing print subscriber, no.

Q. Okay. So given that the email -- reverse email append service was only to be performed for existing customers, it is fair to say that Gannett possessed additional information beyond the email address for the people that it sent email addresses to Acxiom for in order to get additional information; it already possessed that additional information at the time it sent the email addresses of those people to Acxiom, correct, because they were existing customers?

A. They were existing print subscribers.

Q. So there was a purpose for Gannett to send the email addresses of those people to Acxiom, even though it already had other information about those people beyond their emails, correct?

A. So the only subscriber that we would have that we would have -- there are digital subscribers. That is a whole other category that we haven't discussed. But for print subscribers, we would have to have their name and delivery address.

Q. But for digital subscribers as well,

Page 145

you would also need their name and address in order to process their payments, correct?

A.     No.

Q.     Walk me through that.

A.     A digital subscriber requires a name and an email address.

Q.     Okay.  So you would have the name?

A.     Yes.

Q.     Okay.

MR. HEDIN:  Nothing further.

MR. SHEIKALI:  Nothing for me too.

THE VIDEOGRAPHER:  Okay.  We are off the record at 2:59 p.m., and this concludes today's testimony given by Helen Trask.  The total number of media used was four and will be retained by Veritext.  And we are going off the record.

(Deposition concluded at 2:59 p.m. EDT)

FURTHER THE DEPONENT SAITH NOT

Page 146

C E R T I F I C A T E

I hereby certify that the above and foregoing deposition was taken down by me in stenotypy, and the questions and answers thereto were reduced to typewriting under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing, to the best of my ability.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

LAURA H. NICHOLS

Commissioner-Notary Public, State of AL

ACCR License No. 3, Exp. 9/30/2024

GA CCR No. 2714, Exp. 4/1/2025

TN LCR No. 679, Exp. 6/30/2025

Transcript Certified on 6/4/2024

Page 147

**[& - 26]**

**&**

**&**   2:14 6:21

**0**

**0001**   5:24
**0276**   5:19

**1**

**1**   10:3 24:7
  58:2 59:1
  64:22 83:24
  105:17
**1/1/2010**   5:22
**10**   62:15
**10019**   2:16
**104**   5:21 57:1,4
  57:15,21 59:3
**10685**   1:4 10:9
**10:17**   9:10,18
**10th**   78:23
**11**   4:4,6
**112**   6:4
**1140**   2:7
**11:54**   64:22,25
**11th**   64:8
**12**   5:4
**12/5/2020**   6:15
**120**   6:8
**124**   6:12
**125**   6:17
**127**   6:20
**12:36**   64:25
  65:2
**13**   64:3 73:4,5
  73:6

**131**   4:7
**1330**   2:15
**1395**   2:7
**14**   45:21
**141**   4:8
**143**   4:9
**144**   4:10
**14736**   91:10
**147376**   7:14
  85:24 88:15
**17**   5:4 12:8,11
  12:14 13:19,22
  13:25 14:4,11
  17:12 45:1
**18**   5:8 20:17,19
  45:1
**18409**   147:18
**19**   5:12 22:3,3
  22:4,25 31:11
  34:16 36:25
  48:16 51:19,22
  51:25 52:6,10
  52:21 53:1,18
  54:17 56:12
  57:11,14 58:2
  59:1 63:15
  75:14,18
**1993**   16:1,3
  17:5
**1:31**   88:8,10

**2**

**2**   24:8 35:11,23
  36:1 37:4
  53:25 56:7,21
  57:10,11,13

59:8,19 61:1
  61:16 64:6
  65:2 79:8,10
  79:18 82:20
  88:5
**2/9/2006**   7:7,16
**20**   5:8,14 49:14
  49:16,25 51:16
  51:24 52:7,11
  52:16 53:2,16
  53:23 54:8,14
  54:15 55:17,21
  56:11,22 57:1
  57:15,21 59:3
  59:8,21 63:15
  75:18
**2001**   16:2,4,6
**2005**   69:18
**2006**   68:12
  77:4
**2010**   105:17
**2011**   78:23
**2013**   25:12
  54:3 59:13,14
  60:21 61:24
  63:18
**2014**   64:8
**2015**   17:17
  21:8 93:17
  94:22 121:21
  132:10,19,25
  133:7 134:15
  134:25 136:10
  136:16,24
  143:22

**2016**   17:18
  37:9 52:22
  54:6 59:5
  81:19 86:7
  87:20,23 88:23
  89:4 94:22
  116:9 126:9
  130:22 132:10
  132:19,25
  133:7 134:15
  134:25 136:10
  136:16,24
  143:23
**2017**   86:8
**2019**   106:16,24
**2021**   16:2
**2022**   16:20
**2023**   16:20
**2024**   1:17 9:9
  9:19
**21**   5:17 66:4,6
  66:18 73:3
  77:2
**21st**   17:17
**22**   5:12,21
  104:22,23
  106:2 107:11
**2290**   3:7
**23**   6:4 112:16
  112:17,21
**24**   6:8 120:5,6
**25**   6:12 124:15
  124:18
**26**   6:17 125:22
  125:24,25

Page 1

**[27 - able]**

**27** 6:20 125:21 125:22 127:6,7
**2714** 147:22
**28th** 87:19,23 88:23 89:4
**2:33** 128:5,8
**2:37** 128:8
**2:59** 146:13,18
**2nd** 86:7

**3**

**3** 7:7 35:11 60:1,7 61:23 68:2,3 69:1 72:9,10,11 73:2,3,3 74:25 75:10 78:18 79:12 82:20 84:16 88:10,16 103:9,14 104:14 128:5 147:21
**30** 1:15 5:5 8:4 12:21 14:1,8 14:20
**305** 2:9
**30th** 17:18 86:8
**313** 3:10
**32nd** 2:15
**33131** 2:8
**357-2107** 2:9
**364** 5:15
**37** 53:25 56:7 56:22 59:8 61:1,16

**4**

**4** 1:17 7:10 9:9 35:23 36:1 69:7,8 80:19 82:4 104:9
**4/1/2025** 147:22
**4/2016** 54:11
**41** 56:25 57:4 57:15,21 59:3 107:4
**465-7000** 3:10
**468** 56:8,15 60:22
**48226-3506** 3:9
**49** 5:14
**4:22** 1:4 10:9
**4a** 82:10
**4b** 80:21
**4th** 9:18 37:9 52:22

**5**

**5** 15:3,6 17:12 35:23 51:23 52:6,10,21,25 53:18 54:6 103:15 104:3
**5/22** 49:6,8
**5/4/2016** 25:7
**53** 45:24

**6**

**6** 1:15 5:5 7:13 8:4 12:21 14:1 14:8,20 25:4

61:24 85:7,8 85:18,20,21 88:14 93:6 95:21 98:14 100:25 104:15 104:16
**6/30/2025** 147:23
**6/4/2024** 147:24
**646** 2:17
**66** 5:17
**660** 3:8
**6733693** 1:24
**679** 147:23
**68** 7:7
**69** 7:10
**6th** 25:12 59:15 63:18

**7**

**7** 72:14 84:16
**78** 7:16
**7th** 69:18

**8**

**8** 7:16 78:8,9 103:8,12,13
**8037468** 53:23
**8145319** 37:1
**837-7150** 2:17
**85** 7:13

**9**

**9** 15:7 25:2 64:7

**9/30/2024** 147:21
**9/7/2005** 7:10
**97** 16:6
**98** 16:6
**9th** 68:12 77:3

**a**

**a.m.** 9:10,18 64:25
**aam** 109:15,17 109:21,24 110:3,9,15,16 110:22 111:6 111:13,15,19 111:20 112:3,6 112:10,11 113:7,10,16,20 114:3,4,9,13,16 114:17 115:9 115:17,18,19 116:5,20 117:12,21,24 118:4,12,19 119:11,15 142:18,22,24 143:2
**ability** 147:10
**able** 19:16 34:21 36:6,11 49:19,22 51:22 62:10,20 65:8 71:23 72:17 77:5,19,24 79:4 86:23 96:24 100:7

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[able - address]**

106:5 113:24
114:4,9 117:8
144:22
**above** 9:11
17:12 40:21
41:4 104:9
147:3
**absolutely** 63:3
**access** 115:17
**accompanied**
80:8
**accordance**
104:8
**account** 24:10
24:15,18 25:20
27:10,17 31:12
31:19 32:19
35:7,10,14,18
35:19,22,25
36:7,8 37:1,4,7
50:24 51:3,9
51:12 52:1,3,5
52:9,20,25
53:7,17,22
54:3,5,7,16
55:14 56:1,2,3
56:6,14,23
57:5,6,13,14,23
57:25 58:1,1,7
58:9 59:2,12
60:22 61:15
63:21 109:3
116:2 129:13
**accounts** 25:22
36:8 52:17

53:8,15 54:14
55:5,8,15
66:23 109:16
109:18,25
110:4,8,13
**accr** 147:21
**accurate** 133:4
133:12,17
134:8,14 135:8
135:13,23
136:4,9,15,20
136:24 137:14
138:6,22
139:10 140:6
144:1,3,6,7
**accurately**
121:16
**acquire** 128:11
**acquired** 123:6
123:13,14,20
130:21,24
**acting** 9:4
**action** 10:16
147:12
**active** 50:24
51:4 52:16
116:1,2,20
119:20
**activity** 27:16
129:13
**actual** 92:16
102:15 108:3
**actually** 12:8
17:12 132:23

**acxiom** 7:8,11
7:17 13:23
14:3 68:12,15
68:18,21 69:15
69:25 70:1,2,8
70:11,23 71:2
71:20 72:18
73:11,18,23
74:4,8,12,15,21
75:8 76:14
77:20 78:19
79:5,11,17
80:4,9,15 83:3
83:4 84:20,25
86:2 88:17
89:2,6,6,14,23
90:23 91:8,14
91:19,22 92:3
92:9,17,24
94:12 95:6
96:5,7 97:25
98:10 99:12
100:2 104:17
109:6 128:11
129:1,8,18
134:4,12,17
135:2,5,13,14
135:15,24
136:6,7,12,18
136:23 137:1,3
137:7,15,24
138:8,19,25
139:6,7,11,20
139:23 140:5,7
140:22,23

141:13,14,20
141:25 142:3,8
142:13 143:13
145:9,12,16
**acxiom's** 99:10
135:16 138:22
140:15
**ad** 38:3
**add** 70:24
74:15 80:4,10
129:21 141:4
**added** 90:24
92:19 128:15
129:4,10,25
**addendum**
85:17
**additional**
20:25 70:17
74:16 92:23
104:3 127:25
131:13,17
145:7,10,11
**address** 28:6,7
73:19 80:9,10
98:12 99:1,4
99:23 102:11
108:20 117:8
122:20 129:13
129:14,22
137:1,3,9,25
139:8 141:15
141:16 142:3,8
142:17 143:1
143:14,17
144:16,18,22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[address - appears]**

| | | | |
|---|---|---|---|
| 145:1,8,24 146:1,6 | **ae** 59:25,25 60:1 | **al** 10:6 61:3,7,8 61:9 147:20 | 97:23 99:6 100:10 102:8 |
| **addressed** 75:3 75:11 77:9 | **affidavit** 131:25 132:4,8 132:17 | **alabama** 9:3,4 **allow** 46:25 | 106:5 110:18 111:16,23,24 |
| **addresses** 73:22,23 74:9 89:6 90:25 91:15,17 116:23 117:4 119:15 121:5 122:9 129:8,9 129:10,18,20 138:8,24 139:6 139:13 141:13 143:13 145:9 145:12,16 | **affiliate** 82:10 **affiliated** 41:24 109:21 **affiliates** 72:16 72:17 **affiliations** 10:21 **agency** 30:21 31:6 **ago** 99:15 118:14 | **alongside** 90:25 **alternate** 83:2 83:4 **amazon** 39:14 39:14 **amended** 13:23 **amendment** 78:18,22,25 79:6,12 82:20 83:18,19 84:2 84:8 85:14 88:16 103:8 104:14 | 113:15 115:13 119:23,24 122:12 126:14 126:21 129:24 130:2 **answered** 73:16 **answering** 62:23 63:8 **answers** 147:5 **anybody** 18:24 |
| **adds** 91:20 **adequately** 63:6 **adhere** 107:22 **administer** 10:15 **advance** 18:11 **advertiser** 114:3,6,8,19 115:1 **advertisers** 113:12,22,25 114:1,15 121:25 122:1 127:21 **advertising** 27:23 126:15 126:20 130:9 131:6,8 | **agree** 10:1 31:24 34:25 54:21 55:1,9 55:10 143:18 **agreed** 8:2 **agreement** 7:7 7:10,16 42:10 42:20 68:10,25 69:1,14,20 72:19 75:16 78:19 79:12 80:25 82:5 83:18,19 84:1 88:17 118:3 **agreements** 69:25 **ahead** 76:20,21 **air** 9:17,17 | **amendments** 69:3,21 134:9 **americas** 2:15 **amount** 60:17 60:17 **analytics** 76:8 **annual** 116:6 **annually** 95:25 **answer** 19:16 21:23 28:16,18 30:11 41:19 47:15,17 49:13 52:8 53:11 62:5,10,20 63:2 69:23 76:13 77:5 86:21,24 94:7 95:19 96:24 | 87:13 95:9 101:3,15 **anywise** 147:13 **appear** 20:22 28:15 29:17 31:2 37:13 38:16 52:11 53:1 58:9,13 64:7 93:23 **appearance** 10:19 **appearances** 10:21 **appearing** 12:10 **appears** 36:3 40:24 54:9 56:7 59:13 67:11 72:20 94:1 108:18 |

Page 4

**[append - bates]**

append 71:20
79:20,24 82:22
83:1,9,12
88:20 89:7
91:3,6,18 92:4
92:24 94:2,18
94:19,19
129:19,19
135:6,7,25
136:22 137:8
137:16,23
138:3,9,22
139:4,12,18,19
141:14 143:18
145:5
appended
82:22 90:24
92:11 109:5
128:11,25
appending
70:17 75:1,9
91:11 129:7,16
applicable
33:16
application
93:19
appointments
123:5
appreciate
102:19 131:19
appropriate
45:18
approve 80:24
approving 82:4
82:7

approximately
16:12,19,21,22
95:11,15
archive 102:17
area 33:16 62:1
87:8 101:2
argiriou 87:3
98:5
arrow 14:6
article 5:8 6:4
6:20
asked 34:20
47:12 50:16
53:6 118:13
asking 11:18
13:24 26:4
45:16,16 57:19
61:4 62:25
63:4 76:24
79:9 82:1,3
92:15 99:19
106:11 107:20
109:16 112:8,9
118:17
asks 114:3,6,8
assemble
111:12
assign 8:19
assistance
43:20
assume 86:14
assuming 36:16
141:17
assumption
63:13 94:9

96:3
attention 15:1
attorney 2:5,13
3:5 10:22
audio 9:24
audit 109:14
110:7 114:16
auditing
109:25 111:21
115:7 116:20
117:12,20,24
117:25
auditor 109:14
109:17
audits 115:18
authorized
10:15
automatic
111:14
available
102:19
avenue 2:7,15
3:8
aware 71:17
84:8,11 88:22
89:9 99:14
102:22 118:2
118:25 120:22
120:25 125:14
125:17 127:18
127:22

**b**

b 1:15 5:5 8:4
12:21 14:1,8
14:20 37:14

80:21 104:7
back 14:7 16:1
16:6 32:2
36:13 48:15
51:21,25 54:3
55:16,23 59:7
65:2 70:25
72:9,10 74:18
80:11 81:15,18
82:19 88:10
89:14,18,19
90:23 91:15
98:9 103:7
115:10,12
116:9 121:23
128:1 129:1,8
129:21
backup 102:17
102:18
backwards
91:23
baker 108:10
117:9,10,15
bar 27:3
based 57:5
63:12 96:3
basically 46:19
70:11 118:8
basis 71:21
84:21 102:5
119:16,16,17
119:17
batch 86:10,11
bates 5:15,18
5:23

**[bearing - certify]**

**bearing** 65:5
**beck** 82:13,16
  87:2,9
**beginning** 5:18
  5:23 10:22
  14:7 21:8 24:1
  65:2 88:10
**begins** 31:15
**behalf** 1:8
  15:15 122:16
**believe** 14:24
  18:1 25:25
  27:14 36:18,22
  38:24 40:1,19
  41:8 43:4,10
  44:8 50:15,21
  52:19 55:19
  57:12 59:2
  60:5,19 63:23
  67:10,14 73:2
  78:17,21 79:3
  81:8,25 82:25
  83:11 84:14
  85:1,3 89:24
  90:2 92:12,20
  93:10,12 94:10
  94:15,20,23,25
  95:5 110:13
  118:1 122:18
  126:8 129:3,4
  141:22,23
  142:12
**belonged**
  141:16

**benefit** 34:19
  72:18 103:3
**benefits** 121:25
  122:1,6
**best** 31:4 86:23
  96:19 117:8
  147:9
**better** 112:23
**beyond** 46:12
  100:17 116:7
  145:8,18
**billing** 87:5
**birmingham**
  9:3
**bit** 71:10 97:3
**block** 67:16
**blocks** 125:7
**blog** 6:4
**board** 134:20
**books** 45:3
**bottom** 13:11
  98:14 108:19
**bought** 38:22
  106:24
**bpa** 109:22
**branding**
  133:13
**brands** 121:4
  121:14
**break** 16:1,4
  64:18,24 65:7
  65:12 72:3
  88:3,7,13
  128:7

**brickell** 2:7
**broken** 80:18
**brought** 14:7
**build** 122:21
**building** 3:7
  125:7
**built** 31:7
**bullet** 83:8
**bursor** 2:14
**bursor.com**
  2:18
**business** 17:2,9
  103:22 106:12
  106:13 126:15
**businesses**
  103:19
**button** 13:11

|   |
|---|
| **c** |

**c** 2:1 3:1 147:1
  147:1
**call** 24:2 26:25
**called** 20:13
  23:10 36:17
  37:18 38:6,7
  68:12 70:5
  82:22 124:11
  127:3 130:19
**calls** 123:6
  138:11 140:1
**camera** 9:22
  132:14
**cancel** 33:3
**capable** 63:7
**capacity** 12:2
  81:3

**card** 36:15,17
  36:18 60:8,14
**carrier** 36:21
  36:22
**case** 1:4 10:8
  45:20 49:15
  50:7,14 79:1
  92:18 99:5
  132:5
**cases** 53:21
  93:20
**categories** 74:6
  126:11
**category**
  145:21
**caus** 36:15
**cause** 9:11
  147:14
**caused** 73:13
**cc** 60:13
**ccr** 147:22
**cease** 106:13
**certain** 67:10
  69:3 77:25
  90:1 114:24
  123:13,23
  131:16 134:4
  134:11 135:12
  135:16,24
  142:14,17
**certified** 1:21
  8:6 9:1 147:24
**certify** 9:5
  147:3,11

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[change - consumed]**

| | | | |
|---|---|---|---|
| **change** 21:16 36:15,19 96:6 133:25 | **coincided** 46:19 | 124:1 | **comscore** 126:17 |
| **changed** 17:8 29:24 36:17,18 85:4 116:7 | **collectively** 95:17 96:11,17 96:20 | **company** 10:6 39:6 41:11,25 42:1,3,4,7,17 42:19,21 43:24 44:5,6 82:12 82:14 87:1,12 100:22 106:22 106:23 107:7 113:8,17 122:21 123:1 124:11 127:3 127:15 130:7 130:11,18 | **concerning** 91:16 99:21 |
| **charge** 100:24 120:3 | **column** 33:21 34:1,3 51:8,9 54:10 56:8 59:18,19,25 60:10,11,16 61:2,8,11,12,14 61:15,20,23 63:10 64:1 | | **concerns** 45:2 77:4 91:11 |
| **charges** 95:22 | | | **concluded** 146:18 |
| **ci** 1:4 10:9,9 | | | **concludes** 146:13 |
| **circumstances** 44:4 | | | **conducted** 9:20 10:11 100:1 |
| **civil** 9:6 | | | **confer** 34:13 35:1 46:12,14 54:18 55:5 58:22 119:8 |
| **clarification** 73:14 | **columns** 34:5 50:3 60:6 67:17 | **complaint** 45:20 | |
| **clarify** 140:12 | **come** 12:15 23:24 86:15 101:1 121:23 | **complete** 58:6 58:20 | **confident** 102:24 |
| **class** 2:3 45:25 | | **completed** 139:20,21 | **confirm** 39:25 55:20 |
| **clear** 30:13 45:9 64:23 73:8 94:17 142:19 | **comes** 117:1 | **completely** 62:3 | **confused** 91:9 |
| | **coming** 98:23 | **compliance** 8:12 | **confusion** 77:14,16,24 |
| **clearing** 125:9 | **commenced** 25:23 | **composite** 22:3 22:25 105:1,11 106:2 107:11 | **conjunction** 122:15 |
| **click** 14:9 | **commencing** 9:9 | | **connect** 82:23 |
| **clicked** 14:6 | **commissioner** 8:6 9:5 147:20 | **comprehensive** 102:24 | **connection** 9:22 23:18 44:18 65:6 131:2 |
| **client** 72:16 103:21,23 104:7 | **commitment** 95:23 | **comprise** 105:23 | **consent** 46:4 |
| **clients** 103:18 | **communicati...** 100:2 | **comprises** 20:8 | **considered** 109:6,7 |
| **close** 111:25 | **community** 70:5 95:4 | **computer** 22:14 23:3,5 30:14 49:21 | **consumed** 77:20 134:4 |
| **code** 29:6 36:19 110:13 114:2 115:23 116:25 | | | |
| **codes** 29:8,20 29:25 30:3 34:2,15 114:24 | **companies** 39:15,17,19 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[consumer - currently]**

| | | | |
|---|---|---|---|
| **consumer** 16:9 16:11,14,16,18 16:24 17:1,2,6 17:7,9 18:2,6 26:25 36:17 83:14 101:2,2 101:4,6,8,12,16 103:20 104:9 122:6 135:16 135:24 140:24 | **continuing** 3:1 6:1 | 37:1,5,15 38:13 39:24 41:1,6 44:1,2 45:5 50:5,7,8 50:11,12 51:20 52:11 53:2 54:3,4 55:18 56:19,24 57:1 58:15 60:11,15 60:18 64:5 65:24 66:25 67:6,7,14 68:12,23 69:5 70:19 72:8,10 72:19,22 78:20 79:2,13 80:5 80:12 83:16 84:6,21 86:4,8 86:9 88:17,20 88:21 93:18,19 93:24,25 105:19 107:2 109:20 115:3 116:21 121:21 132:12,21 133:3,9,14 134:2,18 135:3 135:20 136:19 137:4,10 138:20 139:1,9 139:14 140:10 142:23 143:3 143:14,20 145:12,18 146:2 147:8 | **correspond** 47:9 54:16 |
| | **contract** 41:21 70:4,5 74:25 75:10 77:9 81:21 82:2 100:17 108:17 118:2,6,7,7,14 118:16,22 | | **corresponding** 38:21 48:17 129:9 137:2 139:7 |
| | | | **counsel** 8:4,16 8:18 9:8 10:5 10:20,24 11:1 11:3,6 18:20 46:13 90:18 99:11,12 100:23 147:12 |
| **consumers** 103:18,23 | **contracts** 93:15 134:9 | | |
| **contact** 86:25 87:5,10 | **conversation** 90:7 | | **country** 106:21 |
| | **copies** 43:19 | | **couple** 130:6 141:8 143:6 |
| **contacted** 103:23 | **copy** 58:24 102:3 | | |
| **contain** 27:21 32:22 47:23 48:3 95:6 125:15 | **corner** 49:9 | | **court** 1:1 8:13 9:7 10:7,13 11:4,4 |
| | **corporate** 12:2 | | |
| | **corporation** 6:13,15 12:3 15:15,22 28:17 41:24 124:12 124:24 134:5 | | **coverage** 33:6,8 33:9,12 |
| **contained** 48:7 52:16 91:16 | | | **covered** 119:12 |
| **containing** 89:6 | **correct** 12:4,5 15:7,16,17,20 18:4 21:8,9,12 21:13,21 22:15 22:16,19,20,22 22:23 24:6,13 24:14,25 25:4 25:5,8,12 27:5 28:10,11 30:16 30:17,25 31:1 31:17 32:18,20 35:8,9,15,23 | | **create** 37:19 |
| **contains** 22:17 31:16 37:3,5 50:3 | | | **created** 130:16 |
| **content** 6:6 | | | **creation** 133:19 133:20,25 |
| **continue** 9:25 54:22 55:1 63:23 83:20 84:5 | | | **credit** 36:15,16 36:18 60:8,13 |
| | | | **current** 16:7 80:13,17 |
| **continued** 69:2 133:20 | | | **currently** 13:12 14:19 30:14 62:17 96:25 101:19,24 |
| **continues** 62:8 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [custodians - demographic]

| | | | |
|---|---|---|---|
| **custodians** 100:13 | **cv** 1:4 10:9 | 112:10 113:11 | **dated** 68:12 |
| **customer** 5:17 | **d** | 113:21 114:14 | 69:17 77:3 |
| 23:24 26:18 | **d** 1:5 51:9 56:8 | 115:17 116:2 | 105:17 |
| 27:24 28:19 | **daily** 20:5,11 | 116:18,19 | **dates** 50:22 |
| 39:21 40:5,6 | 20:12 21:19 | 120:24 122:6 | 54:3 65:18 |
| 44:7 47:23 | 29:5 95:17 | 122:10,22,25 | 86:6 |
| 48:4 62:19 | 106:20 | 123:25 125:6 | **david** 3:14 |
| 65:10 71:19 | **data** 6:5,14 7:7 | 125:16 127:19 | 10:12 |
| 75:8 84:21,24 | 7:10,16 23:15 | 128:11,13 | **day** 26:23 49:5 |
| 87:9 94:13,24 | 29:3,13,16 | 133:24 135:12 | 114:24 |
| 96:7 100:16 | 34:6,9,22 | 139:22 140:11 | **days** 115:24 |
| 101:5,16 | 36:20 37:17 | 141:4,17 | **december** |
| 103:20 110:14 | 38:21 39:2 | 142:24 | 17:17 21:8 |
| 110:19,21 | 48:17 50:3,9 | **database** 5:14 | 25:12 59:15 |
| 111:5 114:22 | 51:15,24 52:6 | 34:11,12,19 | 61:24 63:18 |
| 115:1 116:18 | 52:9 53:1,7,22 | 62:7,11,12,25 | 93:17 |
| 116:19 120:24 | 54:6,8,10,13,23 | 63:11 65:20 | **defendant** 1:13 |
| 122:10,22 | 55:17,21 56:21 | 71:20 92:19,23 | 3:3 5:6 11:3 |
| 125:16 127:19 | 57:3,21 59:3,6 | 121:4 122:21 | 14:2 |
| 128:25 136:1 | 59:10,17,22 | 123:6,12 124:4 | **defines** 45:25 |
| 139:22 140:4 | 60:20,25 61:5 | 124:23 128:12 | **definitely** 82:11 |
| 144:17 145:2 | 61:18 62:19 | 135:16 | **definition** |
| **customer's** | 63:5,9,13,25 | **databases** | 29:20 62:4 |
| 31:18 109:3 | 64:3 65:10,15 | 39:22 40:4 | 82:6 108:23 |
| **customers** 31:3 | 68:10,24,25 | 44:12 47:15,21 | **definitively** |
| 39:11 43:19 | 69:14 70:17,18 | 47:22,25 48:1 | 142:25 |
| 65:20 75:2 | 70:24 71:20 | 62:16 122:3 | **deliver** 44:7 |
| 80:14 94:2,6 | 73:11 75:1,9 | **date** 9:5 17:16 | 144:23 |
| 103:21,24 | 75:15 78:19 | 29:7 37:12 | **delivery** 26:12 |
| 104:10,16 | 79:12,25 80:8 | 49:6,7,7,8 | 27:10 33:3 |
| 112:4 115:20 | 90:24,24 91:1 | 59:14 61:5,10 | 145:23 |
| 145:6,13 | 91:2,8 92:17 | 61:21,23 62:2 | **demographic** |
| **cut** 24:19 31:23 | 92:18,23 94:12 | 62:3 63:17,19 | 70:14,18 |
| 58:5,14 | 95:21 109:5,14 | 63:24 64:11,11 | 128:17,18,21 |
| | 110:3 112:1,3 | 81:12 | |

**[demonstrate - document]**

| | | | |
|---|---|---|---|
| **demonstrate** 103:22 | 131:14 133:11 134:22 140:3 146:18 147:4,8 | **different** 21:24 24:15,24 25:16 25:20,24 26:23 | **discussion** 14:16 133:10 134:3 140:3 |
| **denver** 42:4 | **depositions** 8:14 | 30:4,5 35:10 35:14,18 36:4 | **discussions** 90:17 |
| **department** 17:8 23:24 50:15,17 107:19 108:6,7 111:4,10,12 117:5,7 | **describe** 70:7 75:19 79:4,8 79:15,16 121:17 | 39:2 41:16 44:15 64:14 77:21 78:1 97:2,3,8,17 105:1 107:20 107:21 | **dismiss** 132:4 **distinction** 46:21 **distribute** 43:13,19 |
| **departments** 107:20 | **described** 75:1 **describes** 29:22 | **digit** 34:4 | **distributed** 41:13 |
| **depends** 9:21 107:19 116:10 | 63:10 118:11 118:18 | **digital** 42:23 43:1 145:20,25 146:5 | **distributing** 105:7 |
| **depicting** 23:4 | **description** 94:18 | **direct** 14:25 | **distribution** 41:8,11,13 |
| **deponent** 1:16 4:5 7:4 8:5 9:10 11:9 146:19 | **destruction** 108:4 **detail** 62:24 | 17:10 38:2,2 **directbase** 6:14 124:23 125:4,6 | **distributor** 43:25 **district** 1:1,2 |
| **deposed** 11:20 | **determine** 36:6 36:11 44:19 51:22 | **directing** 63:1 **directly** 65:17 | 9:7 10:7,8 40:19 |
| **deposition** 1:15 5:5 7:3 8:4,10 8:11,20 9:19 | **detroit** 3:9 41:5 41:10,25 42:1 | 65:22 67:3 82:18 101:9 **director** 17:1 | **division** 69:16 130:11,13 |
| 10:4,10 14:2,8 14:21 17:21 18:11,12,15,24 | 42:5,5,7,12,13 42:14,17,18,22 43:3,6,7,8,24 | 18:1,2,6 **disclosed** 46:3 | **dm** 40:15,18 **doc** 85:20 |
| 18:25 19:3,14 19:20 34:25 40:12 44:25 | 44:11,11 45:23 46:22 **dictionaries** | **discovery** 34:20 **discuss** 13:1 | **document** 12:7 12:14,25 13:9 13:13,19,21 |
| 45:8,19 46:8,9 46:11 47:6 54:22 55:1,9 | 34:9 **dictionary** 29:16 34:19 | 14:12 32:1 120:9 **discussed** 93:16 | 14:11,19,23,24 15:1 17:11 20:16,21 21:3 |
| 55:11 62:16 68:5 69:10 78:11 85:10 | 63:9,13 **differences** 61:13 | 145:22 **discussing** 65:11 | 22:7,9 29:21 50:6 55:24 58:5 66:18,21 |
| 93:17 99:10 | | | 67:2,9,11 68:1 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[document - estimate]**

69:12 75:15 78:16,16 86:23 93:11 99:9,14 100:1,9,12,14 101:19,25 102:10 103:1,3 104:20 105:15 105:16,20 107:5,24 108:12 112:16 112:20 113:1 118:10,18 120:10 121:2 121:12 124:22 126:3

**documents** 19:2,12,17,19 45:12 57:7 99:20 100:9 101:4 105:23

**doing** 106:11 106:13 122:18

**dollars** 60:3 95:22

**double** 97:9

**drives** 125:6

**dropped** 64:16

**ds** 29:5

**duly** 11:10

**duties** 18:5 21:15

**duty** 82:4

**e**

**e** 2:1,1 3:1,1 28:22 64:1 72:7 147:1,1

**earlier** 73:7 81:21 129:17 131:25 133:10 135:11 140:3 140:13 143:11 143:21

**eastern** 1:2 10:7

**ed** 18:20 100:20

**edt** 9:10 64:25 88:8 128:8 146:18

**effect** 8:11 69:21 78:25 84:13 106:6 107:15 118:20

**effective** 78:23 86:6

**efficiency** 113:13

**effort** 98:25 99:20

**efforts** 98:16,19

**eight** 99:15

**either** 63:6 95:7 116:17 122:19

**elicit** 131:14

**email** 46:15 79:20,20,24 80:2,4,7,9

82:22,22,23 83:1,2,3,9,10 83:12,13 88:20 89:6,7 90:25 91:6,11,14,17 91:19,20 92:4 92:24 94:2,18 94:19,19 98:11 98:12 99:1,3 99:23 100:1 102:11 108:20 121:5 122:2,9 122:19 129:3,6 129:7,7,9,14,16 129:17,22 135:6,7 136:22 137:2,8,16,23 138:3,9,22 139:4,6,11,12 139:18,19 141:13,14,16 142:3,8,13 143:10,13,17 143:18 144:16 144:18,21 145:1,4,5,8,9 145:12,16 146:6

**emailed** 98:12 99:22

**emails** 83:4 91:24 104:17 129:20 142:10 145:18

**employed** 15:21,24 16:3 16:5 81:3,4,16 81:20

**employees** 102:5

**enabled** 13:2

**ended** 60:22 62:25 64:8 65:19

**ends** 25:2,3

**engaged** 74:20

**enhance** 70:11 70:15 140:25

**enhanced** 6:14 89:8 90:24 91:1,2 124:23 125:8 140:11

**enhancement** 74:14 75:23 82:24 83:10 135:12 139:21 140:16

**enhancing** 140:22

**entered** 88:16 118:3

**entire** 17:4 67:17

**entities** 39:10

**entity** 68:11 120:20

**ertel** 108:21

**estimate** 96:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[et - federal]**

et   10:6
etcetera   114:2
event   59:7
  87:18 120:21
events   120:19
  120:21
evidence   8:21
exact   96:18
examination
  4:1,6,7 9:12
  11:13 131:23
examined
  11:10
example   46:23
  114:20,22
exceed   96:12
excel   5:14
  19:21 49:14,19
  50:2 55:3
  65:10
except   8:17
exchange
  127:19 137:2
  143:13
excluded   67:18
exclusively
  117:25
excuse   84:11
  132:13
exhibit   5:4,8,12
  5:14,17,21 6:4
  6:8,12,17,20
  7:7,10,13,16
  12:7,11,14
  13:19,22,25

14:4 17:12
20:17,19 22:2
22:3,3,4,14,25
24:6,13 31:11
34:15 35:4
36:25 45:1,1
48:16 49:11,14
49:16,24 51:16
51:19,22,24
52:6,7,10,11,16
52:21 53:1,2
53:15,18,23
54:8,14,15,17
55:17,21 56:11
56:12,22 57:1
57:11,14,15,21
58:2,13,14
59:1,3,8,21
63:15,15 66:4
66:6,18 68:2,3
69:1,7,8 72:9
72:10,11,12,15
74:25 75:10
78:3,7,9 85:6,7
85:8,18,21
88:13 93:6
95:21 98:14
100:25 103:8
103:12,13
104:14,16,19
104:22,23
105:1,11,24
106:2 107:3,4
107:11 112:16
112:17,21

120:5,6 124:15
124:18 125:19
125:21,25
127:6,7
exhibits   5:1 6:1
  7:1 19:6,10,13
  30:15
exist   53:16 54:7
  102:16 117:17
existed   68:21
  101:18 103:1
  133:19
existence   99:17
existing   71:19
  84:20,24
  103:20,22,24
  104:10,16
  118:16 144:16
  145:2,3,6,13,14
exists   29:21
  40:3 55:2,7
  102:11 107:14
  119:9
exp   147:21,22
  147:23
expect   53:3
  98:22
expert   26:13
  49:2 62:2
  122:19
expiration
  27:12 61:2,5,7
  61:10,12,13,21
  63:17,19,23

expire   60:23,25
  62:3 64:11,13
expired   60:22
  61:25
expires   61:19
express   86:10
  86:11
extent   46:11
  90:16

**f**

f   147:1
facilitate
  122:23
fact   69:2 76:18
failed   63:6,7,9
fair   17:22 77:8
  122:8 145:6
fall   101:7,12,15
  109:10 133:16
fallen   99:25
falls   42:22
  101:5
familiar   19:22
  68:14 78:15
  87:18,22 106:4
  109:23 120:10
  124:7,13,24
  125:10 126:16
  127:2 130:7
far   84:12 96:12
  101:9
february   68:12
  77:3
federal   9:6

Page 12

**[fhedin - free]**

| | | | |
|---|---|---|---|
| **fhedin** 2:10 | **filed** 10:6 98:25 | 97:10 98:14 | 93:7,23 98:18 |
| **field** 28:15,25 | **files** 70:12,16 | 99:8,12,16 | 99:2,14,15 |
| 29:3,10,11,14 | 70:17,23,24 | 105:16 122:6 | 101:17,22,23 |
| 30:22,25 31:5 | 71:1,4 73:8 | 123:5 125:3 | 102:23 137:5 |
| 31:9 36:21 | 74:17,18 90:2 | **fisher** 2:14 | **formation** |
| 37:14,16,17,21 | 90:5,22 91:2 | **five** 16:1,4 | 21:20 |
| 38:9,11,16,22 | 92:12,16,18 | 22:13 60:2,3 | **formats** 62:17 |
| 40:15 48:17 | 97:24 98:9,9 | 95:22 121:5 | **formed** 21:5,7 |
| **fields** 29:18,22 | 102:15 108:11 | 123:5 127:24 | 21:10,15 42:6 |
| 34:10,18 67:10 | 108:24,25 | **flagship** 45:23 | 46:18 93:18 |
| **fifth** 15:1 36:25 | 109:2,6,8,10 | **flip** 80:6 | 121:21 |
| 48:16 51:21 | 110:22 111:25 | **floor** 2:15 | **former** 73:25 |
| **fifty** 95:15 | 112:1,6 113:24 | **florida** 2:8 | 74:3,7,16 75:2 |
| 121:4,14 | 114:16,17,18 | **folder** 19:6,7 | **forms** 80:21 |
| **figure** 60:16 | 115:6,18,20,22 | 98:11 | **found** 126:7 |
| **file** 5:14 19:21 | 117:11,16 | **follow** 13:6 | **foundation** |
| 46:24 49:14,19 | 120:3 125:8,10 | 71:16 127:25 | 96:23 102:7 |
| 49:20 50:2,13 | 125:15 129:25 | 128:10 | 110:18 111:22 |
| 55:13 65:10 | 139:23 140:4,9 | **following** 9:12 | 119:21 137:19 |
| 66:10,11 79:19 | 142:20,21,24 | 43:21 118:5 | 138:10 |
| 84:18,20 86:15 | **finance** 101:22 | **follows** 11:11 | **four** 146:15 |
| 89:4,5,8,13,13 | **financially** | **force** 8:11 | **fourth** 35:3 |
| 89:18 91:19,20 | 10:17 | **foregoing** 9:7 | 36:13 56:10,12 |
| 91:20 92:2,12 | **find** 98:19 | 127:21 147:4,7 | 86:3 |
| 98:19,23,23 | **finding** 57:23 | **forever** 111:15 | **fraietta** 2:12 |
| 99:1 105:7 | **first** 3:7 11:10 | **form** 7:13,14 | 10:25 11:1 |
| 106:1 108:23 | 22:24 23:2 | 8:17 19:15 | **frame** 17:17 |
| 110:11,19 | 24:1,5,12,16,19 | 20:13 21:22 | **frank** 2:4 10:23 |
| 111:9,12 | 24:23 25:3,10 | 31:22,24 34:11 | 11:16 26:5 |
| 129:22 135:6 | 27:1,3 28:5,21 | 38:17 43:15 | 72:3 77:13 |
| 135:14,22 | 29:4 30:6,25 | 52:12 53:10 | 88:1 102:10 |
| 136:5 139:18 | 31:22 32:12 | 54:8 58:6,20 | **free** 42:5,12 |
| 139:19 140:5,7 | 35:15 36:3,7 | 67:12 85:15 | 43:7 44:11 |
| 140:13,14 | 42:23,25 45:2 | 87:14,20,24 | 45:23 46:22 |
| | 79:22 83:21 | 88:14,15,24 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[friday - genesys]**

| | | | |
|---|---|---|---|
| **friday** 29:7 99:9 102:23 | 43:24 44:3,4 44:18 45:4,14 | 107:16 108:17 108:18,20 | 47:7,9 48:5,11 55:4 68:17 |
| **front** 22:7,8 49:25 88:25 | 45:21 46:3 47:1,21 49:14 | 109:12,25 110:4,9 112:2 | 90:17 92:19 99:11 100:8 |
| **ftp** 98:11 | 50:7 54:19 | 112:4,9,10,11 | 101:18,19 |
| **full** 8:12 11:24 | 55:6 56:4 | 115:17,19 | 103:1 113:21 |
| **funny** 118:13 | 58:23 62:17,19 | 117:13,21 | 114:4,14 126:6 |
| **further** 131:12 143:4 144:8 146:10,19 147:11 | 63:5 65:17,19 65:22 66:24 67:4 68:11,20 69:16 70:2,9 | 118:4,12,19 119:9,11,19 120:20 122:22 122:25 123:24 | 132:4,24 133:24 137:12 138:2,3,21 140:22 143:22 |
| **future** 31:8 | 71:2,19 72:16 72:17 73:18,22 | 124:10 126:17 127:19 128:11 | **gannett.com.** 98:13 |
| **g** | 74:3,7,8,12,18 74:20 75:6,6,8 | 129:1,21,21 130:11,12,13 | **gannett's** 6:4 **garbling** 71:9 |
| **g** 28:22 | 76:12,14,25 | 130:15,16,21 | **gary** 82:13 87:2 |
| **ga** 147:22 | 77:11,20 78:19 | 131:4 132:8,18 | 87:9 |
| **gain** 122:6 | 79:6,11,18 | 133:6 134:4,10 | **gatehouse** 5:21 |
| **gaining** 18:7 | 80:3,7,9,11,14 | 134:15 135:1,5 | 105:16 106:8 |
| **gannet** 7:8,17 | 80:24 81:3,10 | 135:5,15,17,17 | 106:12,14,15 |
| **gannett** 1:12,16 | 81:23 82:16 | 135:23,25 | 106:17,20,22 |
| 4:4 5:6,8 6:20 | 84:19,25 86:2 | 136:2,5,6,11,16 | 106:23 107:7 |
| 7:3 8:4 9:10 | 87:13 88:17,19 | 136:23,25 | 107:12 108:17 |
| 10:6 11:8 12:3 | 89:5,8,12 91:8 | 137:7,15,23,24 | **general** 18:9 |
| 14:2,20 15:15 | 91:14,15 92:3 | 138:6,17,18,23 | **generally** 45:14 |
| 15:22,25 16:8 | 92:5,17 93:11 | 139:5,11,17,19 | 70:7 79:16 |
| 16:15,18,24,25 | 93:13,18 94:2 | 139:21,22 | **generate** 50:20 |
| 17:4,25 18:6 | 94:19 95:18,23 | 140:4,6,24,25 | **generated** 23:7 |
| 20:1,5,10,13 | 96:4 98:5,10 | 141:13,24 | 23:20 30:7 |
| 21:18,25 23:16 | 98:16 99:13,16 | 142:2,7 143:12 | 50:13 |
| 23:21 25:22 | 100:1,21 | 143:17 144:4,5 | **generic** 94:1 |
| 28:17 32:2 | 101:24 102:5 | 144:15,21,25 | **genesys** 23:9 |
| 34:14 35:1 | 104:17 106:10 | 145:1,7,15 | 28:4 32:9 |
| 38:15 39:4,6 | 106:13,15,23 | **gannett's** 40:3 | 34:11,12 35:5 |
| 39:22 41:20,22 | 106:24 107:13 | 44:12 45:10 | 44:15 48:2,3 |
| 41:24 42:2,17 42:19 43:3,18 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[genesys - hedin]**

51:17 53:17 54:7 109:1 128:16,19,22 129:2,4,5,11,12 129:23,25

**getting** 72:5 91:9 122:18 140:18

**gics** 5:12 23:10 23:12 24:9 28:3,4 29:18

**gift** 28:7,9,13 28:14

**give** 25:18 34:9 49:12 82:6 97:20 122:25 123:25 127:24

**given** 137:12 138:3 145:4 146:14 147:8

**gives** 26:22 29:17

**glance** 59:6

**global** 102:5

**go** 10:1 31:10 32:4 35:2 36:24 49:11 51:25 55:23 56:10,11,16 64:16 75:14 76:19,20,21 77:2,13,16 78:5 84:15 85:5 86:16 95:20 103:7

104:3 105:8 107:23 113:6 113:24 114:4,9 114:11 115:4 129:2

**goes** 33:10 109:3 112:1

**going** 9:17,17 9:18 11:18 12:8 20:16 22:1,2 34:24 36:13 42:24 45:6,9 48:15 49:13 51:21 54:12,22,25 55:10,16 59:7 64:22 65:14 80:20 81:14 82:19 88:5 90:15,20 95:14 101:14 102:6 104:21 109:1 111:14 112:14 112:15 120:4 124:14 125:19 125:20 127:5 128:5 138:12 146:16

**gold** 123:7

**good** 9:16 10:23,25 11:2 11:14,15 30:21

**granular** 62:24

**great** 64:20 66:1

**ground** 11:23

**grounds** 8:19 99:8

**group** 20:13 107:21 108:9 120:19,23 124:7

**gui** 23:8,14,15 32:13 34:11

**guthrie** 28:21 40:9,11 58:16 58:20

**h**

**h** 1:20 8:6 9:1 28:22 72:7 147:19

**handled** 133:6

**happen** 102:14 115:8

**happening** 26:22 89:9

**happens** 26:15

**hard** 97:2

**hardy** 123:4,13 124:4

**head** 108:9 124:8 138:13

**header** 34:1,6 51:9

**headers** 63:11

**heading** 15:2,6 75:15 113:7 121:2,25 125:3

**heard** 9:24 76:3 120:14 124:22

127:14 130:18

**hearing** 147:9

**hearst** 6:20 127:20

**hedin** 2:4,6 4:6 4:8,10 10:23 10:24 11:13,16 12:13,17,19,23 12:24 13:5,12 13:18 14:10,18 19:18 20:21 22:1,6,13 24:21 26:6,7 30:6,13 31:21 32:3 34:8,17 35:2 38:18,20 43:16,18 45:15 46:15 47:11,19 47:20 49:18,24 52:13,15 53:13 54:12,20 55:7 55:12,16 56:18 57:12 58:19,25 62:15 63:3,16 65:4 66:1,8,14 66:17 67:13,20 67:24,25 68:6 69:11 71:10,15 71:17 72:4,6 72:25 73:6 77:15,22 78:2 78:6,12 85:11 85:23 88:3,12 90:22 97:6 99:13 100:4,7

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[hedin - information]**

102:13 103:4,5
103:13,15
104:21,25
105:6,10
110:21 112:2
112:14,19,25
119:6,10,14,25
120:4,8,14
121:9,11
123:18,19
124:14,16,21
125:20,23
126:2 127:5,9
127:14 128:9
131:11 134:19
134:23 135:10
135:21 136:14
137:5,18
138:10 139:2
139:25 141:3,8
141:11 142:6
143:4 144:10
144:13 146:10
**hedinllp.com**
  2:10
**held**  16:10
**helen**  1:16 4:5
  6:5 7:4 8:5
  9:11 10:4 11:9
  11:25 88:2
  146:14
**helps**  122:20
**history**  27:7,19
  53:19,20

**hold**  12:17 90:8
  92:6 120:11
**holder**  27:17
**holding**  107:7
**home**  24:2,4,5
**hon**  1:5
**honestly**  29:8
**honigman**  3:6
**honigman.com**
  3:11
**house**  100:23
  125:9 129:5
**housed**  135:16
**households**
  33:10
**houses**  129:13
**housing**  111:9
**howell**  71:24
  72:1,6 76:16
  76:17 77:10
  81:25 82:11
  87:16 90:6
  92:21 93:8,9
  120:1 130:1
**huh**  30:9 59:9
**hundred**  39:25
  95:15,24 96:4
  96:12,14 97:19
  107:8 121:4,13
**hurwitz**  80:24
  81:2,9

**i**

**idea**  123:21
**identification**
  12:12 20:20

22:5 49:17
66:7 68:4 69:9
78:10 85:9
104:24 112:18
120:7 124:19
126:1 127:8
**identified**  86:2
  86:20 98:17
  108:4,13
  131:16
**identifies**  36:22
**identifying**
  83:14
**ifs**  128:14
**ii**  104:8
**inadvertently**
  53:7
**inaudible**  70:2
**inbox**  98:17
**include**  27:11
  27:15 95:1,1
**included**  94:5
  94:13,24 111:5
  117:4 119:15
  137:16 139:12
**includes**  116:23
**including**  20:2
  20:6 45:3,22
  47:5 62:17
  99:21 119:19
**inclusive**  21:19
**incorporated**
  68:11 69:17
**incorrect**  63:4

**increase**  122:2
**index**  4:1 5:1
  7:1
**indicates**  25:6
  25:11 45:21
  60:2 62:2 99:3
**indicating**
  39:23
**individual**
  22:18 25:17
  53:6 93:24
**individually**
  1:7
**individuals**
  95:11 131:15
  143:16
**infobase**  7:13
  75:23 76:8,9
  77:4 82:23
  83:10 85:15,24
  88:14
**information**
  6:8,12 22:18
  25:16 26:7,17
  27:7,22 28:9
  28:13 29:1
  30:18,22,24
  31:2,23 32:23
  33:1,3 36:7
  37:4,5 38:16
  38:20 39:22
  40:3,7,15
  44:12 46:2,5
  46:22,23 47:21
  47:23 48:4,7

**[information - know]**

48:12 49:12 50:10 51:11 52:16 53:8,16 53:24 54:21 55:2,7,14 59:1 65:19 67:11,22 69:17 70:14 73:12,18 74:2 74:6,12,16 75:8 83:14 87:15 89:19,21 89:22 90:9,13 91:16 92:7,8 92:10,11 94:14 94:24 95:10 96:7 110:9,24 110:25 111:5 111:18 114:1 115:5,9,11,22 116:23 117:3 128:19,21,23 128:24,25 129:2,10,22 131:13 132:9 132:18 133:1,5 133:6 135:18 136:7,11,17 137:7,13,15,17 138:5,19 139:10 141:25 143:1,14,25 145:7,10,11,17

**informs** 6:6

**input** 89:5

**install** 135:6,14 135:23 136:5 139:18 140:5 140:13,14

**instance** 44:9

**instances** 71:18

**instruct** 111:12

**instructed** 112:3,10

**intended** 46:16

**intentionally** 53:12

**interested** 10:17 147:13

**interests** 126:13

**interface** 32:17

**internal** 18:20 135:18 139:20 139:21

**internally** 23:12 95:3,9 135:25 140:25

**internet** 9:22 65:6

**interrupt** 20:4 76:22 114:7

**interruption** 109:4

**introduce** 20:16 22:2 66:4 112:14,15 120:4 124:14

**introduced** 12:9

**introduces** 5:8

**involve** 91:8

**involved** 120:21

**involves** 122:9

**issue** 65:6 66:2 103:2 117:8 121:24

**issues** 131:8

**j**

**j** 28:22

**jack** 126:23,25 131:10,10

**jad** 3:4 11:2 18:20 31:21 34:8 45:16 47:11 54:12 62:15 65:13 67:13 100:5 102:20 119:6 131:12

**jad's** 19:8

**january** 105:17

**jay** 28:21 40:8 40:9

**joa** 42:1,8 43:2

**job** 1:24 16:7 16:14,24 17:25 18:5 21:15,16

**johnny** 1:7 5:12 10:5 22:19 24:13 45:12 56:19 132:19 136:17

**joint** 42:6,10

**journal** 45:4

**jsheikali** 3:11

**july** 17:18

**june** 1:17 9:9 9:18 86:7,7 87:19,23 88:23 89:3

**k**

**kathy** 126:23 126:25 131:10 131:10

**kept** 90:3,5 128:21

**kin** 147:12

**kind** 25:14 70:21 72:5 73:17 79:15 112:1

**knew** 98:22

**know** 13:1 14:12 15:2 20:25 22:6,10 26:14,19 27:1 28:16,18,22 29:8,13,19,19 29:25 30:11,12 31:7 32:4 33:14,15,20 34:2,7,15,22 37:11 39:1,18 40:1,2,6 41:3 45:7 47:14 49:6,19,22 53:19 57:3,20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[know - loading]**

58:4 61:13
62:24 63:1
66:10,14 67:13
68:7 69:23,24
71:8,10 75:12
76:2,3,3,4,6
78:12 80:16,18
81:11,14,15,20
82:14 84:12
85:3,12 86:12
87:17 89:25
90:4 91:25
92:22 93:2,7
93:11,14 95:7
95:8,9 96:16
98:1,2,3,4
102:18,18
103:10 105:3
105:13 106:4
107:16 108:22
109:7,9 110:11
110:12,18,19
110:25 111:2,4
111:16 112:21
113:4 114:23
115:2,21,22,23
115:23,25
116:2,7,8,24,24
117:2,10,14,18
118:14,15,21
118:22 120:9
121:22 122:14
123:19 124:2,3
124:6,7,8,17
126:18,24

127:10 129:19
129:24 130:2
130:23 131:1,5
131:12 141:18
142:1,7,14,16
142:20,21,23
**knowledge**
31:4 110:2
112:13 117:23
119:19
**knowledgeable**
77:11 86:23
87:14 107:10
108:2,8 117:16
117:19 131:8
**known** 23:12
**knows** 77:25
93:15,15
**kumar** 1:5

**l**

**l** 2:12 8:1 64:1
72:7,7
**large** 9:4
**larger** 66:10
**larkin** 18:21
100:20,21
**launch** 6:21
**laura** 1:20 8:6
9:1 10:14
147:19
**lauren** 123:4,13
124:4
**law** 2:5,13 3:5
**laws** 8:12

**lawsuit** 17:19
22:22 23:18
98:25
**lawyers** 11:17
**lays** 23:8
**lcr** 147:23
**leading** 8:17
49:4 134:20
136:14 137:5
137:18 138:11
139:25 141:3
**leads** 59:1
**learn** 73:13
**learned** 99:16
**leave** 122:14
**leaving** 102:2
**left** 24:22 37:14
40:25 67:18
81:12
**legal** 3:15
18:16,18,23
**letter** 31:15
33:17 34:5
**letters** 37:13
**license** 134:11
134:16 147:21
**likely** 42:25
94:5 96:7
107:20
**limit** 45:12,18
**limitation** 45:5
46:7 47:8
**limited** 46:5
137:9

**link** 64:2
**linked** 56:3
57:7
**list** 5:17 6:13
6:14 19:5,9
66:22,24 72:15
72:22 77:4
91:14 123:6,7
123:12,23
124:4,11,23
129:7,17 139:6
140:18 141:1
143:12
**listed** 15:6
17:17 24:22,24
35:11,18 53:15
54:14 72:21
75:12 79:18
87:9
**lists** 79:10
125:4,7,8
135:16,24
136:1 140:23
140:24
**litigation** 21:12
44:18 66:25
81:7 94:22
98:21 131:25
132:1 143:24
**little** 64:18 66:9
71:10
**llp** 2:6 3:6
**load** 66:9
**loading** 66:11
66:11

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[local - meaning]**

**local** 5:10 121:4,14
**localiq** 130:7,7 130:10,14,25
**locate** 99:1,1,20
**located** 101:19 126:6
**location** 10:10
**long** 15:24 16:10 53:20 111:17 118:13
**longer** 87:1,11
**look** 12:7,25 20:24 24:21 28:6 42:20 44:24 45:2 53:22 56:6 60:6 78:7 82:10 85:11 102:21 103:2,9 105:3,12 108:19 112:20 115:6 120:8 123:2 124:16 127:9,25
**looked** 112:23 112:24
**looking** 13:22 13:25 14:3,3 14:19 26:14 30:14 36:14 51:19 73:2 78:20 85:18 88:13 93:5 104:13

**looks** 14:5 33:4 49:2,3 51:11 52:20 54:2 82:20 98:8
**lookup** 143:11
**lot** 39:2 128:14
**lsc** 125:15
**lsc's** 125:6,7
**lunch** 64:24

**m**

**m** 41:5
**maaxsupport** 98:13
**made** 8:16 36:19 45:8 47:5 63:20 69:21 98:25 99:20 100:19 100:20 116:5 118:9
**magazine** 39:5 45:4 109:18 110:8
**mail** 38:2,2
**mailing** 125:4 137:1,9,25 138:7,24 139:8
**maintain** 89:16 89:20,22 101:25
**maintained** 62:18 89:17,24 92:13,14,17 102:2 117:13

**maintains** 62:18 112:4
**make** 8:18 98:16 136:7
**making** 132:7 132:17
**managed** 93:20
**manager** 40:20
**march** 64:8 90:12
**mark** 12:8 22:2 49:13 104:21 125:20 127:5
**marked** 7:1 12:11,14 13:19 13:22 17:11 19:6 20:19 22:4 31:11 49:16 66:6,18 68:2,4,25 69:9 74:25 75:10 78:7,10 85:9 104:23 112:17 112:20 120:6 124:18 125:25 127:7
**market** 33:6,7 33:9,12 103:19
**marketing** 6:22 16:9,11,14,16 16:18,24 17:1 17:2,6,7,9 18:3 18:6 27:16,23 103:18 120:21 127:3,15

135:18
**master** 108:11 108:23
**match** 141:18
**matched** 95:23
**matches** 57:24 58:1
**matching** 59:6
**material** 119:15
**materials** 27:22 27:23 45:3 100:2 104:20 108:4 119:11
**matter** 10:5 11:18 90:11
**mcclatchy** 6:21 127:20
**mean** 20:4 30:4 33:7 34:1,6,15 36:15 39:13 54:20 55:2 62:22 63:5 64:1 74:10 76:22 77:16 82:7 86:11,13 86:18 89:15 92:13 97:2 103:20 107:14 112:6 113:19 113:19 114:6 114:13 126:11 140:9 141:19
**meaning** 29:17 29:22 34:9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[meaning - newspaper]

63:10
**meaningful**
46:21
**means** 29:5,7
33:15 34:23
36:16 38:5
42:9 43:6
48:19 62:4,4
62:13 63:19,24
83:11
**media** 5:21
10:3 42:7,23
42:25 43:1
64:22 65:2
88:5,10 105:16
107:6,7 121:4
121:6,14 128:5
146:15
**memorialize**
65:14
**mentioned**
102:22
**merely** 103:23
**merged** 106:16
**merger** 97:3
**message** 36:14
**method** 41:9
59:22 60:11,18
**methods** 59:24
**miami** 2:8
**michigan** 1:2
3:9 5:17 10:8
41:15,18 46:1
67:5 119:20

**middle** 13:11
**million** 96:25
97:4,5,11,12,14
97:15 121:5
**mind** 64:18
72:2 88:1
**minimum**
95:24
**minute** 20:17
28:24 40:14
81:13 112:15
121:23
**minutes** 127:24
**missed** 26:12
**missing** 79:20
**misspoke** 73:7
**misstates** 142:4
**misunderstan...**
90:8
**mobile** 122:2
**moment** 80:23
**momentarily**
66:5
**monday** 29:7
**money** 60:7,18
63:21 65:17,22
**month** 50:22
119:16,17
**months** 85:2
116:11,15,18
**morning** 9:16
10:23,25 11:2
11:14,15
**motion** 46:24
55:13 132:4

**move** 132:14
**multiple** 25:21
38:1,4 39:13
105:11 106:3

**n**

**n** 2:1 3:1 8:1
64:1
**name** 10:12
11:16,24 28:20
28:21 41:10
42:3,21 43:2
50:22 55:24,25
56:19 57:7
76:2 77:21
80:8,10 87:1,4
87:10 108:22
124:8 129:13
137:1,9,25
139:7 141:15
142:17 143:1
143:13,17
145:23 146:1,5
146:7
**named** 22:18
22:22 108:20
123:4
**names** 39:18
56:3 73:19,22
73:23 74:9
78:1 115:23
116:23 117:4
119:14 129:8
129:20 138:7
138:23

**national** 3:7
5:10
**nationwide**
20:10
**necessarily**
55:4
**necessary** 8:15
**need** 49:12
55:20,23 64:15
65:9 113:11,21
114:14 137:24
146:1
**needed** 63:22
140:7
**neither** 147:11
**network** 5:9
6:9 19:23,25
20:7,14 21:4
21:10,14,21
41:13 46:18
69:17 93:18
120:15,17,23
121:17,20
124:3 133:11
133:12,17,20
133:21 134:1
**new** 2:16,16
20:13 107:6,7
**news** 42:5,13
42:14,22 43:8
44:11
**newspaper**
20:8 39:11
43:13,19,25
45:19 46:6,22

Page 20

**[newspaper - okay]**

| | | | |
|---|---|---|---|
| 59:11 65:17 116:12 117:22 144:23 | **noticing** 10:22 **november** 78:23 | **numerous** 47:5 | **okay** 11:4,22 12:6 13:14,14 |
| **newspapers** 20:9,11 21:20 39:7 44:7 45:22 70:6 71:7,13 95:4 | **nucleus** 6:22 127:3,15 **number** 5:2,15 5:18,24 6:2 7:14 10:8 12:8 | **o** | 13:17,18 14:10 14:14,18,22,25 15:5,14,21 16:3,7,17,20,23 17:16,24 18:14 |

**o** 8:1 72:7
**oath** 10:16
**object** 45:7 46:7,10 90:16 90:21 99:8 102:6 119:21 134:19 137:5
**objection** 19:15 21:22 38:17 43:15 46:17 52:12 53:10 96:23 110:17 111:22 134:22 135:10,21 136:14 137:18 138:10 139:2 139:25 141:3 142:4
**objections** 8:16 8:19 10:18 46:9
**obligations** 118:11
**obtained** 73:22 92:9,23
**occurred** 51:23 84:9
**offer** 46:14
**offered** 8:20 46:12
**oh** 13:14 40:17 59:5

**noticing** 10:22
**november** 78:23
**nucleus** 6:22 127:3,15
**number** 5:2,15 5:18,24 6:2 7:14 10:8 12:8 24:7,8,10,18 31:13,19 32:19 35:7,11,14,18 35:19 37:1 40:25 41:2 49:25 50:3 51:9 52:1,3,5 52:10 53:23 56:1,2,7,15 57:5,6,13,14,23 58:1,1,2,7,9 78:8,18 85:24 88:14,15 96:18 96:20 103:8 104:15,22 110:12 114:10 120:5 124:15 125:21 127:6 146:14
**numbers** 24:22 24:24 31:16 35:22,25 51:12 54:16 56:3 126:11
**numerical** 60:16

59:11 65:17 116:12 117:22 144:23
**newspapers** 20:9,11 21:20 39:7 44:7 45:22 70:6 71:7,13 95:4
**nichols** 1:20 8:6 9:1 10:14 147:19
**ninety** 49:5 97:18
**noncustomers** 73:24
**nonsubscriber** 73:8,11,17
**nonsubscribers** 71:5 80:17
**nope** 30:20
**nordheimer** 3:14 10:12
**normal** 113:12 113:22
**notary** 1:23 8:8 9:3 147:20
**notation** 77:21
**note** 9:19 45:17 46:17
**notes** 127:25
**notice** 5:4 12:22 14:1,8 14:21 44:25 46:9 62:16

**numerous** 47:5

**o**

**okay** 11:4,22 12:6 13:14,14 13:17,18 14:10 14:14,18,22,25 15:5,14,21 16:3,7,17,20,23 17:16,24 18:14 18:22 19:12,18 19:22,22 20:7 20:12,24 21:2 21:3,7,18 22:12 23:10,13 23:16 24:12 26:3 27:1,21 28:2 29:16 31:10 32:3,7 32:14,16 34:3 34:13 38:8 39:10 40:2 41:15 44:24 47:11,12,19,25 48:15,21 49:11 50:2,23 51:8 51:21 53:5 54:2,5,18,20 55:12,16 56:6 56:21 59:7,16 59:21 60:1,10 60:20 61:9,22 61:22 62:14 64:6,12,21 65:4 66:1,14 66:17,21 67:9 67:20,24,24,25 68:10,14 69:6

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[okay - parties]**

| | | | |
|---|---|---|---|
| 69:20 70:7,13 | 124:21 125:1 | 104:12,15 | **page** 4:3 5:2 |
| 70:15 71:1,23 | 126:2,5,16,20 | 110:7,16 | 6:2,8,12 7:6 |
| 72:21 73:12,17 | 127:2,18,23 | 111:20 136:4 | 15:1,3,4 17:12 |
| 74:2,11,15,24 | 128:2 130:1,5 | 136:20 137:8 | 25:3 72:12,14 |
| 75:17 76:5,17 | 131:7,11 | 137:23 138:9 | 72:25 73:2,3 |
| 76:25 77:15,22 | 138:15 141:22 | 145:9 146:1 | 75:14,18 77:2 |
| 78:2,15,22 | 142:16,25 | **orders** 80:24 | 80:20,20 83:23 |
| 79:4,15,21 | 144:8 145:4 | 82:4,7,7,10 | 83:24 84:15 |
| 80:1 81:2,9,17 | 146:7,9,12 | 104:15 | 95:21 98:14 |
| 81:23 82:13,19 | **once** 63:20 | **original** 55:24 | 103:9,14 104:3 |
| 83:1,12 84:7 | 123:16 139:19 | **outcome** 10:17 | 105:16 107:4 |
| 84:12,15 85:2 | **ones** 111:8,11 | **outline** 118:23 | 107:23 108:5 |
| 85:5,5,22,23 | **open** 49:20 | **outlined** 86:15 | 108:13,14 |
| 86:1,17 87:5 | 62:25 | **output** 98:8 | 109:10 113:7 |
| 87:18 88:4,12 | **operating** | 139:19,23 | 123:8,12 125:2 |
| 89:2,12,25 | 42:10 | **outset** 93:17 | 125:3 |
| 91:4,13,21 | **operation** 42:6 | **outside** 113:12 | **pages** 15:6 |
| 92:2,2,8,22 | **opinion** 96:6 | 113:22 | 22:24 23:2 |
| 93:16 95:8,16 | **opposite** 91:22 | **overlay** 32:15 | 75:19,22 |
| 96:10,15,19 | **oral** 9:11 | **oversaw** 18:7 | **paid** 60:2,8,18 |
| 97:10,16 98:8 | **order** 7:13,13 | **own** 41:12 | 64:11 101:21 |
| 102:13 103:4,7 | 80:21 84:1 | 43:14 106:22 | **paragraph** |
| 104:5,12 | 85:15,24,24 | 106:23 135:25 | 17:11,14 45:21 |
| 105:22 106:17 | 86:1,3,4,7,11 | 139:20,21 | 45:24 79:18 |
| 106:25 107:9 | 86:13,14,17,18 | 141:1 | 125:2,5,12 |
| 108:7 109:12 | 87:14,19,20,22 | **owned** 20:1,5 | **part** 42:19 |
| 112:25 113:3,6 | 87:24 88:14,15 | 42:19 | 84:18 |
| 113:10 114:8 | 88:20,22,24 | | **partially** 42:2,2 |
| 114:20 115:8 | 89:3 91:10,13 | **p** | **participants** |
| 115:14 116:12 | 93:7,23 96:8 | **p** 2:1,1 3:1,1 | 9:23 |
| 116:17 117:2,6 | 97:25 98:3,18 | 8:1 37:14 | **particular** 31:3 |
| 117:20 119:5,8 | 99:2,14,15,17 | **p.a.** 2:14 | 34:21 63:4 |
| 119:13,25 | 99:18,21 | **p.m.** 64:25 88:8 | 106:1 |
| 120:17,22 | 100:25 101:17 | 88:8 128:8,8 | **parties** 8:3,18 |
| 122:12 123:2 | 101:22 102:23 | 146:13,18 | 10:1,1 39:21 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[parties - placed]**

| | | | |
|---|---|---|---|
| 46:3 100:3 118:11 120:24 122:10 132:20 133:2 137:14 138:5 144:1 147:12 | **payor** 28:7,9 30:21 31:6 | 96:22 97:13 105:12 106:7,9 107:1,15 | 136:17 137:13 143:25 |

46:3 100:3
118:11 120:24
122:10 132:20
133:2 137:14
138:5 144:1
147:12
**partner** 41:20
**partners**
122:16
**partnership**
43:2 127:16
**party** 10:16
38:15,22,23,25
38:25 39:24
44:5 109:13
112:5,7,12
122:6 142:1
**past** 99:9
**paul** 71:25
91:24 93:2,4
**pause** 13:16
14:15 20:18
22:11 49:23
66:13,16 72:23
127:11
**pay** 102:17
**payment** 30:22
48:19,21 59:22
59:24 60:11,17
60:18 63:20,21
63:22 101:23
118:8,15,25
119:2
**payments** 55:3
109:4 146:2

**payor** 28:7,9
30:21 31:6
**pdf** 72:13
**pdfs** 19:21
**pending** 61:2,7
**people** 71:11
95:16 96:16,20
102:2 145:8,12
145:16,18
**percent** 40:1
107:8
**perform** 89:7
111:21 131:4
**performed**
21:16 101:12
102:15 145:6
**performing**
130:14
**period** 17:18,20
17:20,25 21:11
39:8,12 41:17
41:23 42:16
43:13 46:2,20
48:24 49:1,4,5
50:22,25 51:5
52:18,23 62:19
65:23,23 67:4
68:21 69:4,22
70:10,21 71:3
71:18 74:13,22
79:1 80:2 81:5
81:6,16,24
82:5 83:20
84:10,13 94:11
94:21,22 95:13

96:22 97:13
105:12 106:7,9
107:1,15
109:13,19
110:1,10,23
111:7,20 113:4
117:3,12
118:19,21
119:12,18
126:8 132:11
132:20,25
133:8 134:10
134:15 135:1
136:10,16,24
138:6,17
139:17 142:18
143:23 144:15
**periodic** 84:21
84:23
**permitted**
103:16
**perpetuity**
83:20 84:7
**person** 28:14
58:10 62:8
76:12 77:5
83:5 86:22,25
93:4,10 100:19
107:9 108:1,8
117:7,15
126:21,25
127:1 130:2
131:7 141:15
**personal**
132:18 133:1,5

136:17 137:13
143:25
**personally** 44:6
**personicx** 76:5
**persons** 67:3
73:21
**pertain** 64:7
**pertaining**
25:23 27:10,16
28:14 47:22
50:20 51:12
52:9 53:8 54:6
65:10 112:4
124:22 126:12
128:12
**pertains** 22:18
32:23 36:8
37:11 55:17,21
56:22 57:4,22
126:8
**pfraietta** 2:18
**phil** 10:25
**philip** 2:12
**phone** 40:25
41:2 123:6
**pi** 63:19
**pia** 61:13,20
62:3 64:10
**pick** 98:23
**piece** 79:23
**pieces** 79:23
**place** 69:3
**placed** 80:25
86:1,18 87:19
87:23 88:15,23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[placed - produced]**

89:3 99:15,17
104:13,15
**placing** 100:25
**plaintiff** 2:3
10:5,24 11:1
11:17 22:22
23:17,22 50:7
50:14 99:4
**plaintiffs** 1:10
5:1 6:1 12:11
14:1 20:19
22:4 46:13
49:16 66:6,25
68:2,3,25 69:7
69:8 74:25
75:10 78:7,9
85:7,8,20
99:12 100:14
104:14,23
112:17,21
120:6 124:18
125:25 127:7
**plaintiff's** 5:4
**play** 114:21
**please** 9:19
10:18 11:5,24
13:20 14:10
15:3 20:24
22:9 32:5
35:16 36:25
57:19 58:19
68:6,8 69:11
72:11 78:12
83:7 85:11
103:8 112:19

113:7
**point** 27:18
44:17,23 46:1
83:9 116:10
136:9
**policies** 105:2
105:11 106:3,6
106:9 107:10
107:14,21
108:3
**policy** 5:22
105:17 107:3
107:22 108:19
138:4
**popping** 66:4
**populated** 31:5
31:9
**position** 16:11
45:8 47:5
**positive** 107:8
**possess** 144:16
**possessed**
145:1,7,10
**possession** 55:4
**possible** 25:21
43:5 53:5
57:25 58:3
**posted** 98:10
**potentially**
86:18 115:2
**practice** 70:16
75:7 132:24
137:12 138:4
143:22

**practices** 18:9
45:10 47:7,9
74:21 75:1,5
75:11 120:22
133:18,23,24
**premarked**
85:6
**preparation**
40:12 98:20
**prepare** 18:11
18:14 63:6
**prepared** 15:18
**preparing**
18:23,25 19:3
19:14,19
**presence** 121:6
**present** 3:13
17:5
**presented**
115:16
**presently** 15:21
**president** 28:19
87:7
**press** 42:5,12
43:8 44:11
45:23 46:23
**previously** 7:1
68:1,4 69:9
78:10 85:9
91:5 104:13
**primarily**
18:17,23
**print** 6:17
126:5 145:3,14
145:22

**prior** 8:21
16:13,19,23
23:21 32:11
45:8 47:6
50:13 65:23
75:9 80:13,17
84:9 102:4
118:20 133:19
142:5
**privilege** 90:21
**probably** 95:15
107:18 126:23
**problem** 102:1
123:11
**procedure** 9:6
**proceed** 11:6
**proceeding**
10:18
**proceedings**
9:12
**process** 36:15
70:22 95:25
118:15 135:15
136:25 143:12
146:2
**processes** 18:7
**processing**
104:10
**produce** 31:24
54:21 55:2,8
58:21 63:7,9
99:4
**produced**
23:17 31:25
34:9 49:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [produced - put]

50:6 54:15,24 55:15 58:5 63:5 66:24 99:11 105:2 119:7

**product** 75:23 75:25 76:3,4,6 77:6 83:10 92:4 103:17 136:7 137:16 138:9,22 139:4 139:5,12 140:5 140:8,14

**production** 23:21 50:14 85:24

**products** 76:13 76:15 77:9,10 77:25 79:10,17 134:11 135:1,4 139:16

**professional** 1:22 8:7 9:2

**profile** 6:17 126:5

**program** 122:2 122:9 124:3

**programs** 103:18

**promotion** 28:25 29:11 123:7

**promotional** 27:16

**promotions** 6:9 121:2 122:15 122:23

**properly** 49:21

**properties** 5:10 21:18

**provide** 15:18 73:13 84:20 109:24 110:7,9 110:16 113:25 129:18 135:15 136:6,11,17 137:1,24 138:18 139:7 140:7 141:2 143:12,19

**provided** 9:6 72:18 79:5,11 79:17 83:3,13 83:15 93:5 109:5 110:15 111:6,19,19 113:15 116:19 116:20 123:24 124:23 129:8 129:18 134:12 135:13,14 137:7,15 138:7 138:23 139:11 139:23

**provides** 83:4 108:20 112:6

**providing** 70:9 117:20 134:5 138:4 139:6

140:24 141:20 143:24

**provision** 84:19

**provisions** 84:24

**pub** 37:13

**public** 1:23 8:8 9:4 70:5 147:20

**publication** 26:23,24 33:10 33:13 44:21 45:24 47:13 48:13 93:24 97:2,4,17 116:10

**publications** 20:1,6,9 41:20 42:11,15 47:1 48:5,6,8 74:7 93:20,21 95:17 96:12,17,21 97:9,18,22 106:21 133:7 133:16,18,19 144:24,25

**publish** 106:17

**published** 20:9 42:15,15 95:18 106:20 113:4 116:6 117:1

**publisher** 43:20 45:22

**publishers** 41:14,16 125:8

**publishing** 41:5 41:10,25 42:1 42:7,17,18 43:3,6,24 44:5 44:6

**pull** 53:6,7 78:2 113:11,21 114:14 115:9 115:11

**pulled** 51:16 102:25

**pulling** 12:21

**purchase** 27:11 122:17

**purchased** 39:20,23 60:21 61:24 63:18 65:16,21 67:3

**purchases** 45:3

**purpose** 74:11 139:22 145:15

**purposes** 21:12 30:4 115:7 117:24,25 135:19

**pursuant** 79:6 80:25 82:4 86:19 87:20,24 88:16,23 92:3 97:25 104:13 104:15 134:9

**put** 37:20 100:15 101:3 141:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[putative - referenced]**

| | | | |
|---|---|---|---|
| **putative** 2:3 | **quickly** 113:25 142:19 | **reasonable** 99:19 | 129:1,20 144:5 146:13,16 |

**q**

**qualified** 76:12
**quality** 9:21,22
**quarter** 116:16
 116:18
**quarterly** 85:1
 116:9 118:8
 119:17
**question** 28:18
 38:19 43:17,22
 45:15,17 47:16
 47:18 49:13
 52:14 57:18
 61:14 71:11,14
 71:16 75:4
 92:21 110:6
 113:16 115:13
 115:15 120:1
 121:10 128:10
 130:5 144:11
**questions** 8:17
 8:17 11:19
 21:1 34:18
 62:11,20,23
 63:1,8 65:9
 76:13,24 77:5
 86:24 106:5
 126:21 130:6
 131:16,18,21
 134:20 141:7
 144:9 147:5
**quick** 59:6
 113:13

**quite** 12:15
 72:4 105:4

**r**

**r** 2:1 3:1 28:22
 61:14,20,23
 147:1
**ran** 102:24
**rate** 141:18
**reach** 65:8
 96:13
**reachlocal**
 130:19,21,25
 131:3
**reactivation**
 83:2
**read** 127:12
**reader** 6:18
**reading** 8:9
**ready** 13:1
 14:12 20:25
 22:10 105:3,13
 105:14 112:22
 120:9 124:17
 127:10
**really** 44:22
 63:1 79:22
 131:19
**realtime** 1:21
 8:7 9:2
**reason** 94:10
 94:15,20,23,25
 95:5

**reasonably**
 103:21
**rebecca** 124:9
**rebranded**
 130:25
**recall** 20:15
 31:8 42:3,21
 44:8 131:24
 132:3,7,16
 134:5
**receipts** 94:12
**receive** 110:3
 135:24 137:2
**received** 28:12
 44:25 46:8
 48:19,22 76:14
 89:14,18,19
 90:23 102:16
 112:11 139:19
**receiving** 43:7
 43:9
**recognize**
 107:5
**recollection**
 21:4 78:4
**record** 9:18
 10:2,21 11:24
 14:16 15:11
 24:9 64:16,23
 65:3 77:14,17
 78:5 80:2,3
 88:6,11 108:2
 108:12 128:6

**recorded** 9:24
 10:4
**recording** 9:21
 9:25
**records** 5:21
 24:16 25:15
 33:22 55:3,5
 67:22 71:21
 74:16 84:21,24
 95:24 96:5
 104:9 105:17
 107:16,24
 110:14 111:5
**red** 48:17
**redacted** 67:9
**redaction**
 67:16,19
**redirect** 141:9
**reduced** 147:6
**reexamination**
 4:8,9,10
 141:11 143:9
 144:13
**refer** 24:13
 41:7 68:1
 140:19
**reference** 39:1
 43:5 75:22
**referenced** 7:2
 68:5 69:10
 78:11 85:10
 98:18 125:11

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[references - resided]

**references**
43:11
**referencing**
49:9,10 123:22
124:5
**referring** 17:19
27:2 30:19
51:24 61:3
70:16 73:1
82:9,21 83:7
91:2,5,10
108:16 140:14
140:21,23
**reflect** 25:16
34:22 37:16,17
59:11,22 60:7
64:4 92:23
**reflected** 26:8
26:17 27:6,7
44:1,13 50:25
51:5 52:6
87:15 100:25
**reflects** 36:7
50:10 59:4
60:13 61:23
67:2
**refresh** 21:3
78:4
**regarding**
100:2 135:12
140:3
**regardless** 45:7
**registered** 1:22
8:7 9:2

**regularly**
113:11,20
**relate** 47:7
**related** 10:16
108:2
**relating** 8:13
**relationship**
68:17,20
103:22 118:12
118:18 124:11
126:17,18,22
**relevance**
107:1
**relevant** 17:18
17:20,24 21:11
39:8,12 41:17
41:23 42:16
43:12 46:2,20
47:14 50:25
51:5 52:18,23
62:18 65:22,23
67:4 68:21
69:4,22 70:9
70:20 71:2,18
74:13,21 79:1
79:24 80:1
81:6 82:5
84:10,13 94:11
94:21 95:12
96:21 97:13
106:7 107:1,15
109:13,19
110:1,10,22
111:6,20 117:3
117:12 118:19

118:20 119:12
119:18 126:8
132:10,19
134:10 138:6
138:17 139:17
142:18 143:23
144:15
**remind** 117:6
**remote** 1:15
**remotely** 9:9
10:11
**renewed** 69:1
**reopen** 34:25
55:9,11 131:14
**repeat** 35:16
51:2 57:18
87:21 137:20
138:12
**rephrase** 38:18
43:16 52:13
110:6 138:16
**report** 98:11,17
99:2,21 110:12
116:6 117:1
**reported** 1:19
**reporter** 1:21
1:23 8:7,7 9:2
9:3 10:13 11:5
30:1 64:15
71:9 121:7
123:15 125:22
**repositories**
100:13
**represent** 29:4
33:17 36:21

45:11,25 48:18
99:25 126:7
**representation**
132:8,17
**representative**
12:3 36:19
**representing**
10:12 11:17
**represents**
29:14 31:18
147:7
**reproduced**
31:22 58:23
**request** 31:21
32:2 33:4 34:8
34:14 54:13
100:9,15 101:3
102:13 114:18
119:6 131:13
**requested**
50:22 100:16
100:17 113:12
113:22 114:14
**requesting** 82:8
**requests** 54:19
100:14,19,20
113:13,14,23
**required** 84:19
111:16
**requirements**
84:19
**requires** 146:5
**reserve** 131:13
**resided** 67:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[residents - sabbag's]**

residents 46:1
resides 128:23
resolve 65:9
  66:2
respect 22:24
  23:2 45:10
  75:2,5,7 91:13
  107:14 117:22
  133:4,15,24
  136:22 138:2
  138:21 139:3
  139:15,16
  140:4,12
  143:10,16
respective 8:3
responded 38:2
response 25:18
  92:24 100:9,14
  131:16
responses
  113:13
responsive
  45:11 100:8
  102:25
rest 29:8
restarted 25:20
restate 13:20
restored
  102:17
restrictions
  103:16
result 133:25
  147:13
retain 92:5
  139:23

retained
  146:15
retaining 18:8
retention 5:22
  29:10 104:20
  105:2,17 106:3
  107:10,17,24
  108:3,3,19
return 83:15
  89:8
returned 92:3
reveal 48:11
revealed 26:24
  47:14
reverse 83:12
  88:20 89:7
  91:6,11,18
  92:4 94:2,18
  94:19 129:6,16
  129:19 135:7
  139:4,11,18
  141:14 143:10
  143:18 145:5
review 12:25
  14:10 19:2,19
  22:9
reviewed 19:13
  19:17
reviewing
  13:13
rick 108:10
  117:9,10,15,15
ridiculous
  55:13

right 12:1,23
  13:13 14:5,7
  23:18 24:17
  25:10 27:4
  29:23 31:12,16
  31:23 34:25
  35:2,11 36:1,4
  36:24 37:9,14
  38:12 40:16,22
  40:25 41:5
  44:17 49:9,18
  50:4 51:13
  52:18,23 54:9
  56:1,4,23 58:6
  58:11 64:9
  67:20 68:22
  69:4,18 78:23
  82:24 85:14,16
  87:6,10,11
  91:17 93:22
  94:3,4,14
  98:24 100:12
  103:5,11
  105:15,18
  112:19 115:19
  123:3,4,12
  125:18 127:23
  128:1 129:15
  130:5,22
  131:14 137:25
  142:18
rights 118:11
romero 131:10
route 36:23

row 40:21
  54:10 59:19
  60:1,7 61:9,22
rows 50:3
  53:24,24 56:7
  56:21,25 57:4
  57:15,21 59:3
  59:8 61:1,16
  64:6
rule 5:4 14:1,20
rules 8:13 9:6
  11:23
run 122:24

**s**

s 2:1,4 3:1 8:1
  64:1
sabbag 1:7
  5:12 10:6
  22:19,21 24:13
  25:7 28:12
  38:14,22 43:6
  43:25 44:10,20
  45:13,13 47:4
  47:13,22 48:12
  50:20,24 51:4
  52:17 53:9
  54:16 55:17,22
  56:19 57:4,22
  65:11,16 67:18
  128:12 132:19
  136:18 144:5
sabbag's 32:23
  37:8 45:2
  50:10 56:22
  57:7 67:10,21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[sabbag's - seek]**

| | | | |
|---|---|---|---|
| 141:24,25 | **schedules** | **screenshots** | 80:19,21 82:4 |
| 142:2,8,17 | 69:15 106:3 | 22:14 23:3,6 | 82:10,20 83:24 |
| 143:1 | **scope** 45:18 | 23:17,21 24:6 | 84:16,18 86:3 |
| **saith** 146:19 | 46:7,11 | 24:12,17,23 | 86:3 95:22 |
| **satellite** 69:16 | **screen** 9:24 | 32:11 51:19 | 103:15 104:7,8 |
| **satisfied** 113:14 | 12:10 13:3,10 | **sdk** 1:4 10:9 | 104:9 123:3 |
| **satisfy** 114:18 | 14:9 19:7,8 | **search** 47:21,25 | **see** 12:13,19 |
| **saw** 99:9 | 20:22 26:16 | 50:21 98:17 | 17:13 19:5,8,9 |
| **saying** 25:25 | 27:3,4,19,25 | 100:5,8 101:4 | 22:13 23:25 |
| 43:23,23 46:16 | 28:2,5 29:4 | 101:10 102:4,9 | 24:19 28:6,24 |
| 53:14 98:24 | 30:7,10,14,25 | 102:14,24 | 29:10 30:21 |
| **says** 14:11,20 | 31:22 33:2,22 | **searchable** | 31:11 32:19 |
| 17:13 27:4 | 35:3,3,14,15,17 | 102:12 | 33:23 38:8 |
| 28:7,9 31:12 | 35:19 36:3,4,7 | **searched** 44:19 | 40:14,22 49:5 |
| 33:18 34:4 | 36:13,25 37:3 | 45:13 100:11 | 49:7 51:8 52:1 |
| 40:22 41:4,5 | 37:4 38:9 | 100:13 | 53:3,23 54:10 |
| 45:8,24 60:2 | 51:22,23 52:1 | **searches** 45:11 | 55:24,24 56:1 |
| 66:11 69:16 | 52:2,4,6,10,21 | 45:12 47:14 | 56:2,8,14,19 |
| 73:3 80:21 | 52:25 53:18 | 48:11 100:1 | 58:7,23 59:6 |
| 83:17 86:10 | 54:6 56:11,12 | 101:12,14,15 | 59:16 61:11 |
| 95:22 99:22 | 57:8,9,10,11,13 | **second** 18:10 | 66:17 75:19,23 |
| 103:17 104:6 | 58:2,8 59:1 | 24:20 25:3,6 | 80:19 83:22,25 |
| 105:6 113:10 | 66:5,15 132:15 | 27:4 31:10,25 | 84:16 95:21 |
| 121:3,25 123:5 | **screens** 22:14 | 35:13,15,19 | 96:1 98:13 |
| 125:5 | 22:17 24:1 | 36:4 49:15 | 102:10 103:2 |
| **scenario** | 26:13 27:2 | 67:24 76:11 | 103:17,25 |
| 143:19 144:14 | 32:13 35:11,23 | 79:23 80:20 | 104:6 113:10 |
| **scenarios** | 36:1,9 49:3 | 83:8 95:20 | 114:9 119:9 |
| 140:22,23 | **screenshot** | 97:20 103:6 | 121:1,11,24 |
| **schedule** 75:15 | 24:19,20 30:7 | 104:2,25 | 122:5 123:10 |
| 77:3 79:6,12 | 31:11,25 32:4 | 109:12 112:16 | 125:1,5 127:24 |
| 82:20 83:18 | 32:8,22 35:4 | 121:1,12 | **seeing** 99:9 |
| 84:2,9,16 | 44:1 48:16 | 124:10 125:2,2 | **seek** 45:25 |
| 119:1,3 | 58:10,17,20 | **section** 28:6 | 90:14 |
| | | 29:1 79:8,10 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[seen - shown]**

| | | | |
|---|---|---|---|
| **seen** 9:23 14:22 | **sentence** 121:1 | 129:16 130:15 | 73:4 77:13,18 |
| 38:3 78:16 | 121:12,16 | 134:4,11,16 | 77:23 85:19 |
| 105:20,22 | **separate** 24:9 | 135:5,13 | 88:1 90:15,20 |
| **selected** 24:5 | 25:22 44:16 | **set** 97:2,4,18 | 96:23 99:7,24 |
| **sell** 39:15 | 51:12 69:25 | 111:8 | 102:6,9,21 |
| **send** 39:15 | 70:4,4 130:11 | **seven** 31:16 | 103:11,14 |
| 70:23,24 74:17 | **separated** 95:3 | **seventeen** 19:5 | 105:4,9 110:17 |
| 74:17 79:19,24 | 95:4 | 19:9,11,13 | 111:22 112:24 |
| 80:3,9,10 91:3 | **separately** | **seventh** 17:11 | 119:8,13,21,23 |
| 91:14,15,19 | 49:21 93:20 | 72:12 | 120:11 131:17 |
| 95:24 112:7 | 133:6 | **several** 69:1,15 | 131:20,23 |
| 114:16 115:10 | **september** | **shalina** 1:5 | 132:16 134:21 |
| 115:11 140:9 | 69:17 | **share** 13:3,10 | 134:24 135:11 |
| 142:9 145:16 | **serve** 109:17 | 19:6,7 49:20 | 135:22 136:15 |
| **sending** 71:2 | **service** 23:24 | 132:9,18,25 | 137:6,20,22 |
| 73:18,23 74:3 | 26:9,10,16 | **shared** 42:20 | 138:15 139:3 |
| 74:8,12 75:6,8 | 28:19 40:5,6 | 122:20 | 140:2 141:6 |
| 91:8 96:4 | 82:21 83:2,9 | **sharing** 137:13 | 142:4 143:6,9 |
| **sends** 91:19 | 89:7 91:6,7 | **sheet** 55:3 | 144:8 146:11 |
| 92:13 115:19 | 92:4,25 100:16 | **sheikali** 3:4 4:7 | **short** 72:3 |
| **senior** 16:9,11 | 101:5,16 109:4 | 4:9 11:2,3 | **shortly** 12:10 |
| 16:13 17:1 | 135:6,7,7,14,23 | 12:15,20 14:5 | 21:11 |
| 18:1,2,6 | 136:5,23 137:8 | 19:15 21:22 | **shots** 32:13 |
| **sent** 27:24 28:1 | 137:24 138:3 | 24:18 26:4 | **show** 27:19 |
| 46:15 73:7,11 | 141:19 143:18 | 30:10 32:1 | 60:21 61:18 |
| 89:22,23 90:25 | 145:5 | 34:13,24 38:17 | 65:21 74:24 |
| 96:7 97:21,22 | **services** 6:13 | 43:15 45:6 | 125:19 |
| 97:24 98:9 | 6:15 70:8 | 46:10 47:3,17 | **showing** 61:7 |
| 99:3 111:13 | 72:18 75:20 | 52:12 53:10 | **shown** 24:4,16 |
| 115:7 119:15 | 76:14 77:9,10 | 54:18,25 55:10 | 30:15 32:19 |
| 129:1,8,21 | 77:19 79:5,16 | 56:16 57:10 | 33:1 35:23 |
| 140:11 141:13 | 93:5 109:24 | 58:22 62:22 | 36:1,9 51:23 |
| 142:2,8,12,18 | 110:7,16 | 63:12 64:19 | 52:5,10,21,25 |
| 142:24 143:2 | 111:21 117:21 | 65:7,24 67:15 | 53:1,15,17,24 |
| 145:9,11 | 124:12,24 | 67:23 72:2 | 54:5,13,17 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[shown - stipulation]**

| | | | |
|---|---|---|---|
| 55:14 57:15 61:1,15 107:11 109:10 | 93:2,4,9 120:1 130:1 | 67:16 84:3 | **stands**  37:19 40:19 |
| **shows**  28:3 31:22 61:5,9 61:12,20 63:16 65:15 89:1 | **skip**  11:22 | **sound**  17:22 109:23 124:13 | **start**  14:14 25:19 27:9 29:7 37:12 46:19 89:21 121:9 |
| | **social**  121:6 | **sounded**  71:11 | |
| | **sold**  38:8,14,24 39:4,6,10,14,14 | **sounds**  34:14 | |
| | | **source**  37:16,21 76:23 84:18 140:4,7 | |
| **sic**  91:24 93:2,4 | **solutions**  3:15 6:22 127:3,15 | | **started**  26:1,1 27:20 37:8 38:2 49:4 52:22 54:6 65:18 72:5 |
| **side**  80:6 126:15,20,24 130:9 131:6,9 136:3 | **somebody** 64:16 98:22 108:20 124:9 | **sources**  37:22 | |
| | | **speak**  18:19 40:11 44:22 45:9 71:22 90:10 108:23 | |
| **signature**  8:9 147:18 | **sorry**  12:17 13:5,8,15,20 15:11 16:2,2 20:3 22:25 23:16 34:2 35:13,15,16 42:15 43:22 45:1 51:2 52:4 53:24 56:11 59:5 61:14,16 64:10 68:24 71:25 72:10,16 73:10 74:5 75:6 79:17 83:19 85:15,19 87:21 93:9 117:6 119:17 121:7,9 123:10 123:15,17,18 124:6 125:23 138:13 140:20 142:11 | | **starting**  37:23 37:24 38:4 59:12,24 107:4 |
| **signed**  81:21 82:1,2 | | **speaking**  70:8 | |
| **similarly**  1:8 | | **specific**  93:23 99:22 102:10 115:21 | **starts**  121:12 125:3 |
| **simply**  133:12 | | | **state**  9:4 10:19 10:20 11:24 41:15,18 110:12 147:20 |
| **simultaneous** 26:5 | | **specifically** 50:19 65:13 71:22 109:16 | |
| **sitting**  142:7 | | | **stated**  141:22 |
| **situated**  1:9 | | **specifics** 110:11,25 | **states**  1:1 9:7 10:7 60:3 |
| **situation**  97:8 144:20 | | **speculation** 138:11 140:1 | |
| | | | **statute**  46:21 |
| **six**  50:22 99:15 116:11,15,17 119:16,17 123:6 | | **spell**  28:22 | **stay**  30:10 |
| | | **spoke**  18:16,22 18:25 65:8 | **stenotypy** 147:5 |
| **size**  116:10 | | **spoken**  90:7 | **steve**  108:21 |
| **sizemore**  71:24 71:25 76:16,17 77:10 81:25 82:11 87:17 90:6,11,17 91:24 92:21 | | **spreadsheet** 50:9 51:1,6,13 | **stipulate**  65:15 67:21 |
| | | **stand**  29:9 40:18 | |
| | **sort**  26:12 27:15 46:7 | **standing**  86:4,7 86:11,13,14,17 | **stipulated**  8:2 65:25 |
| | | | **stipulation**  9:8 65:8,14 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[stop - take]**

| | | | |
|---|---|---|---|
| **stop**  25:19 27:9 49:6,7 64:14 | 138:18 144:22 145:3,19 146:5 | 109:25 110:4,8 115:18,20 144:4,4 | **swear**  11:5 |
| **stops**  62:8 | **subscribers** 18:8 48:8 | **subscriptions** 18:8 26:5 39:4 | **sworn**  11:10 |
| **store**  89:12,15 | 66:22 71:4,6 | 39:7,11 43:14 | **system**  19:7 23:3,5,8,11,14 |
| **stored**  53:20,20 128:13,13 | 71:12 74:1,3,7 | 45:4 46:6 | 24:9 25:22 |
| **strike**  23:1 35:21,24 39:5 | 74:17 75:2,9 | 50:11 52:17 | 26:8 27:21 |
| 41:22 52:4 | 80:17 110:15 | 65:16,21 67:3 | 28:3,4 29:18 |
| 132:23 136:21 | 114:2,10,23 | **subset**  82:23 | 32:7,10,12,15 |
| **stuff**  39:2 | 116:20 117:22 | 83:9 | 32:16 35:5 |
| **sub**  64:1 | 119:20 132:10 | **success**  125:6 | 44:15,16 48:2 |
| **subject**  69:3,21 | 133:1,5 137:14 | **sufficient**  65:20 | 48:3 49:20 |
| 80:14 | 138:8,24 | 141:14 | 50:24 51:15,17 |
| **submitted** | 143:25 145:14 | **suggest**  48:12 | 51:18 53:17 |
| 104:9 | 145:21,22,25 | **suite**  2:7 | 54:7 56:4 |
| **submitting** | **subscribership** | **sunday**  29:6 | 58:10 64:13 |
| 131:24 132:3 | 126:12 | **supervision** | 102:3 103:1 |
| **subpart**  103:16 | **subscribing** | 147:6 | 105:7 114:4,9 |
| **subpoena** | 33:11 144:5 | **support**  114:14 | 114:11 128:16 |
| 13:23 14:4 | **subscription** | 132:4 | 128:19 129:2,4 |
| **subscribe** | 25:23 27:12,13 | **supported** | 129:5,11,12,23 |
| 95:12,16 96:16 | 27:20 28:13,25 | 113:8,11,16,20 | **systems**  31:7 |
| 96:20 114:23 | 32:24 37:8,12 | 113:21 | 44:19 45:14 |
| 115:25 | 37:19,23,25 | **suppressing** | 93:15 101:18 |
| **subscribed** | 38:4,15,23 | 119:19 | 101:19 102:5 |
| 47:13 48:12 | 39:16,20,23 | **sure**  27:18 | 128:22,22 |
| **subscriber**  25:7 | 43:7,9 48:20 | 28:22 35:17 | **t** |
| 25:11 28:1 | 48:24,25 50:23 | 38:25 39:1 | **t**  8:1,1 28:22 |
| 44:10,14,20 | 51:3 52:21 | 40:3 43:21 | 33:17 147:1,1 |
| 47:4 48:4 | 59:11,23 60:4 | 51:3 58:4 61:4 | **tab**  14:11 24:1 |
| 62:19 66:23 | 60:21,24 61:6 | 62:2,12 83:8 | 24:2,4,5 26:9 |
| 116:19 128:23 | 61:10,19,24 | 90:4 100:18 | 26:10,18,20 |
| 132:9 136:6,11 | 62:6,8,9 63:17 | 116:22 137:20 | 27:3,8 |
| 137:17 138:5 | 64:2,8 65:18 | | **tabs**  23:25 |
| | 109:14,16,18 | | **take**  12:7,25 20:24 44:24 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[take - time]**

46:13 58:20 69:6 72:2 78:6 81:14,17 85:11 88:3 102:21 103:9 105:2,12 111:17 112:20 120:8 124:16 127:9 141:4

**taken** 8:5 10:4 30:8,12 32:8 58:16 147:4

**takes** 26:21

**talking** 57:8 60:25 93:12,13 105:25 118:23 123:16 129:17

**team** 18:16,18 18:23 23:24 58:18 100:16 100:16,17,24 101:4,6,8,13,16

**teams** 101:7,11

**technical** 65:6

**technically** 106:23

**technology** 10:11 107:24 108:2

**telephone** 24:22,24

**telesource** 76:9

**tell** 24:8 42:8 75:25 83:6,23 89:2 106:8 113:25 114:20

122:14 123:8 130:17

**tells** 115:24,25

**tenure** 17:4

**term** 33:15 62:7,12 83:17

**terminate** 84:3

**terminated** 83:21

**termination** 83:17 84:4,8

**terms** 62:11 86:19 104:4,8 126:12

**testified** 11:11 63:18 89:3 91:5,22 96:15 135:12 137:22 138:16 141:23 143:11,21

**testify** 46:25 47:7 77:19,24 100:5,8

**testifying** 12:2 15:14 63:14 91:7 140:15

**testimonial** 124:5

**testimonials** 123:3

**testimony** 15:19 131:14 134:5 142:5 146:14

**text** 33:18 36:14

**thank** 14:17 65:4 128:3,9 131:18 132:15

**thanks** 143:5

**thereto** 8:21 79:7 147:5

**thing** 26:13 47:12 66:3 127:13 130:3

**things** 26:23 39:3 64:14 116:25

**think** 10:9 16:5 42:24 55:3 62:22 64:15 66:9,15 67:15 67:16,18 77:14 77:20,23,25 81:19 82:15 91:9 94:17 107:19 108:8 116:14,15 118:8 124:9 128:20 144:14 144:20

**thinking** 31:8 73:15

**third** 32:4 35:13,17 38:15 38:22,23,25,25 39:24 44:5 46:3 100:3 103:9 109:13

112:5,7,11 113:6 120:24 122:10 123:11 132:20 133:2 137:14 138:5 142:1 144:1

**thirteen** 64:4

**thorough** 102:14

**thought** 96:15 97:10

**thousand** 95:15 95:23,24 96:4 96:13,14

**three** 15:5,8,16 15:19 33:22 34:5 35:21,22 35:25 36:9 85:2 95:24 96:4,12,13 135:1,4,5 139:16

**ticket** 122:17

**time** 8:19,20 10:19 17:17,18 17:19,20,24 21:11 25:20,24 26:1,2 39:8,12 41:17,23 42:16 43:8,12 46:2 46:19,20 48:6 48:9,24 49:1,3 50:25 51:5 52:18,23 62:18 65:23,23 67:4

**[time - trask]**

68:21 69:4,22
70:9,20 71:2
71:18 74:13,21
79:1 80:1 81:1
81:4,6,16,21,24
82:2,5,12,15
84:10,13 86:19
87:7 90:14
94:6,11,21,21
95:12,18 96:21
97:5,13 99:8
99:12,16
105:12 106:9
107:1,15
109:13,19,21
110:1,10,23
111:6,17,20
113:3,14,14
117:3,12
118:19,20
119:12,18
126:8 131:12
131:19 132:11
132:20,25
133:8 134:10
134:15 135:1
136:10,16,24
138:6,17
139:17 142:18
143:5,23
144:15 145:11
**timeframe**
86:20
**times** 47:5 69:1
85:4

**title** 16:8,14,25
17:2,6,9,25
21:25
**titled** 14:1
**titles** 17:8
**tmc** 33:4,5,18
**tn** 147:23
**today** 5:9 6:9
6:17 7:11
11:19 12:2
14:23 15:15
19:23,25 20:2
20:6,7,8,14
21:4,10,14,19
21:21 27:2,4
29:6 31:19
37:8,12 39:5,7
39:11 40:22,25
41:4,12,16,17
43:9,12,13,25
44:21,23 45:5
45:10,13,19,24
46:6,12,18,22
47:1,4,6,9,23
48:1,13 50:11
50:23 51:4
59:11 65:16
69:16 70:1,4
71:7,12 72:21
93:13,14,18
94:6,13,24
95:5,6,12 96:6
96:13 97:7,11
101:20 106:10
106:18 107:14

107:16 109:14
109:18 110:8
110:15 111:19
116:8,12,19
117:22 118:4
120:15,17,23
121:3,13,17,20
124:2 125:8,11
125:16 126:6
126:12,24
128:13 132:9
133:1,5,11,12
133:16,20,21
133:24 134:1
136:11 137:13
137:17 138:4,8
138:18,24
142:2,7,9,10
143:25 144:6
144:21
**today's** 18:11
18:12,15,24,25
19:3,14,20
40:12 146:13
**together**
122:16
**tom** 87:3 98:5
**took** 16:4 23:20
58:10 64:18
88:13
**top** 17:13 24:22
27:3,3 31:12
49:8 121:3,24
123:4,12 124:8

**topic** 45:2,7
62:15,21,23
63:8 72:5
**topics** 15:2,5,6
15:8,16,19
17:13 47:8
100:6
**total** 33:6,7,9
33:12 146:14
**transaction**
108:24,25
109:2,6,8
**transcript**
147:8,24
**transfer** 71:19
127:19 141:24
**transferred**
110:24 111:1
135:17
**transmissions**
80:15 94:12
116:4 119:20
125:15
**transmit** 112:3
112:10
**transmitted**
89:5,13,18
102:16 104:17
110:20,22
111:25 116:3
117:11
**transmitting**
120:24 122:9
**trask** 1:16 4:5
6:5 7:4 8:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[trask - usa]**

9:11 10:4 11:9 11:14,25 12:24 47:20 49:25 65:5 66:19 88:12 113:1 128:10 131:15 131:24 141:12 146:14

**trial** 8:19

**tribune** 6:21 127:20

**true** 56:25 97:1 141:12 142:1,6 147:7

**try** 66:11 105:7

**trying** 81:19

**turn** 68:7 69:12 72:9,10,11

**twenty** 15:5,8 15:16,19 60:2 60:3

**two** 22:24 23:2 24:1,5,12,16,23 27:2 32:11,12 34:4,4,5 42:11 51:12 54:14 64:14 69:24 79:23 95:4 97:19 116:11 121:3,13 131:2

**type** 19:18 31:2 33:21 53:16 54:13 71:1 74:2 86:3 90:13 110:3,9

111:18 124:4 128:24 130:3 131:3

**types** 108:4,12 108:12 109:9

**typewriting** 147:6

**typical** 26:15

**typically** 26:11 33:9

## u

**u** 8:1 28:22 37:14

**uh** 59:9

**unable** 36:12

**uncommon** 70:3

**under** 15:2,6 17:6 21:25 24:4 26:8,10 26:18 27:7 28:6,25 30:22 34:1,6 37:13 40:14 42:6,18 42:22 46:21 51:8 56:7 60:7 60:16 61:9,22 63:25 72:19 79:11 80:19 82:19 83:17 84:2,18 86:2,3 93:5 95:21 101:5,8,12,15 103:15,16 104:3,6,7

109:10 113:7 121:2,24 122:1 125:1,2 147:6

**underlying** 110:14

**understand** 21:23 22:21 53:13 93:22 114:13 121:8

**understanding** 23:23 91:18 92:6 107:6 132:22 134:25 139:5

**understands** 77:21

**unique** 35:22 35:25

**unit** 10:3

**united** 1:1 9:7 10:7 21:20 60:3

**uniting** 5:9

**unredacted** 67:12

**unwilling** 46:25

**update** 33:4

**updated** 33:18

**updates** 26:22 116:9

**ups** 127:25

**usa** 5:9 6:9,17 7:11 19:23,25 20:2,6,7,8,13 21:4,10,14,19

21:20 27:2,4 29:6 31:18 37:8,12 39:5,7 39:10 40:22,25 41:4,12,16,17 43:9,12,13,25 44:21,22 45:5 45:10,13,19,24 46:6,12,18,22 47:1,4,9,23 48:1,13 50:11 50:23 51:4 59:11 65:16 69:16 70:1,4 71:7,12 72:21 93:13,14,18 94:6,13,24 95:5,6,12 96:6 96:13 106:10 106:18 109:14 109:18 110:8 110:15 116:12 116:19 117:22 118:4 120:15 120:17,23 121:3,13,17,20 124:2 125:8,11 125:15 126:6 126:12,24 132:9 133:1,5 133:11,12,16 133:20,21,24 134:1 136:11 137:13,17 138:4,8,18,24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[usa - working]**

142:9,10
143:25 144:6
144:21
**usat** 5:19,24
**use** 41:16 44:4
109:13 134:11
134:15 135:18
135:25 136:5,7
137:8,23 138:2
138:9,21 140:5
140:7,13,25
141:5
**used** 29:25 30:1
30:3 43:24
92:9,11 103:17
103:19 109:15
122:23 135:1,4
135:5 136:23
139:16 146:15
**user** 32:17
**uses** 103:16
114:17
**using** 10:11
13:9
**ut** 31:15 37:13
**ut7357634**
32:20
**ut8037468** 35:8

**v**

**v** 37:19 38:5
**vacation** 26:11
27:9
**valid** 134:21
**value** 38:11,21
60:13 63:16

64:3 143:19
**values** 29:17,23
33:25 34:5,10
34:18,22 37:20
63:4,10,14
**various** 21:19
23:25 29:18,22
29:23 45:22
63:14 126:11
126:13 133:15
133:18 134:9
**vehicle** 133:13
**ventures** 6:10
120:15,18,19
120:23 121:18
121:20 124:3
**veritext** 3:15
10:12,14 19:7
146:16
**versus** 10:6
**vice** 28:19 87:7
**video** 1:15 9:25
10:4
**videographer**
3:14 9:16
10:13 13:2,7
13:14 64:17,21
65:1 88:4,9
128:4 132:13
146:12
**view** 49:19,21
**virtual** 10:11
**virtually** 9:20
**voluntarily**
37:18

**voluntary**
37:19
**vp** 16:9,11,13
16:16,17,23
**vs** 1:11

**w**

**w** 72:7
**wait** 12:17
85:15
**waived** 8:10
**walk** 25:14
70:21 114:12
122:12 146:4
**want** 13:3
34:15,17 47:2
66:3 67:25
100:4 102:18
106:4 127:12
127:24
**wanted** 13:10
73:8
**wants** 114:23
115:2
**warehoused**
109:1
**warrants** 104:7
**warranty** 104:3
**way** 21:15,16
41:24 89:10
102:4 136:25
143:11
**ways** 37:22,24
38:4
**web** 6:8,12

**website** 126:6
**week** 114:24
115:24
**weeks** 64:4
**wendy** 80:23
81:2,9
**went** 46:11
**wholesale**
71:20
**whoops** 64:10
**wide** 121:6
**wiki** 26:20,21
26:22
**witness** 8:10
9:11,23 11:5
13:12 34:18,21
45:16 46:25
47:12,15 62:20
63:7,7 77:19
100:4 147:9
**wondering**
126:10
**woodward** 3:8
**words** 121:13
133:23
**work** 13:8,8
82:16 117:23
121:17 122:16
125:4 131:3
141:5
**worked** 70:22
136:25 143:12
**working** 17:6
66:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[works - zoom]**

**works**  139:5
**wrapping**
  138:13
**write**  48:17
  49:5 51:23
  113:2
**writing**  47:6
**written**  45:3
  46:8 118:10,17
  119:2,11

**x**

**x**  114:2,24

**y**

**y**  60:6,9,17
  114:2,24
**y'all**  123:15
**yeah**  12:20
  13:8 23:6
  30:17 32:1
  34:17 53:24
  57:20 60:24
  61:17 64:17,19
  72:10 78:17
  85:20 88:3
  91:4 95:20
  106:2 108:15
  119:22 125:23
  131:20 141:2
**year**  16:1,4,12
  16:19 83:20
  96:5 113:5
  116:11 121:22
  130:17,23

**yearly**  119:16
**years**  69:2
  99:15,15
  116:11
**yellow**  14:11
**yep**  85:25
  134:7
**york**  2:16,16

**z**

**z**  60:7,9,10
  114:2,25
**zip**  110:13
  114:2,24
  115:23 116:25
**zoom**  9:9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.